## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREENFISH II, L.P., | : | |
| By and through its general partner | : | |
| PURPLEFISH, LLC; | : | |
| | : | CIVIL ACTION NO. |
| Roundstone Healthcare Partners III, LP, | : | |
| Roundstone Healthcare Partners IV, LP, | : | |
| Roundstone Healthcare Partners VI, LP, | : | COMPLAINT |
| Roundstone Healthcare Partners VII, LP, | : | CIVIL ACTION |
| Roundstone Healthcare Capital VIII, LP, | : | |
| JGUN Hospital Receivables Resolution | : | |
| Fund I, LP, and | : | JURY TRIAL DEMANDED |
| Roundstone Healthcare Capital X, LP | : | |
| By and through their general partner | : | |
| ROUNDSTONE HEALTHCARE | : | |
| PARTNERS, LLC; | : | |
| | : | |
| Roundstone Healthcare Capital V, LP, | : | |
| By and through their general partner | : | |
| ROUNDSTONE HEALTCARE CAPITAL | : | |
| MANAGEMENT V, LLC; | : | |
| | : | |
| Two Rivers Capital XI, LP | : | |
| By and through their general partner | : | |
| TWO RIVERS CAP MGMT, LLC; and | : | |
| | : | |
| ROUNDSTONE HEALTHCARE | : | |
| INVESTMENTS, LLC | : | |
| Plaintiffs, | : | |
| v. | : | |
| INTERNATIONAL PORTFOLIO, INC., | : | |
| RICHARD SHUSTERMAN, | : | |
| ROBERT FELDMAN | : | |
| MICHAEL ZOLDAN, | : | |
| DSP HOLDINGS, INC. d/b/a DEBT SALES | : | |
| PARTNERS, | : | |
| WILLIAM L. WEINER, ESQUIRE, | : | |
| PETER J. TUCCI, ESQUIRE, | : | |
| FOX ROTHSCHILD LLC, | : | |
| DUANE MORRIS LLC, | : | |
| GARY PERKISS, ESQUIRE, | : | |
| JOHN DOES 1-10 and | : | |
| JOHN DOE CORPORATIONS 1-10, | : | |
| Defendants. | : | |

Plaintiffs, individually or through their respective general partners, Purplefish LLC, Roundstone Healthcare Partners, LLC, Roundstone Healthcare Capital Management V, LLC, Two Rivers Cap Mgmt, LLC, and Roundstone Healthcare Investments, LLC (collectively, "Plaintiffs"), bring this action against Defendants Richard Shusterman ("Shusterman"), Robert Feldman ("Feldman"), Michael Zoldan ("Zoldan") and DSP Holdings, Inc. d/b/a Debt Sales Partners ("DSP") (collectively, the "RICO Defendants") and International Portfolio, Inc. ("IPI"), William L. Weiner, Esquire ("Weiner"), Peter J. Tucci, Esquire ("Tucci"), Fox Rothschild LLP ("Fox"), Duane Morris LLP ("Duane"), Gary Perkiss, Esquire ("Perkiss"), John Does 1-10 and John Doe Corporations 1-10 (collectively, the "Co-Defendants"). The RICO Defendants and the Co-Defendants are collectively referred to as "Defendants." Plaintiffs assert the claims alleged herein upon knowledge as to their own acts and otherwise upon information and belief as follows:

## I.     SUMMARY OF THE ACTION

1.     The RICO Defendants, with the assistance of the Co-Defendants, are responsible for orchestrating a widespread, premeditated pattern of deception and fraud (the "Fraudulent Scheme") in violation of the Racketeer Influenced and Corrupt Organization Act ("RICO") from at least 2007 through the present, and continuing, involving the direct solicitation of more than $100 million in investment money from Plaintiffs and other similarly situated purchasers ("Primary Investors") of discounted portfolios of medical receivables (the "Portfolios" or the "Funds") that Hospitals have written off as bad debt expense and IPI sold to Plaintiffs based upon the Defendants' deceptive representations and revenue projections. As part of the Fraudulent Scheme, the

RICO Defendants purposefully overstated the true value of the Portfolios sold to Plaintiffs and other Primary Investors and misrepresented the existence of a real secondary market of purchasers for the Portfolios that existed separate and apart from the primary investors for the stated purpose of reselling Plaintiffs' Portfolios to independent secondary buyers so as to create a theoretical substantial profit to Plaintiffs.

2.      As more fully set forth below, in furtherance of the Fraudulent Scheme, DSP, by and through Zoldan, artificially inflated the value of the Portfolios purchased by Plaintiffs through appraisal "Liquidation Letters," which enhanced the illusion that the Portfolios would be purchased by independent secondary buyers at a price higher than that being paid by Plaintiffs.

3.      In reality, IPI used a substantial portion of Plaintiffs' investment money to repurchase the Portfolios from Plaintiffs and other Primary Investors with representations that those Portfolios could be re-sold by IPI, with the assistance of the Defendants, to secondary-market investors at the price levels resulting in a promised profit to Plaintiffs.  However, rather than re-selling the Portfolios to true secondary-market investors, IPI, with the assistance of the others Defendants, merely re-sold the same Portfolios to other Primary Investors like Plaintiffs, based in whole or in part on an artificially inflated value provided by DSP, by and through Zoldan, coupled with similar misrepresentations regarding the existence of a real secondary market in which to re-sell the Portfolios.

4.      Absent the RICO Defendants' fraudulently created "secondary market" of buyers for the Portfolios, the true value of the Portfolios that Plaintiffs purchased from IPI were only a small fraction of the amount Plaintiffs paid.  Thus, Plaintiffs paid a price for the Portfolios they purchased from IPI based in large part upon the fraudulently created and manufactured

appearance of a secondary market of buyers for the repurchase of the Portfolios. The secondary market was manufactured by the RICO Defendants and was merely an illusion created by the RICO Defendants' fraudulent acts, with the assistance of the Co-Defendants, and in furtherance of the Fraudulent Scheme.

5.      The Fraudulent Scheme described above is believed to be part of a pattern of deceptive practices pursuant to which the RICO Defendants induced Plaintiffs and other Primary Investors to purchase Portfolios at artificially inflated values, with no real intention and/or ability to re-sell the Portfolios for the return on investment promised the Primary Investors. Even though the RICO Defendants knew and know there is no real secondary market of purchasers and/or re-purchasers of the Portfolios at the price levels they represented, they continued to fraudulently induce Primary Investors, like Plaintiffs, to continue to purchase additional Portfolios. To keep the Fraudulent Scheme alive, the RICO Defendants needed to continue bringing in new Primary Investors so that money invested by the new Primary Investors could be used to repurchase Portfolios from the prior Primary Investors, like Plaintiffs, at price levels resulting in a substantial profit to the prior Primary Investors, to bolster the illusion of a true secondary market and to facilitate additional sales of Portfolios in furtherance of the Fraudulent Scheme.

6.      The RICO Defendants engaged in a pattern of deception successfully designed to mislead Plaintiffs into believing in the existence of a secondary market, separate and apart from the Primary Investors, that would and could repurchase the Portfolios at sufficient price levels promised and represented by the RICO Defendants, to entice Plaintiffs to continue their purchasing relationship with IPI in order to continue the flow of funds from Plaintiffs to IPI, Shusterman, Feldman, Zoldan and DSP, in furtherance of the Fraudulent Scheme, for which

Shusterman, Feldman, Zoldan and DSP received substantial money from IPI or otherwise directly from the Primary Investors. The Co-Defendants assisted and participated with the RICO Defendants in their pattern of deception, concealed or suppressed the truth and/or misled and induced Plaintiffs into believing in the existence of a true secondary market, separate and apart from the Primary Investors, through which IPI would and could resell the Portfolios at prices higher than the prices paid by Plaintiffs.

7.      In addition to claims under RICO, Plaintiffs seek to hold one or more of the Defendants liable for breach of contract, fraudulent inducement, aiding and abetting, misrepresentations, unjust enrichment and/or conversion in connection with the Fraudulent Scheme.

## II.     PARTIES

8.      Plaintiff Greenfish Fund II, L.P., is a limited partnership organized and existing under the laws of the State of Delaware with a registered office at 1339 Chestnut Street, Suite 500, Philadelphia, Pennsylvania 19107 ("Greenfish II" ), which brings this action by and through its general partner, Purplefish, LLC, which is a limited liability company organized and existing under the laws of the State of Delaware and registered to do business in the Commonwealth of Pennsylvania, having a registered office at 1339 Chestnut Street, Suite 500, Philadelphia, Pennsylvania 19107.

9.      Plaintiffs Roundstone Healthcare Partners III, LP, Roundstone Healthcare Partners IV, LP, Roundstone Healthcare Partners VI, LP, Roundstone Healthcare Partners VII, LP, Roundstone Healthcare Capital VIII, LP, JGUN Hospital Receivables Resolution Fund I, LP, and Roundstone Healthcare Capital X, LP (collectively, the "Roundstone Funds") are each limited partnerships and are registered to do business in the State of Massachusetts, having a

registered office at 68 White St., Suite 7-183, Red Bank, New Jersey 07701, which bring this action by and through their general partner, Roundstone Healthcare Partners, LLC, a limited liability company registered to do business in the State of New Jersey and having a registered office at 68 White St., Suite 7-183, Red Bank, New Jersey 07701.

10.     Plaintiff Roundstone Healthcare Capital V, LP is a limited partnership registered to do business in the State of New Jersey, which brings this action by and through its general partner, Roundstone Healthcare Capital Management V, LLC, a limited liability company with a business address at 68 White Street, Suite 7-183, Red Bank, New Jersey, 07701.

11.     Plaintiff Two Rivers Healthcare Cap Mgmt, LLC (the "TR GP"), is a limited liability company and is registered to do business in the State of New Jersey having a registered office at 68 White St., Suite 7-183, Red Bank, New Jersey 07701 and is the General Partner of Two Rivers Healthcare Capital XI, LP (the "TR Fund").

12.     Plaintiff Roundstone Healthcare Investments, LLC is a limited liability company organized and existing under the laws of the State of Delaware with a business address at  289 Great Road, Suite 304, Acton, MA, 01720. (The TR Fund, Roundstone Funds, Roundstone Healthcare Capital Management V, LLC and Roundstone Healthcare Investments, LLC are collectively referred to hereinafter as "Roundstone").

13.     Defendant International Portfolio, Inc. ("IPI") is a business corporation organized and existing under the laws of the State of Delaware and is registered to do business in the Commonwealth of Pennsylvania having an office and place of business at 200 Barr Harbor Drive, Suite 400, West Conshohocken, Montgomery County, Pennsylvania.

14.     Defendant Richard Shusterman ("Shusterman") is an adult individual with a business address at Pan Asian Consulting Group LLC, 2255 Glades Road, Ste. 324A, Boca

Raton, Florida 33431. At all material times hereto, Shusterman was President and Director of IPI.

15.    Defendant Robert Feldman ("Feldman") is an adult individual residing at 1310 Fennimore Lane, Gladwyne, Pennsylvania. Upon information and belief, at all material times hereto, Feldman was a principal of defendant IPI.

16.    Defendant DSP Holdings, Inc., is a business corporation organized and existing under the laws of the State of Ohio with its principal place of business located at 36 Munroe Falls Avenue, Munroe Falls, Ohio 44262.

17.    Defendant Debt Sales Partners is, based upon information and belief, a trading name for DSP Holdings, Inc., with its principal place of business at 36 Munroe Falls Avenue, Munroe Falls, Ohio 44262. DSP holds itself out as the "leading technology company specializing in facilitating the sale of charged-off, sub-performing, and performing receivables through the use of Web technology." DSP Holdings, Inc. and Debt Sales Partners. are referred to collectively hereinafter as "DSP."

18.    Defendant Michael Zoldan ("Zoldan") is an adult individual residing in Ohio with a business address of 36 Munroe Falls Avenue, Munroe Falls, Ohio 44262. At all material times hereto, Zoldan was President of DSP.

19.    Defendants Shusterman, Feldman, Zoldan and DSP are referred to collectively herein as the "RICO Defendants."

20.    Defendant William L. Weiner, Esquire ("Weiner") is an adult individual having an office and principal place of business at Suite 200, 1940 Route 70 East, Cherry Hill, New Jersey 08003. At all material times hereto, Defendant Weiner was engaged by, and acting as legal counsel to, Defendant IPI, initially, through Fox Rothschild LLP and

later, through Duane Morris LLP.

21.    Defendant Peter J. Tucci, Esquire ("Tucci") is an adult individual having an office and principal place of business at 2700 Kelly Rd, Ste. 300, Warrington, PA 18976. At all material times hereto, Defendant Tucci was engaged by, and acting as legal counsel to, Defendant IPI, through Fox Rothschild, LLP.

22.    Defendant Fox Rothschild LLP ("Fox") is a limited liability partnership, with law offices throughout the United States and various foreign countries.

23.    At all times material hereto, numerous attorneys employed by Fox were engaged by, and acting as legal counsel to, Plaintiff Greenfish II in connection with its dealings with Defendant IPI.

24.    At all times material hereto, numerous attorneys employed by Fox were also engaged by, and acting as legal counsel to, Defendant IPI in connection with its dealings with Plaintiff Greenfish II.

25.    Defendant Duane Morris LLP ("Duane") is a limited liability partnership, with law offices throughout the United States and various foreign countries. At all times material hereto, numerous attorneys employed by Duane were engaged by, and acting as legal counsel to, Defendant IPI in connection with its dealings with Plaintiffs.

26.    Defendant Gary M. Perkiss, Esquire ("Perkiss") is an adult individual having an office and principal place of business at Noble Plaza, Ste. 313, 801 Old York Road, Jenkintown, PA.  Beginning on or about July 2010, Defendant Perkiss was engaged by, and acting as legal counsel to, Defendant IPI.

27.    Defendants JOHN DOES 1-10, names being fictitious, are individuals whose identities are currently unknown.

28.     Defendants JOHN DOE CORPORATIONS 1-10, names being fictitious, are entities whose identities are currently unknown.

29.     At all times material hereto, Defendants herein named as JOHN DOES 1-10 and JOHN DOE CORPORATIONS 1-10, and each and all of them, were in some manner responsible for the acts and/or omissions and damages and injuries as alleged herein.

30.     Defendants IPI, Weiner, Tucci, Fox, Duane, Perkiss, JOHN DOE 1-10 and JOHN DOE CORPORATIONS 1-10 are referred to collectively herein as the "Co-Defendants.

## III.     VENUE AND JURISDICTION

31.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331 as the complaint raises questions involving the laws of the United States under and pursuant to 18 U.S.C. §§1962(c) and (d); this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over the remaining claims as they are so related to claims in the action for which there is original jurisdiction as to form part of the same case or controversy.

32.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because many of the acts and practices complained of herein occurred in substantial part in this District.

33.     In connection with the acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce including, but not limited, to the United States mails, wire and internet.

## IV.     FACTUAL ALLEGATIONS

### THE INITIAL PITCH

34.     Plaintiffs all purchased Portfolios from IPI through various investment

funds. These Portfolios are a combination of unpaid insurance payments, medical debt not covered by insurance, workers' compensation claims, and the non-covered consumer portion of insurance claims (deductibles and co-insurance). The accounts, debts and claims (collectively "Accounts"), which subsequently were bundled in the Portfolios were purchased by IPI overwhelmingly from Jackson Memorial Hospital ("JMH") and Health Management Associates, Inc. ("HMA"). JMH and HMA are collectively referred to as the "Hospitals."

35.    Plaintiffs each purchased Portfolios pursuant to written contracts with IPI.  Each of the Portfolios was to contain "zero agency" medical debt - *i.e.,* debt Accounts that were held only by the original provider (here, the Hospitals) and not previously owned by any other collection entity or investor.

36.    Shusterman and Weiner misrepresented to Plaintiffs that numerous Accounts bundled in the Portfolios were zero agency debt accounts when, in fact, they were not.  The distinction was important to Plaintiffs because zero agency accounts are Accounts that were not previously owned, and were bought directly from the Hospitals and, therefore, Plaintiffs were willing to, and did in fact, pay more for purported zero agency Accounts.  For example, *see December 22, 200*9 letter from Weiner, on behalf of Duane and as counsel to IPI, a true and correct copy of which is attached hereto as Exhibit "A".

37.    In addition to selling the Portfolios to Plaintiffs, IPI agreed, at no cost to Plaintiffs, to oversee, monitor and remit collections from these Portfolios to Plaintiffs.

38.    Importantly, Defendants Weiner, Tucci, Zoldan and DSP, along with IPI, Shusterman and Feldman, as an inducement to Plaintiffs to purchase and continue to purchase the Portfolios, further misrepresented the existence of a secondary market of buyers for the

Portfolios that existed separate from IPI's own operations and apart from other Primary Investors, and through which IPI would and could resell the Portfolios.

39.     Tucci, on behalf of Fox and as counsel to IPI, drafted a letter dated December 16, 2008 on which Plaintiffs relied, and were intended to rely, in which Tucci explained IPI's business model to include, specifically, IPI's repurchase of portfolios of Accounts previously sold by IPI which may then be resold to various third parties, which bolstered the illusion of a true secondary market of Portfolio purchasers.  A true and correct copy of the December 16, 2008 correspondence is attached hereto as Exhibit "B".

40.     Weiner, on behalf of Duane and as counsel to IPI, likewise supported the existence of a secondary market of Portfolio purchasers in a December 17, 2009 letter to a Greenfish II representative, on which Greenfish II relied, and was intended to rely, in furtherance of the Fraudulent Scheme.  A true and correct copy of the December 17, 2009 correspondence is attached hereto as Exhibit "C".

41.     In furtherance of the Fraudulent Scheme, the IPI "process" with respect to the Accounts bundled in the Portfolios was represented to Plaintiffs as follows:

- IPI buys directly from the hospital and immediately resells to its investors. The price paid by the investor includes several services to be provided by IPI, including accessing the debt, assisting in servicing the Accounts (managing the outsourcing of collections) and reselling.

*Purchase:* IPI receives more than 30 data elements (patient name, date of service, social security number, previous payments, insurance data, etc.) from the Hospitals for each account prior to submitting a purchase proposal. In addition to this information, IPI supplements the data with fields relevant to determining a patient's ability to pay

(FICO  scores, home ownership and value, other assets, etc.).

*Post-Purchase/Collecting:* After buying, IPI develops a strategy for the file. IPI

scrubs the account data, begins collection (through a network of agencies and law

firms), monitors payments made directly to the Hospitals, and remits payments to its

investors.

*Sale:* IPI has tremendous contacts on the secondary market and will assist in

resale when the investor so desires.

42.     In the end, the only thing the RICO Defendants were doing was moving the

Accounts within the Portfolios among Primary Investors, since their alleged secondary market

actually was non-existent, so that when there were no new Primary Investors' investment funds

forthcoming, the IPI business model collapsed – a classic deceptive investment scheme.

43.     There is no real, true secondary market of Portfolio purchasers at the price levels

represented by the RICO Defendants.  Rather, IPI, with the assistance of the RICO Defendants

and the other Co-Defendants, has been paying monies to some Plaintiffs, while misrepresenting

the monies to be "sale proceeds" from the sale of some Portfolios in the secondary market, when,

in fact, those purported "sale proceeds" were, in reality, merely the proceeds from Portfolio sales

to other Plaintiffs and/or other Primary Investors and/or were proceeds from Portfolios

repurchased by IPI.

44.     The RICO Defendants have engaged in the Fraudulent Scheme outlined above for

their own personal gain.  Not only did IPI, Shusterman and Feldman breach the various

agreements IPI entered into with Plaintiffs, but Shusterman, Feldman and the other RICO

Defendants, with the assistance and participation of the Co-Defendants, engaged in various

fraudulent activities for their own personal gain, including but not limited to: selling Accounts

which were not zero agency – *i.e.,* representing that the Accounts were not previously owned when, in fact, they were; selling Portfolios that had been previously sold to other investors; selling the same Accounts, which were bundled into multiple Portfolios concurrently, to multiple parties; selling Accounts which were past the statute of limitations for collections; fraudulently creating the appearance of a real secondary market of buyers for the Portfolios and placing a value on the Portfolios based upon the existence of this purported secondary market; falsifying invoices; and converting and/or misappropriating monies belonging to Plaintiffs.

45.    The RICO Defendants, with the assistance and participation of the Co-Defendants, used IPI as the enterprise through which they carried out their racketeering activities. Over a more than five year period, through numerous meetings, telephone calls, emails, wired funds and letters, the RICO Defendants promoted the Fraudulent Scheme to benefit themselves (and the Co-Defendants) through illegally-obtained funding and related investments that were procured through Plaintiffs and others by deception, artifice and fraud. By fraudulently inducing Plaintiffs and other Primary Investors to enter into the agreements to purchase Portfolios as described in detail below, the RICO Defendants could continue their Fraudulent Scheme by using those very investments to mask and shield the non-existence of a true, secondary market of Portfolio purchasers willing to purchase at the price levels represented. Plaintiffs bring this Complaint to hold the RICO Defendants liable for their unlawful and disruptive actions, and to hold the Co-Defendants liable for their contribution to the maintenance and success of the Fraudulent Scheme, and then the cover up thereof, as detailed below.

46.    Other Primary Investors who, like Plaintiffs, were fraudulently induced to enter into agreements with IPI to purchase Portfolios, include, but are not limited to, JER Receivables LLC, Rosenberg & Associates, Inc., International Portfolio Access, LLC and Bill Howell who,

like Plaintiffs, have collectively incurred millions in damages as a result of the Fraudulent Scheme.

A.   **GREENFISH II**

47.   In 2007, Eric Raymond ("Raymond"), who had previously purchased medical debt portfolios from IPI for his own account, met with Feldman, a friend, and Feldman's brother-in-law, Shusterman, about creating a fund to acquire large amounts of medical debt portfolios from IPI.

48.   Raymond, induced by Shusterman and Feldman's sales pitch, sought to create Greenfish Fund, L.P. ("Greenfish I") for the purpose of buying a medical debt portfolio from IPI and, with the assistance of Fox, offered limited partnership interests therein.

49.   Raymond was further persuaded of the validity and profitability of purchasing medical debt portfolios from IPI by Shusterman's own 5% investment in Greenfish I, which, upon information and belief, Shusterman invested to create the appearance that purchasing debt portfolios from IPI was a worthy investment.

50.   After the apparent success of Greenfish I (achieving an approximately 30% IRR in just over one year), Raymond considered creating another larger fund to purchase medical debt portfolios from IPI, and thus sought reassurances that IPI, its business model, its promised secondary market of debt portfolio purchasers and its expected rate of return were reasonable.

51.   To that end, Raymond relied upon, among other things, a December 16, 2008 letter from Tucci, a Fox attorney who worked extensively with IPI, regarding how IPI works, which stated in part that there continues to be a strong pool of purchasers for uncollected medical debt. A true and correct copy of this correspondence is attached hereto as Exhibit "B".

52.     In addition, on January 9, 2009, Andrew Romberger, Esq., a Fox attorney working on behalf of Raymond, met with Tucci, as well as another Fox attorney representing IPI.

53.     Tucci and the other Fox attorney assured Romberger that IPI has in place appropriate controls to prevent the buying and selling of the same Accounts receivable, and that IPI buys its receivables from large, reputable Hospitals and institutions.

54.     Greenfish I's experience was used as an example of IPI's business model: IPI would sell Accounts receivable to the Primary Investor, then IPI made *de minimus* collection efforts on its behalf.  After a few months time, the Primary Investor would re-sell the Portfolios back to IPI, at a significant profit, and thereafter, IPI purportedly would re-sell the Portfolios to a third party in the secondary market for such Portfolios.

55.     Thereafter, Raymond requested and attended a follow-up meeting on January 20, 2009, also attended by Romberger, the Fox attorney present on behalf of Raymond, and Shusterman, Tucci and Weiner, all present on behalf of IPI.

56.     At this meeting, Shusterman offered the following assurances as to IPI's business model: IPI is in the business of acquiring and selling medical Accounts receivable, with others "holding" the Accounts; IPI does not generate revenue from managing and collecting the Portfolios; and IPI does not make money on the resale transactions.  Shusterman also explained that the receivables to be acquired can be resold at materially greater prices in a few months as a result of IPI, through its network of collection agents and law firms, "scrubbing" and "mining" the Accounts by verifying information, commencing litigation actions and/or obtaining judgments and other steps that increase the likelihood of payment and decreased the time for collection.

57.     Following the January 2009 meetings, Raymond, reasonably relying on Shusterman, Tucci, Weiner and Fox's misrepresentations regarding the strong secondary market, promised rate of return, and purported legitimacy of IPI, entered into Master Purchase Agreements (MPA) dated February 10, 2009 and September 29, 2009, respectively, with IPI (true and correct copies of the February 10, 2009 and September 29, 2009 MPAs are attached hereto collectively as Exhibit "D"), pursuant to which a new entity, Greenfish II, purchased:

a.      On February 25, 2009, a medical debt Portfolio containing Accounts having an aggregate face value of $10,453,540.30 for the sum of $1,149,889.44 ("Greenfish II Portfolio 1");

b.      On March 24, 2009 and April 9, 2009, medical debt Portfolios containing Accounts having an aggregate face value of $19,827,071.72 for the sum of $2,180,977.89 ("Greenfish II Portfolio 2");

c.      On April 16, 2009, medical debt Portfolios containing Accounts having an aggregate face value of $18,751,935.75 for the sum of $1,500,000.00 ("Greenfish II Portfolio 3");

d.      Between July 15, 2009 and August 3, 2009, medical debt Portfolios containing Accounts having an aggregate face value of $45,409,090.91 for the sum of $3,525,000.00 ("Greenfish II Portfolio 4");

e.      Between October 17, 2009 and December 29, 2009, medical debt Portfolios containing Accounts having an aggregate face value of $103,630,499.16 for the sum of $4,425,000 ("Greenfish II Portfolio 5").

58.     Under the terms of paragraph 3 of the MPA, IPI agreed, at no cost to Greenfish

II, to perform the following services:

    a.      Manage the Portfolios through the designation of collection agencies and/or law firms for collection and/or directly engage in activities to collect the amounts owing;

    b.      Assist in finding prospective buyers for the uncollected/remaining Portfolios;

    c.      Initiate collection activities by law firms and agencies; and

    d.      Prepare, execute, record and monitor all UCC-1 filings.

59.     Further, pursuant to paragraph 4 of the MPA, IPI agreed to remit all monies collected by the agencies twice monthly net of fees to the agencies and/or law firms. And, to the extent IPI received payments directly from the medical provider, IPI was to remit those sums to Greenfish II together with a report of collections.

60.     Fox assisted and/or participated in the drafting and/or negotiation of the MPAs referred to above.  For example, *see,* January 7, 2009 correspondence from Fox, a true and correct copy of which is attached hereto as Exhibit "E".

61.     Greenfish II made all required payments for the above-referenced Portfolios via electronic wire transfers.

    B.    **Roundstone and TR Funds (collectively, "Roundstone" Funds)**

62.     At some time in 2007, Roundstone representatives were made aware of IPI's medical debt selling business through an acquaintance, Bill Howell, who had invested in, and made a profit from, investing in medical debt portfolios. Howell had purchased from IPI a portfolio of medical receivables similar to the type purchased by Greenfish I, which Portfolio IPI thereafter re-purchased and purportedly resold to secondary market buyers, thus resulting in a substantial profit to Howell.

63.    In June 2007, Roundstone met with Shusterman and Feldman, and was induced to acquire Portfolios from IPI by promises of substantial returns from re-sales of Portfolios to IPI's secondary market purchasers, and IPI's unique expertise and connections in the medical debt purchasing business.

64.    In reasonable reliance on the representations made by Shusterman and Feldman as to the existence of a secondary market of purchasers, who would repurchase Portfolios at a price resulting in a substantial profit to Roundstone, as well as by Howell's historical success, Roundstone created numerous investment funds (the "Funds") to purchase hospital receivables from IPI with the reasonable expectation that such investments would generate returns for their investors through collection efforts and eventual resale by IPI of the Portfolios in the secondary market at price levels which would result in substantial profit to the Funds.

65.    Shusterman induced and intended to induce Roundstone into purchasing and continuing to purchase Portfolios based upon his misrepresentations as to the existence of a secondary market of purchasers, as well as a pattern and practice whereby IPI repurchased from Roundstone, at a profit to Roundstone, Portfolios that Roundstone purchased from IPI in 2007 and early 2008.

66.    To that end, Shusterman made repeated representations about third party purchasers with whom he, on behalf of IPI, dealt with and who could or would repurchase Portfolios sold to Roundstone by and through IPI, resulting in a substantial profit to Roundstone. For example,

a.    On December 13, 2007, Shusterman wrote Roundstone representatives to advise that "we are working with one of my consistent buyers to purchase your entire pool of

Accounts" and also pushed them to purchase another HMA file. A true and correct copy of the December 13, 2007 correspondence is attached hereto as Exhibit "F".

b.      On April 8, 2008, Shusterman wrote Roundstone representatives: "I wanted to let you know I worked long and hard to sell all three portfolios you own. I have them all sold." A true and correct copy of the April 8, 2008 correspondence is attached hereto as Exhibit "G".

67.      On September 7, 2008, Shusterman wrote Roundstone representatives to advise that "I have a buyer who has bought many portfolios from us in the past interested and ready to buy two portfolios you own." Shusterman also represented that "The attorney who wants to buy the file has purchased many portfolios from us in the past and will be looking to buy more files in the next month as well." Shusterman's advice was: "I suggest you sell the files. I have more portfolios ready for sale as well." A true and correct copy of the September 7, 2008 correspondence is attached hereto as Exhibit "H".

68.      Roundstone also reasonably relied upon Shusterman's false assurances of a strong, independent secondary buyer market, as well as steady, ever-increasing collection returns, which representations were knowingly false when made and made in furtherance of the Fraudulent Scheme to further induce Roundstone to continue purchasing Portfolios from IPI in the future. *See,* a true and correct copy of the October 8, 2007 correspondence, attached hereto as Exhibit "I".

69.      Throughout this time period, Shusterman, through deceptive representations, also sought to allay concerns about "outside forces" (*e.g.,* worsening credit impacting collections and/or valuing of the Portfolios; new collection companies as competition) expressed by Roundstone as they continued to raise additional funds for the subsequent

purchases set forth below. *See,* true and correct copies of January 2, 2008 and October 8, 2008 correspondence, attached hereto collectively as Exhibit "J".

70.    Shusterman similarly offered fraudulent explanations as to IPI's motives in pursuing their business model and misrepresented his own expertise and investment results to further induce Roundstone to continue purchasing Portfolios from IPI. *See,* true and correct copies of January 14, 2008 and February 22, 2008 correspondence, attached hereto collectively as Exhibit "K".

71.    Continuing throughout the spring and summer, 2008, Roundstone and IPI, through Shusterman and with the assistance and facilitation of Fox, entered into several additional purchase and repurchase agreements.

72.    As Roundstone continued to raise additional funds for the subsequent purchases set forth below, Roundstone representatives, in the course of securing new investors, and in an effort to protect its investors, continued to seek assurances of a real, independent secondary market of purchasers who would repurchase their Portfolios at prices resulting in a substantial profit to Roundstone.

73.    Attached hereto as Exhibit "L" is a summary of the ten (10) Portfolios Roundstone purchased from IPI from September 2008 through June 2010 (the "Roundstone Portfolios").

74.    Roundstone purchased the Roundstone Portfolios of hospital Accounts receivables from IPI and entered into purchase and sale agreements contracts whereby IPI agreed to manage the servicing and collection of the receivables. S*ee,* a true and correct copy of one of the purchase and sale agreements, which is similar in all material respects to the others, attached hereto as Exhibit "M".

75.    The purchase and sale for the Roundstone Portfolios were drafted, negotiated and/or otherwise facilitated by Fox.    S*ee,* a true and correct copy of December 23, 2008 correspondence, attached hereto as Exhibit "N".

76.    Roundstone made all required payments for the Roundstone Portfolios via electronic wire transfers.

## THE UNFULFILLED REPURCHASE AGREEMENTS

### A.    GREENFISH II

77.    In connection with the Portfolios purchased by Greenfish II referred to above, IPI, through its principals, Shusterman and Feldman, represented in various communications with Greenfish II that there were multiple secondary market buyers interested in acquiring the Greenfish II Portfolios 1 through 4. In fact, Shusterman and Feldman, facilitated by Co-Defendants Weiner, Tucci, Fox and/or Duane, falsely represented in various written communications that they had or could and would secure buyers for the Portfolios at prices resulting in a substantial profit to Greenfish II, and offered several different re-purchase proposals. IPI's legal counsel, Weiner, confirmed the "protocol" for those re-sales.   *See,* November 7, 2009 and December 5, 2009 emails from Shusterman to Raymond, true and correct copies of which are attached hereto collectively as Exhibit "O".

78.    In the December 5, 2009 correspondence, Shusterman represented that all the Accounts in the Portfolios would be repurchased by IPI and IPI then would insert additional Accounts owned by IPI into the Portfolios, thereby creating new Portfolios for sale.

79.    Greenfish II also relied upon an October 14, 2009 letter from Weiner regarding how IPI works, which references buyers unaffiliated with IPI to whom it sells its Portfolios, that IPI sometimes repurchases Portfolios to assist a buyer who has purchased Portfolios from IPI,

and importantly, that "IPI does not realize a profit on the management of Portfolios or on the repurchase of Portfolios."  Upon information and belief, this last statement was false when made and Weiner knew or should have known that it was false when made. Furthermore, all of Weiner's representations contained in the October 14, 2009 letter  induced, and were intended to induce, Greenfish II to purchase and/or continue purchasing Portfolios from IPI.  A true and correct copy of this correspondence is attached hereto as Exhibit "P".

80.    In reliance on the representations set forth above, on December 14, 2009, Greenfish II and IPI entered into four repurchase agreements whereby Greenfish II agreed to sell and IPI agreed to re-purchase, on behalf of third-party, secondary market buyers, the four (4) Portfolios previously purchased by Greenfish II.   True and correct copies of the Repurchase Agreements are attached hereto collectively as Exhibit "Q".    Pursuant to the repurchase agreements, IPI agreed to repurchase the Greenfish II Portfolios as follows:

a.    Greenfish II Portfolio 1 having a face value of $10,453,540.36 at a buy back rate of 15.8% for $1,650,000, to be paid in two installments with the first installment to be paid on March 10, 2010;

b.    Greenfish II Portfolio 2 having a face value of $19,827,071.72 at a buy back rate of 16.9% for $3,350,000, to be paid in four installments with the first installment to be paid on or before January 30, 2010;

c.    Greenfish II Portfolio 3 having a face value of $18,751,935.75 for $2,500,000, to be paid in four installments with the first installment to be paid on or before March 5, 2010; and

d.    Greenfish II Portfolio 4 having a face value of $45,409,090.91 for $4,550,000, to be paid in three installments with the first installment to be paid on or before March 25, 2010.

81.     Pursuant to each repurchase agreement (each, a "Repurchase Agreement" and collectively, the "Repurchase Agreements"), IPI, as the buyer, had the right to terminate any or all of the Repurchase Agreements upon the payment of 2% of the purchase price as liquidated damages, as well as the right to extend the closing dates for a period not to exceed sixty (60) calendar days. *See,* Repurchase Agreements at section 2.4(d)(ii).

82.     Beginning on or about January 29, 2010, IPI, by and through Duane, notified Greenfish II that it was exercising its right to extend the closing on the Repurchase Agreement for Portfolio 2 from January 30 to March 31, 2010.

83.     Thereafter, IPI, by and through Duane, notified Greenfish II that it was exercising its right to extend the closing on the remaining Repurchase Agreements as follows:

a.      On March 3, 2010, extending closing for Portfolio 3 from March 5 to May 4, 2010;

b.      On March 9, 2010, extending closing for Portfolio 1 from March 10 to May 9, 2010, as well as extending payment of the second installment until 60 days after closing, or until July 8, 2010; and

c.      On March 24, 2010, extending closing for Portfolio 4 from March 25 to May 24, 2010.

84.     Although IPI represented that it had numerous third party buyers interested in purchasing the Portfolios at price levels which would result in substantial profit to Greenfish II, and IPI entered into the Repurchase Agreements set forth above, IPI never identified the actual third party buyers.

85.     IPI, by and through Shusterman, continued to misrepresent that IPI was looking for and/or may or did have third-party purchasers for one or more of the Greenfish II Portfolios

in an effort to induce Greenfish II to agree to further extensions of the closing date(s).

86.     Because Greenfish II had entered into the Repurchase Agreements for the sale of Greenfish II Portfolios 1 through 4 (and before Greenfish II had been notified that the purported third party buyers were opting to extend the closing dates and/or cancel the Repurchase Agreements), Greenfish II agreed to and did acquire Greenfish II Portfolio 5 with a face value of $103,630,499.16 for the sum of $4,425,000.

87.     But for the entry into the Repurchase Agreements for Portfolios 1-4, Greenfish II would not have agreed to purchase Greenfish II  Portfolio 5.

88.     Other than repurchasing a small portion of Greenfish II Portfolios 4 and 5, IPI has not repurchased, in whole or in part, Greenfish II Portfolios 1-4, notwithstanding Shusterman's false representations and assurances that secondary market buyers had and/or would be procured and/or that IPI would repurchase the Portfolios at the prices set forth in the Repurchase Agreements.

**B.     Roundstone**

89.     The initial Portfolios purchases by Roundstone from IPI and their subsequent repurchase by IPI for resale to purported secondary market buyers, generating a return on investment consistent with Roundstone's investment strategy, became a cycle upon which Roundstone relied as it raised money from its investors to purchase each new Portfolio from IPI.

90.     Based on the above-described pattern and practice, Roundstone was induced and was intended to be induced to purchase the Roundstone Portfolios, and reasonably relied upon the assurances, Shusterman, Feldman, Zoldan and Weiner that the Roundstone Portfolios would be repurchased by IPI for a price resulting in a significant investment return to Roundstone.

91.    Roundstone also purchased the Roundstone Portfolios in reliance on the assurances of Shusterman, Feldman, Zoldan and Weiner, that there was in fact a true secondary market of purchasers who would purchase the Roundstone Portfolios at price levels resulting in a substantial profit to Roundstone.

92.    In accordance with Roundstone's reasonable expectations, IPI, by and through Shusterman, advised Roundstone in early February, 2010 that IPI was prepared to repurchase one of Roundstone's Portfolios, referred to as Fund III, with the purchase price of $6,200,660.00, to be paid in six installments beginning April 15, 2010, with a provision for an acceleration of payments.  A true and correct copy of the February 3, 2010 email is attached hereto as Exhibit "R".

93.    In furtherance thereof, IPI, through Weiner, as counsel to IPI, forwarded an executed copy of the Agreement for the Repurchase of Fund III to Roundstone on February 23, 2010.  A true and correct copy of the February 23, 2010 email and Repurchase Agreement is attached hereto as Exhibit "S".

94.    Thereafter, Shusterman falsely represented to Roundstone that IPI was exercising its right to extend the April 15, 2010 payment because the collection firm that purchased Fund III "were finishing up existing inventory" and Shusterman was "highly confident" that funding would happen in "2 to 4 weeks."  A true and correct copy of a May 18, 2010 email is attached hereto as Exhibit "T".

95.    However, Shusterman's representations to Roundstone were false and Shusterman knew that they were false at the time they were made, as illustrated in a May 18, 2010 email from Weiner, as counsel to IPI, to Roundstone, in which Weiner states that IPI expects to proceed with the Fund III Repurchase Agreement only after it closes several large transactions in

the next few weeks and receives related funding.

96.     Despite Roundstone's substantial efforts to consummate the Repurchase Agreements as was intended and agreed, the Repurchase Agreements never closed.

## THE SCHEME TO DIVERT PLAINTIFFS' FUNDS

97.     Throughout the summer, 2010, questions and concerns about collections efforts for various Roundstone Funds and other issues were identified by Roundstone and discussed with Shusterman and IPI.

98.     In August 2010, Roundstone met with Zoldan at DSP's offices to discuss some of these questions and concerns.  At that time, Zoldan divulged that DSP, by and through Zoldan and at the direction of Shusterman, had "made up" valuations for the Portfolios IPI sold to investors, including Plaintiffs and other Primary Investors, and therefore, the DSP valuations that Roundstone and other Primary Investors had relied upon in purchasing their Portfolios were bogus and fraudulent.

99.     As a result of Zoldan's confession, as well as the other questions and concerns about IPI's collection efforts and unexpected failure to repurchase the Roundstone Portfolios and fulfill the terms of the Repurchase Agreements, Roundstone decided to locate another collection company to service its Portfolios.

100.    Ultimately, Roundstone attended an in-person meeting with Shusterman and representatives of Shafritz and Braten, P.A ("S&B") in Florida to discuss, among other things, S&B's experience in medical receivables collection and whether S&B, which until this time represented IPI, would and could manage the collection of all of the Accounts that Roundstone had invested in with IPI, rather than IPI continuing to provide this service.

101.     S&B agreed to manage the collection of all of the Roundstone Portfolios that had been purchased from IPI and, to that end, S&B engaged in a process of uploading into its database the Roundstone hospital receivables Accounts from IPI, which process was completed on or about September 3, 2010.

102.     Before the end of September, 2010, S&B became aware of problems with some of the data in the Roundstone Portfolios; specifically, S&B found 1600 duplicate Accounts (*i.e.,* other Accounts with the same original identifying account number matching the 1600 Accounts with another "investor fund code" assigned to the duplicate data file).

103.     In order to quantify the total number of Roundstone duplicate Accounts, S&B suggested uploading into its database the Greenfish II hospital receivables Accounts from IPI. A true and correct copy of October 12, 2010 email from S&B is attached hereto as Exhibit "U".

104.     On October 26, 2010, S&B sent an email to Perkiss, general outside counsel for IPI, and David L. Haselkorn, counsel for Roundstone, advising that, after preparing and forwarding certain files identified for Roundstone, S&B discovered the duplicate Accounts issue. S&B also discovered the following problems with Roundstone's Accounts that had been purchased from, and previously "managed" by IPI:

a.     "other Accounts with the same original identifying account number matching the 1600 Accounts with another "investor fund code" assigned to the duplicate data file ("Potential Duplicate Files");

b.     "Multiple Accounts with different investor fund codes assigned to them where a payment had been posted to one of the duplicate Accounts; and

c.     Accounts where a payment was posted for at least 50% of the original account balance, suggesting that the account may have been settled by IPI's collection agent with the

account debtor, but the account balance had not been adjusted and the file had not been closed as "settled in full."

105.   In addition, it was discovered that over $5,000,000 of Accounts from one of the Roundstone Portfolios had been sold by IPI to another buyer.

106.   In an effort to cover up the Fraudulent Scheme perpetrated on Greenfish II and Roundstone, IPI, through Shusterman and Feldman, its vendors, including DSP, by and through Zoldan, and, upon information and belief, assisted by Perkiss, fabricated invoices for the purpose of creating charges which would offset the monies due to Plaintiffs.   For example, *see,* September 8, 2010 email string between Shusterman and Roundstone, a true and correct copy of which is attached hereto as Exhibit V.

107.   Further, direct payments made to Hospitals by the patient/debtor from Portfolios owned by Plaintiffs, which were to have been remitted from Hospitals to IPI and then to Plaintiffs, have been withheld by Hospitals because the Hospitals contend IPI did not pay them for those Accounts.

108.   IPI has also withheld data on monies that has been remitted to Plaintiffs such that Plaintiffs cannot confirm that the amounts remitted were proper.

109.   IPI also concealed direct payments from the collection agencies responsible for collecting on medical receivables Accounts in the Roundstone and Greenfish II Portfolios, instead keeping the monies for IPI and its principals' own benefit and at the same time failing to pay the collection agencies any contingent fees owed on those monies.

## CONCEALMENT OF THE FRAUDULENT SCHEME

110.   In furtherance of the Fraudulent Scheme, IPI, Shusterman and Feldman insisted that physical possession of the Portfolios remained in the hands of IPI, and any "sale" of the

Portfolios always was accomplished through a Repurchase Agreement between Plaintiffs and IPI, thereby ensuring the identity of the purported secondary buyer remained unknown to Plaintiffs.

111.    Throughout Plaintiffs' entire relationship with IPI, the illusion of legitimacy of IPI and its business model were bolstered by the participation and involvement of seemingly reputable lawyers, law firms and "independent" business associates (*i.e.,* the RICO Defendants and Co-Defendants).

112.    In response to inquiries by Plaintiffs and other potential Primary Investors, and unbeknownst to Plaintiffs, IPI, by and through Shusterman and Feldman, named Plaintiffs and other Primary Investors as "secondary buyers" to whom IPI had previously re-sold Portfolios.

### DEFENDANTS' AFFIRMATIVE DUTY OF DISCLOSURE

113.    In light of all the facts and circumstances, Defendants had an affirmative duty to disclose the true, material facts relating to IPI's business, the purported secondary market of buyers, and associated misrepresentations made to Plaintiffs and other Primary Investors.

114.    Plaintiffs had a reasonable expectation that Defendants would sell them medical debt Portfolios, properly manage and collect thereon, and repurchase such Portfolios for sale to true secondary market purchasers at the prices represented, resulting in a substantial profit to Plaintiffs.

### ESTOPPEL FORM PLEADING AND TOLLING OF THE APPLICABLE STATUTE OF LIMITATIONS

115.    As a result of Defendants' misrepresentations, suppression and concealment of material facts, Defendants are barred and estopped from relying upon the applicable statute of limitations.  Defendants misrepresented, suppressed and/or concealed material facts that they knew or should have known concerning IPI's business, IPI's business model, the purported

secondary market of purchasers of medical debt Portfolios, the purported value of the Portfolios when purchased, the purported substantial profit to be achieved by buying and then re-selling the Portfolios to secondary market buyers, and material facts relating to the misappropriation of monies belonging to Plaintiffs.

**CONDUCT AND PARTICIPATING IN A RICO ENTERPRISE THROUGH A PATTERN OF RACKETEERING – 18 U.S.C. § 1962(c) (Plaintiffs v. Shusterman, Feldman, Zoldan and DSP)**

116.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

117.    Plaintiffs are informed and believe and based thereon allege that an enterprise, specifically, IPI, existed within the meaning of 18 U.S.C. § 1961, and that the RICO Defendants, Shusterman, Feldman, Zoldan and DSP associated together, by and through their employment by, and/or participation in the conduct of IPI, with the common purpose of using IPI as a vehicle for defrauding Plaintiffs of more than $40 million in investment monies.

118.    Upon information and belief, IPI's principals, Defendants Shusterman and Feldman, and potentially others, have created the following new firms, in one or both of which Shusterman and Feldman sought to have Plaintiffs roll-over their Portfolios: (i) Medical Consortium, LLC, which is engaged in the business of "purchasing non-performing uncollected medical receivables from Hospitals" and describes itself as a medical portfolio purchasing firm with over twenty years experience in the medical portfolio and collection industry; and (ii) Pan Asian Commercial Consulting Group, LLC, of which Shusterman is President, and describes itself as "a commercial debt management company experienced in the recovery of business-to-business debt, focusing on China and other Pacific Rim countries."

119.    Plaintiffs, upon information and belief, aver that monies belonging to Plaintiffs

have been diverted to, and are being wrongfully used for the benefit of Medical Consortium, LLC and/or Pan Asian Commercial Consulting Group, LLC.

120.    The activities of the RICO Defendants respecting IPI involve, without limitation: (a) grossly and purposefully overstating the purported substantial profit to be achieved by Plaintiffs in buying and then re-selling the Portfolios to secondary market buyers period for the purpose of inducing Plaintiffs and others known and unknown into sham agreements with IPI; (b) grossly and purposefully overstating the purported value of the Portfolios when purchased from  IPI for the purpose of procuring funds for purposes other than agreements and deals in which Plaintiffs had agreed to invest; (c) repeatedly misrepresenting the purported secondary market of purchasers of medical debt portfolios and other Primary Investors to further induce Plaintiffs to continue purchasing Portfolios from IPI; (d) procuring and accepting wire payments in excess of $40 million from Plaintiffs and misappropriating such funds, or part of such funds, for the RICO Defendants' own personal gain; (e) repeatedly misrepresenting the existence of actual secondary market buyers for Plaintiffs' Portfolios at the price levels represented and/or purported offers made by such secondary market buyers, to conceal the enterprise and keep the enterprise going; (f) intentionally mismanaging Plaintiffs' Accounts to siphon payments rightfully belonging to Plaintiffs away from Plaintiffs and to the RICO Defendants; and (g) concealing the enterprise and pattern of racketeering activity.

121.    IPI's Fraudulent Scheme has a distinct structure based on the essential operating functions of IPI and on each RICO Defendants' particular role within it.

122.    At all relevant times, Zoldan, by and through DSP, was employed by and participated in the operations and management of IPI under the direction and control of Shusterman and/or Feldman.

123.    IPI is engaged in interstate commerce. Specifically, it buys and sells medical debt Portfolios throughout the United States.

## PATTERN OF RACKETEERING ACTIVITY

124.    The pattern of racketeering activity involved more than ten (10) predicate acts since Summer 2007, all constituting wire fraud as defined by 18 U.S.C. § 1343 and/or mail fraud as defined by 18 U.S.C. § 1341 and directly causing financial harm to Plaintiffs, including the loss of more than $12 million to Greenfish II, and the loss of more than $30 million to Roundstone in direct investments in Portfolios purchased from IPI.

125.    Shusterman, Feldman and Zoldan, by and through DSP, were able to commit the predicate offenses specifically alleged by virtue of their positions within IPI and/or involvement in and/or control over the affairs of IPI.

126.    The RICO Defendants, acting directly or, by assisting or participating in, the conduct of IPI's affairs engaged in a pattern of racketeering by: (a) grossly and purposefully overstating the purported substantial profit to be achieved by Plaintiffs in buying and then re-selling the Portfolios to secondary market buyers for the purpose of inducing Plaintiffs and others into sham agreements with IPI; (b) grossly and purposefully overstating the purported value of the Portfolios when purchased by IPI for the purpose of procuring funds for purposes other than transactions in which Plaintiffs had agreed to invest; (c) repeatedly misrepresenting the purported secondary market of purchasers of medical debt portfolios and other Primary Investors to further induce Plaintiffs to continue purchasing Portfolios from IPI; (d) procuring and accepting wire payments in excess of $40 million from Plaintiffs and misappropriating such funds, or part of such funds, for the RICO Defendants own personal gain; (e) repeatedly misrepresenting the existence of actual secondary market buyers for Plaintiffs' Portfolios at the

price levels represented and/or purported offers made by such secondary market buyers, to conceal the enterprise and keep the enterprise going; (f) intentionally mismanaging Plaintiffs' Accounts to siphon payments rightfully belonging to Plaintiffs away from Plaintiffs and to the RICO Defendants; and (g) concealing the enterprise and pattern of racketeering activity.

127.   The RICO Defendants, in their pattern of racketeering activity, regularly used interstate telephone and facsimile transmission lines, cellular phones, internet transmission and/or the United States mail, while engaging in interstate commerce for the purposes of committing fraud and/or deceit, and conspiring to commit fraud and/or deceit, and divesting Plaintiffs of over $40 million.

## RICO OFFENSES

128.   As alleged with particularity below, each RICO Defendant is associated with IPI and conducted or participated in the conduct of IPI's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

129.   As alleged with particularity below, RICO Defendants Shusterman, Feldman and DSP, by and through Zoldan, conspired together to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

## PREDICATE OFFENSES – WIRE FRAUD AND MAIL FRAUD

130.   The RICO Defendants all participated in a scheme to defraud Plaintiffs of more than $40 million through repeated false representations concerning the value of the medical debt Portfolios purchased by Plaintiffs from IPI, the existence of a purported secondary market of buyers for the Portfolios at the price levels represented, and the necessity of IPI's participation in purchasing the Portfolios, managing the Portfolios and re-selling the Portfolios for a substantial profit.

131.    Each of the RICO Defendants committed numerous predicate acts in the nature of fraudulent communications by wire and/or mail.  By way of example, the discussion below of the participation of each of the RICO Defendants in the racketeering activities specifies for each of the RICO Defendants some of the particular predicate acts used to further the pattern of racketeering activity.  In addition, throughout and in furtherance of the Fraudulent Scheme, the RICO Defendants committed the predicate acts and thereby defrauded Plaintiffs of in excess of $40 million via wire transfers.

132.    The RICO Defendants' Fraudulent Scheme began no later than June 2007 and, upon information and belief, has continued since that time.  As a result of the Fraudulent Scheme, Plaintiffs have incurred damages in excess of $40 million.

### SHUSTERMAN, FELDMAN, ZOLDAN AND DSP'S PARTICIPATION IN THE PATTERN OF RACKETEERING ACTIVITY

133.    **Shusterman's Participation:**

a.      As President of IPI, Shusterman directed, controlled and approved all racketeering activities taken in furtherance of the racketeering activity, including:   (a) grossly and purposefully overstating the purported substantial profit to be achieved by Plaintiffs in buying and then re-selling the Portfolios to secondary market buyers for the purpose of inducing Plaintiffs and others known and unknown into sham agreements with IPI; (b) grossly and purposefully overstating the purported value of the Portfolios when repurchased by IPI for the purpose of procuring funds for purposes other than agreements and deals in which Plaintiffs had agreed to invest; (c) repeatedly misrepresenting the purported secondary market of purchasers of medical debt portfolios and other Primary Investors of medical debt portfolios to further induce Plaintiffs to continue purchasing Portfolios from IPI; (d) procuring and accepting wire payments in excess of $40 million from Plaintiffs and misappropriating such funds, or part of such funds,

for the RICO Defendants own personal gain; (e) repeatedly misrepresenting the existence of actual secondary market buyers for Plaintiffs' Portfolios at the price levels represented and/or purported offers made by such secondary market buyers, to conceal the enterprise and keep the enterprise going; (f) intentionally mismanaging Plaintiffs' Accounts to siphon payments belonging to Plaintiffs away from Plaintiffs and to the RICO Defendants; and (g) concealing the enterprise and pattern of racketeering activity.

b.     At the direction, control and approval of Shusterman, Plaintiffs were repeatedly advised and/or informed to make payments for the Portfolios they purchased from IPI via electronic mail, facsimile and/or telephone.

c.     Shusterman received and accepted the fraudulently obtained wire payments from Plaintiffs in excess of $40 million for the purchase of the Portfolios described above.

d.     Upon information and belief, Shusterman, by and through Zoldan, directed, controlled or approved DSP's gross overstatement of the initial value of the Portfolios, upon which Plaintiffs were fraudulently induced to purchase such Portfolios for over-stated amounts.

e.     Upon information and belief, Shusterman directed, controlled or approved the intentional mismanagement of Plaintiffs' Accounts to siphon payments belonging to Plaintiffs away from Plaintiffs and to the RICO Defendants.

f.     Shusterman directed, controlled or approved Zoldan's participation in falsifying numerous invoices for services not provided.  For example, Zoldan orally has confessed that he, by and through DSP, misrepresented to Plaintiffs certain costs associated with DSP's services when, in reality, DSP's arrangement with IPI was below the costs that IPI passed on to Plaintiffs.

g.     Upon information and belief, Shusterman directed, controlled or approved

Zoldan and other's participation in changing various account codes in furtherance of the Fraudulent Scheme to facilitate IPI's ability to sell the same files to different investor groups and/or to misappropriate cash that would otherwise have been directed to the true owner of the Accounts.

      h.    Upon information and belief, Shusterman directed, controlled or approved Zoldan, Feldman and/or other's participation in a scheme to change account codes on a regular basis for the purpose of masking the fact that the Accounts were not zero agency, as represented to Plaintiffs and others known and unknown, but rather, the Accounts had or, in some circumstances, still belonged to fellow investors and thus, had been previously owned and/or were currently owned by another.

      i.    Shusterman and representatives of Shusterman transmitted and received correspondence, documents and/or other data used in furtherance of the scheme to defraud Plaintiffs of their investment monies via interstate telephone, facsimile lines, the internet and through the U.S. mail.

      134.   **Feldman's Participation:**

      a.    Upon information and belief, Feldman and representatives of Feldman, including Zoldan, participated in a scheme to change account codes on a regular basis for the purpose of masking the fact that the Accounts were not previously owned, as represented to Plaintiffs and others known and unknown, but rather, the Accounts had or, in some circumstances, still belonged to fellow investors.

      b.    Upon information and belief, Feldman directed, controlled and/or approved misrepresentations about the purported secondary market of purchasers of medical debt portfolios and other Primary Investors of medical debt portfolios to further induce Plaintiffs to

continue purchasing Portfolios from IPI.

c.      Upon information and belief, Feldman directed, controlled and/or approved misrepresentations about the viability of the secondary market for medical debt portfolios to further induce Plaintiffs to continue purchasing Portfolios from IPI.

135.  **Zoldan's Participation:**

a.      On numerous occasions, Zoldan, in furtherance of the Fraudulent Scheme, forwarded to Plaintiffs Liquidation Letters in which DSP, by and through Zoldan, purportedly in the course of appraising the various Portfolios to be sold to Plaintiffs, knowingly and willfully inflated the liquidation values of the Portfolios and knowingly and willfully participated in the Fraudulent Scheme to defraud Plaintiffs into believing there was a true secondary market of *bona fide* independent buyers separate and apart from the Primary Investors who would repurchase the Portfolios at the price levels represented.

b.      Upon information and belief, Zoldan, together with Shusterman and others, participated in falsifying numerous invoices for services not provided.  For example, Zoldan orally has confessed that he, by and through DSP, misrepresented to Plaintiffs certain costs associated with DSP's services when, in reality, DSP's arrangement with IPI was below the costs that IPI passed on to Plaintiffs.

c.      Upon information and belief, Zoldan and others, including but not limited to Shusterman and Feldman, participated in a scheme to change account codes on a regular basis for the purpose of masking the fact that the Accounts were not previously owned, as represented to Plaintiffs and others known and unknown, but rather, the Accounts had or, in some circumstances, still belonged to other Primary Investors.

d.      Zoldan and other representatives of DSP transmitted and received

correspondence, documents and/or other data used in furtherance of the scheme to defraud Plaintiffs of their investment monies via interstate telephone, facsimile lines, the internet and through the U.S. mail.

136.    **DSP'S Participation:**

a.      At all relevant times, DSP was a controlling person with respect to its employees and/or officers and was responsible for supervising their activities.

b.      DSP, thus, is vicariously liable for all of the predicate acts undertaken by Zoldan, as specifically described above.

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Plaintiffs v. Shusterman, Feldman, Zoldan and DSP)**

137.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

138.    The RICO Defendants, Shusterman, Feldman, Zoldan and DSP are each RICO "persons" as that term is defined in 18 U.S.C. § 1961(3).

139.    As alleged with particularity above, Shusterman, Feldman, Zoldan and DSP were employed by, or associated with IPI at all material times.

140.    As alleged with particularity above, Shusterman, Feldman, Zoldan and DSP participated in the conduct of IPI's affairs through a pattern of racketeering activity.

141.    As alleged with particularity above, the facts demonstrate that Shusterman, Feldman, Zoldan and DSP each unlawfully, willingly, knowingly and/or with reckless disregard performed acts or omissions and conducted or participated in the conduct, directly or indirectly, of IPI's affairs through the means of a pattern of racketeering activity.

142.    As a direct and proximate result of the aforementioned RICO conduct, Plaintiffs

have incurred damages in excess of $40 million.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants Shusterman, Feldman, Zoldan and DSP for treble damages, together with interest, costs and reasonable attorneys' fees as provided by 18 U.S.C. § 1964, and such other relief as the Court deems just and proper.

**COUNT II**
**CONSPIRACY TO ENGAGE IN A**
**PATTERN OF RACKETEERING ACTIVITY – 18 U.S.C. § 1962(d)**
**(Plaintiffs v. Shusterman, Feldman, Zoldan and DSP)**

143. Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length herein.

144. As specifically enumerated above, Shusterman, Feldman, Zoldan and, DSP associated with an enterprise (IPI) engaged in interstate commerce and whose activities directly affected interstate commerce.

145. Shusterman, Feldman, Zoldan and, DSP did conduct, or participate, either directly or indirectly, in the conduct of the affairs of IPI through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(c) and (d).

146. Since no later than 2007, Shusterman, Feldman, Zoldan and DSP cooperated jointly and severally in the commission of two (2) or more predicate acts that are itemized in 18 U.S.C. § 1961(A) and (B), and did so in violation of 18 U.S.C. §§ 1962(d).

147. As a result of the Fraudulent Scheme, Plaintiffs have incurred damages in excess of $40 million.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants Shusterman, Feldman, Zoldan and DSP for treble damages, together with interest, costs and reasonable attorneys' fees as provided by 18 U.S.C.

§ 1964, and such other relief as the Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT
### (Plaintiffs v. IPI)

148.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

149.    IPI has breached the terms of the MPA, purchase and sale agreements and Repurchase Agreements between it and Plaintiffs by, among other things:

a.    Failing to close on the Repurchase Agreements by the stated closing dates and/or the extended closing dates provided for in the various Repurchase Agreements;

b.    Failing to remit to Plaintiffs the purchase price set forth in the various Repurchase Agreements by the date and/or date(s) provided for in the various Repurchase Agreements;

c.    Failing to remit 2% of the purchase price provided in the Repurchase Agreements when IPI failed to close by the stated closing dates and/or extended closing dates provided for in the various Repurchase Agreements;

d.    Failing to properly manage and/or service the Portfolios by failing, among other things, to secure credit scoring of records, segmenting records, providing incomplete capture information and providing incomplete bankrupt and deceased information, such that numerous Accounts have never been placed in the hands of debt collectors and/or law firms and/or were not timely placed such the statute of limitations on the debt expired;

e.    Failing to properly cull the Portfolios to remove and replace all Accounts that are in bankruptcy, deceased and/or were Medicaid or Medicare patients and to replace those Accounts with other Accounts having an equal face value;

     f.      Failing to assist in the sale of the Portfolios;

     g.     Selling the same files to multiple investors;

     h.     Charging Plaintiffs for expenses not permitted or provided in the agreements;

     i.      Failing to have many Accounts placed with collection agencies;

     j.      Failing to promptly remit payments for Plaintiffs' Accounts when received;

     k.     Selling Accounts to Plaintiffs that were not free and clear of all liens, in particular, because the same Accounts were sold to multiple buyers;

     l.      Obtaining paper by filing suit against a hospital to replace bad paper which had been sold to Plaintiffs and then not turning over to Plaintiffs the "good" paper obtained as a result thereof;

     m.    Changing account codes on a routine basis to create the appearance that the Accounts were zero agency when they were not;

     n.     Failing to remit all monies due and owing Plaintiffs.

150.    Plaintiffs have fulfilled all of their obligations under and pursuant to their agreements with IPI.

151.    As a direct result of IPI's breaches as hereinabove set forth, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendant IPI in excess of $75,000.00 for compensatory damages, together with interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT IV
## COMMON LAW FRAUD/FRAUD IN THE INDUCEMENT
### (Plaintiffs v. Shusterman, Feldman, Zoldan and DSP)

152.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

153.    Defendants Shusterman, Feldman, Zoldan and DSP misrepresented the existence of a secondary market of purchasers for medical debt receivables and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs for the purpose of inducing Plaintiffs to purchase Portfolios at prices which did not represent their true value.

154.    At the time Defendants Shusterman, Feldman, Zoldan and DSP solicited Plaintiffs to purchase Portfolios, they knew that the representations they made to Plaintiffs about a secondary market were not truthful, and they knew that Plaintiffs would not have purchased the Portfolios at the prices they did had they known that there did not exist a real secondary market of purchasers for the Portfolios at the price levels represented.

155.    Defendants Shusterman, Feldman, Zoldan and DSP's representations regarding the existence of a secondary market of purchasers for medical debt receivables and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs constituted false representations of material facts, and Defendants Shusterman, Feldman, Zoldan, DSP and Perkiss knew the representations were false at the time they made them.

156.    Defendants Shusterman, Feldman, Zoldan and DSP made these false statements with the specific intent that Plaintiffs would rely upon them in purchasing Portfolios from IPI.

157.    At all relevant times, DSP was a controlling person with respect to its

employees and officers and was responsible for supervising their activities.

158.    Thus, DSP is vicariously liable for the fraudulent acts undertaken by Zoldan, as specifically described above.

159.    It was reasonable and justified for Plaintiffs to rely upon the misrepresentations set forth above.

160.    Plaintiffs would not have purchased the Portfolios from IPI had they known the truth about the secondary market and actual projections for returns.

161.    As a result of those misrepresentations, Plaintiffs have suffered damages.

162.    The actions of Shusterman, Feldman, Zoldan and DSP were willful, knowing, and done with conscious disregard of the rights of Plaintiffs, thereby entitling Plaintiffs to an award of exemplary or punitive damages in an amount sufficient to deter the wrongful conduct set forth above in the future.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants Shusterman, Feldman, Zoldan and DSP in excess of $75,000.00 for compensatory and punitive damages of not less than $50,000,000.00, together with interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

### COUNT V
### AIDING AND ABETTING FRAUD
### RESTATEMENT (SECOND) § 876
### (Plaintiffs v. Weiner, Tucci, Perkiss, Duane and Fox)

163.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

164.    Weiner participated in several telephone calls with Plaintiffs in which he, and one or more of the other RICO Defendants, affirmed the existence of an independent

secondary market of buyers for the Portfolios at the price levels represented, even though Weiner knew or should have known, or through the exercise of reasonable care would have known, this was false

165.     Weiner issued letters to Plaintiffs in which he represented the existence of an independent secondary market of buyers for the Portfolios at the price levels represented, even though Weiner knew, or should have known, or through the exercise of reasonable care would have known, this was false.

166.     Weiner further participated in the Fraudulent Scheme by using his position as a partner at Duane to make oral statements and/or send letters and/or emails concerning the legitimacy and/or validity of IPI's business and business model which he knew or should have known, or through the exercise of reasonable care would have known were false.   In addition, Weiner issued letters to Plaintiff in which he misrepresented the "IPI Process."

167.     Weiner, in furtherance of the Fraudulent Scheme, issued correspondence to Plaintiffs in which he misrepresented that debt Accounts were coming directly from hospital providers, *i.e.*, were not previously owned, when, in fact, they were.

168.     Tucci issued letters to Plaintiffs in which he misrepresented the existence of an independent secondary market of buyers for the Portfolios, even though Tucci knew, or should have known, or through the exercise of reasonable care would have known, this was false.

169.     Tucci further participated in the Fraudulent Scheme by using his position as a partner in Fox to make oral statements and/or sent letters and/or emails concerning the legitimacy and/or validity of IPI's business and business model, which oral statements and/or

letters contained false information.   In addition, Tucci issued letters in which he misrepresented the "IPI Process."

170.      Weiner, Tucci, Perkiss, Duane and/or Fox each failed to exercise reasonable care or competence in obtaining information about IPI's business, business model, the purported secondary market of buyers for the Portfolios and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs, and the artificially inflated values prescribed to the Portfolios, as set forth above, prior to making any such representation to Plaintiffs.

171.      After Weiner ceased to represent IPI in or about the fall of 2010, Perkiss became counsel to IPI.   Thereafter, Perkiss continued to assure Plaintiffs that IPI had buyers for Plaintiffs' Portfolios which he knew, or should have known, or through the exercise of reasonable care would have known, was false.

172.      Weiner, Tucci, Perkiss, Duane and/or Fox  knew, or should have known, that Plaintiffs were relying on their representations about IPI's business, business model, the purported secondary market of buyers for the Portfolios and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs, and the artificially inflated values prescribed to the Portfolios, as set forth above, in deciding whether to purchase Portfolios from IPI.

173.      Weiner, Tucci, Perkiss, Duane and/or Fox incurred a fiduciary duty when they held themselves out as attorneys who endorsed the investments by Plaintiffs with IPI, and who had investigated IPI's business.

174.      Weiner, Tucci, Perkiss, Duane and/or Fox had a duty to exercise reasonable care to avoid making misrepresentations to Plaintiffs.

175.     The representations made by Weiner, Tucci, Perkiss, Duane and/or Fox were misrepresentations of material facts and were made for the purpose of inducing Plaintiffs and/or with knowledge that Plaintiffs would be induced, to purchase the Portfolios that IPI sold to Plaintiffs.

176.     Plaintiffs justifiably relief on the representations of Weiner, Tucci, Duane and/or Fox in deciding to purchase the Portfolios.

177.     The representations made by Weiner, Tucci, Perkiss, Duane and/or Fox, as set forth above, were untrue.

178.     At all relevant times, Duane was a controlling person with respect to its employees, partners and lawyers and was responsible for supervising their activities.

179.     Thus, Duane is vicariously liable for all of the predicate acts undertaken by Weiner, as specifically described above.

180.     At all relevant times, Fox was a controlling person with respect to its employees, partners and lawyers and was responsible for supervising their activities.

181.     Thus, Fox is vicariously liable for all of the predicate acts undertaken by Weiner when he was a Fox attorney, and also is vicariously liable for all of the predicate acts undertaken by Tucci, as specifically described above.

182.     A person is liable for aiding and abetting if harm results to a third person from the tortious conduct of another, if he:

    a.  Does a tortious act in concert with the other or pursuant to a common design with him;

    b.  Knows that the other person's conduct constitutes a breach of duty and gives substantial assistance or encouragement so to conduct himself; or

c. Gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

183. Weiner, Tucci, Perkiss, Duane and/or Fox are liable to Plaintiffs for making the representations they made about IPI's business, business model, the purported secondary market of buyers for the Portfolios and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs, and the artificially inflated values prescribed to the Portfolios, as set forth above, in that Weiner, Tucci, Perkiss, Duane and/or Fox failed to use reasonable care or competence in obtaining accurate information prior to making such representations.

184. Weiner, Tucci and Perkiss breached their fiduciary duty to Plaintiffs by making the misrepresentations set forth above, whether done with knowledge that their representations were false and/or whether they were made with reckless disregard for the truth and/or were made without a reasonable investigation under the circumstances.

185. The actions of Weiner, Tucci, Perkiss, Duane and/or Fox as set forth above, assisted the RICO Defendants in being able to carry out the Fraudulent Scheme.

186. As a result of the misrepresentations made by Weiner, Tucci, Perkiss, Duane and/or Fox, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants Weiner, Tucci, Perkiss, Duane and/or Fox in excess of $75,000.00 for compensatory damages, together with interest, costs, reasonable attorneys; fees, and such other relief as the Court deems just and proper.

## COUNT VI
## NEGLIGENT MISPRESENTATION
## RESTATEMENT (SECOND) § 552(1)
### (Plaintiffs v. Weiner, Tucci, Perkiss, Duane and Fox)

187.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

188.    Weiner, Tucci, Perkiss, Duane and/or Fox are liable to Plaintiffs for making the representations they made about IPI's business, business model, the purported secondary market of buyers for the Portfolios and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs, and the artificially inflated values prescribed to the Portfolios, as set forth in the allegations above, in that Weiner, Tucci, Perkiss, Duane and/or Fox failed to use reasonable care or competence in obtaining accurate information prior to making such representations.

189.    The actions of Weiner, Tucci, Perkiss, Duane and/or Fox were negligent in that each failed to exercise reasonable care or competence in obtaining information about IPI's business, business model, the purported secondary market of buyers for the Portfolios and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs, and the artificially inflated values prescribed to the Portfolios, as set forth above, prior to making any such representation to Plaintiffs.

190.    Weiner, Tucci, Perkiss, Duane and/or Fox  knew, or should have known, that Plaintiffs were relying on their representations about IPI's business, business model, the purported secondary market of buyers for the Portfolios and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs,

and the artificially inflated values prescribed to the Portfolios, as set forth in the allegations above in deciding whether to purchase Portfolios from IPI.

191.    Weiner, Tucci, Perkiss, Duane and/or Fox incurred a duty when they held themselves out as attorneys who endorsed the investments by Plaintiffs with IPI, and who had investigated IPI's business.

192.    Weiner, Tucci, Perkiss, Duane and/or Fox had a duty to exercise reasonable care to avoid making misrepresentations to Plaintiffs.

193.    In fact, Weiner, Tucci, Perkiss, Duane and/or Fox knew that Plaintiffs did not know who the secondary buyers were; thereby precluding Plaintiffs from doing their own due diligence on the secondary buyers.

194.    Plaintiffs justifiably relied on the representations of Weiner, Tucci, Perkiss, Duane and/or Fox in deciding to purchase the Portfolios.

195.    The representations made to Plaintiffs by Weiner, Tucci, Perkiss, Duane and/or Fox, as set forth above, were untrue.

196.    As a result of the negligent misrepresentations by Weiner, Tucci, Perkiss, Duane and/or Fox, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants Weiner, Tucci, Perkiss, Fox and/or Duane in excess of $75,000.00 for compensatory, together with interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT VII
## INNOCENT MISREPRESENTATION
## RESTATEMENT (SECOND) § 552(C)
### (Plaintiffs v. Weiner, Tucci, Perkiss, Duane and Fox)

197.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

198.    Weiner, Tucci, Perkiss, Duane and/or Fox are liable to Plaintiffs for making the misrepresentations made by them about IPI's business, business model, the purported secondary market of buyers for the Portfolios and the return which Plaintiffs could reasonably expect to achieve through the repurchase by IPI of the Portfolios sold to Plaintiffs, and the artificially inflated values prescribed to the Portfolios, as set forth above, in that Weiner, Tucci, Perkiss, Duane and/or Fox made misrepresentations and Plaintiffs relied on the misrepresentations to their detriment.

199.    Weiner, Tucci, Perkiss, Duane and/or Fox knew, or should have known, that Plaintiffs were relying on their representatives about IPI when deciding whether to purchase the Portfolios that IPI sold to Plaintiffs.

200.    In fact, Weiner, Tucci, Perkiss, Duane and/or Fox knew that Plaintiffs did not know who the Secondary Buyers were as they all refused to disclose the names of the Secondary Buyers, thereby precluding Plaintiffs from doing their own due diligence on IPI.

201.    The representations of fact made by Weiner, Tucci, Perkiss, Duane and/or Fox were misrepresentations of material facts and were made for the purpose of inducing Plaintiffs to purchase the Portfolios that IPI sold to Plaintiffs.

202.    Plaintiffs justifiably relied on the representation of Weiner, Tucci, Perkiss, Duane and/or Fox in deciding to purchase the Portfolios that IPI sold to Plaintiffs.

203.    Any person who makes a misrepresentation to another in a sale transaction is liable to the person who relied on that representation to its detriment, even if the person making the misrepresentation did not make it fraudulently or negligently and is entitled to recover the difference between the value of what had been represented and the value of what was received.

204.    The representations made to Plaintiffs by Weiner, Tucci, Perkiss, Duane and/or Fox about IPI were untrue.

205.    As a result of misrepresentations made by Weiner, Tucci, Perkiss, Duane and/or Fox, Plaintiffs suffered damages.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants Weiner, Tucci, Perkiss, Fox and/or Duane in excess of $75,000.00 for the difference in value between the value Plaintiffs paid for the Portfolios and the true value of Plaintiffs' Portfolios, together with interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT VIII
## CONVERSION/MISAPPROPRIATION
### (Plaintiffs v. IPI, Shusterman, Feldman, Zoldan, DSP and Perkiss)

206.    Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

207.    Based upon information and belief, substantially more monies have been collected by IPI, by and through Shusterman and Feldman, both by direct payments from Hospitals and through the efforts of the collection agencies assigned by IPI to assist in the collection of the debt than has been remitted to Plaintiffs.

208.    IPI, by and through Shusterman and Feldman, has converted and/or misappropriated these sums owed to Plaintiffs by fabricating invoices or instructing others,

including Perkiss and DSP, by and through Zoldan, to fabricate invoices to withhold cash rightfully belonging to Plaintiffs.

209.    IPI, by and through Shusterman and Feldman, has further converted and/or misappropriated direct payments which were due Plaintiffs since at least July 2010; moreover, no accounting of the direct payments has been provided to Plaintiffs to quantify the amount of direct payments which were collected by IPI, by and through Shusterman and Feldman, and not remitted to Plaintiffs.

210.    IPI, by and through Shusterman and Feldman, further directed its vendors to change ownership codes for many Accounts at various times in order to misappropriate the monies collected from debtors.   IPI, by and through Shusterman and Feldman, with the assistance and participation of Zoldan, DSP and others, changed account codes on a routine basis in order to wrongfully withhold monies rightfully owed Plaintiffs.

211.    Upon information and belief, IPI, by and through Shusterman and Feldman, converted these monies for their own benefit, thereby depriving Plaintiffs of monies rightfully belonging to them.

212.    At all relevant times, IPI was a controlling person with respect to its employee and officers, and was responsible for supervising their activities.

213.    Thus, IPI is vicariously liable for the fraudulent acts undertaken by Shusterman and Feldman, as specifically described above.

214.    At all relevant times, DSP was a controlling person with respect to its employees and officers and was responsible for supervising their activities.

215.    Thus, DSP is vicariously liable for the fraudulent acts undertaken by Zoldan, as specifically described above.

216.   As a proximate result of the conversions and/or misappropriation by IPI, Shusterman, Feldman, Zoldan, DSP and Perkiss, Plaintiffs have suffered damages.

217.   The actions of IPI, Shusterman, Feldman, Perkiss, Zoldan and DSP were willful, knowing, and done with conscious disregard of the rights of Plaintiffs, thereby entitling Plaintiffs to an award of exemplary or punitive damages in an amount sufficient to deter the wrongful conduct set forth above in the future.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants IPI, Shusterman, Feldman, Perkiss, Zoldan and DSP in excess of $75,000.00 for compensatory and punitive damages of not less than $50,000,000.00, together with interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT IX
## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Plaintiffs v. IPI, Shusterman and Feldman)

218.   Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

219.   After Plaintiffs took custody of their Portfolios from IPI, Shusterman and Feldman intentionally interfered with Plaintiffs' ability to sell the Portfolios (or remaining portions of the Portfolios) through outside firms and/or work directly with collection firms to maximize the return on the Portfolios by, among other things, delaying liquidation reports, intentionally misinforming Plaintiffs about third party payments associated with the files, miscoding receivables, and failing to properly do credit reports on files.

220.   Shusterman and Feldman's conduct was wrongful, malicious, unlawful and done with the intent to cause harm to Plaintiffs.

221.   Shusterman and Feldman acted without proper justification or probable cause.

222.   At all relevant times, IPI was a controlling person with respect to its employees and officers, and was responsible for supervising their activities.

223.   Thus, IPI is vicariously liable for the fraudulent acts undertaken by Shusterman and Feldman, as specifically described above.

224.   As a direct and proximate result of IPI, Shusterman and Feldman's unlawful, wrongful and improper conduct, Plaintiffs have suffered damages.

225.   The actions of IPI, Shusterman and Feldman were willful, knowing, and done with conscious disregard of the rights of Plaintiffs, thereby entitling Plaintiffs to an award of exemplary or punitive damages in an amount sufficient to deter the wrongful conduct set forth above in the future.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants IPI, Shusterman and Feldman in excess of $75,000.00 for compensatory and punitive damages of not less than $50,000,000.00, together with interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT X
## UNJUST ENRICHMENT
### (Plaintiffs v. IPI, Shusterman and Feldman)

226.   Plaintiffs incorporate by reference the averments of the preceding paragraphs as if set forth at length.

227.   Upon information and belief, the monies that Plaintiffs paid for the Portfolios were based upon valuations that grossly and fraudulently over-stated the true value of the Portfolios and were the result of, among other things, Shusterman and Feldman's intentional misrepresentations concerning a true secondary market of buyers for the Portfolios at the price

levels represented.

228.   By reason of the Fraudulent Scheme to defraud Plaintiffs, Shusterman and Feldman have received additional monies rightfully belonging to Plaintiffs which Shusterman and Feldman wrongfully misappropriated and/or converted for their own benefit.

229.   Shusterman and Feldman have retained these monies, which in equity and good conscience should be returned to Plaintiffs.

230.   At all relevant times, IPI was a controlling person with respect to its employees and officers, and was responsible for supervising their activities.

231.   Thus, IPI is vicariously liable for the fraudulent acts undertaken by Shusterman and Feldman, as specifically described above.

232.   As a direct and proximate result of IPI, Shusterman and Feldman's unlawful, wrongful and improper conduct, Plaintiffs have suffered damages.

233.   The acceptance of money for the artificially inflated value of the Portfolios and monies converted and/or misappropriated from Plaintiffs in furtherance of the Fraudulent Scheme to deprive Plaintiffs of monies was willful, knowing, and done with conscious disregard of the rights of Plaintiffs, thereby entitling Plaintiffs to an award of exemplary or punitive damages in an amount sufficient to deter the wrongful conduct of IPI, Shusterman and Feldman in the future.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against Defendants IPI, Shusterman and Feldman in excess of $75,000.00 for compensatory and punitive damages of not less than $50,000,000.00, together with interest, costs, reasonable attorneys' fees, and such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a jury trial of all claims for relief that may be tried before a jury.

Dated: *12/13/2011*

Respectfully submitted,

SILVERANG & DONAHOE LLC

By: _____

Mark S. Haltzman, Esquire
Attorney ID# 38957
595 East Lancaster Avenue, Ste. 203
St. Davids, PA  19087
(610) 263-0131
mhaltzman@sanddlawyers.com