# EXHIBIT A

# EXHIBIT A

**Duane Morris®**

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
BOCA RATON
WILMINGTON
CHERRY HILL
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

WILLIAM L. WEINER
DIRECT DIAL: 609-631-2421
PERSONAL FAX: 609.228.5930
E-MAIL: wlweiner@duanemorris.com

www.duanemorris.com

December 22, 2009

Via Email

Eric Raymond, C.L.U.
Greenfish Fund II, LP
112 Minfford Road
Bala Cynwyd, PA 19004

Re:   International Portfolio, Inc. ("IPI") / Health Management Associates, Inc.
("HMA")/Master Purchase and Sale Agreement ("Agreement")

Dear Eric:

As you know, this Firm is counsel to IPI. Please accept this letter as confirming, based upon our conversations with IPI's President and Chief Executive Officer, Richard Shusterman, and our review of the Agreement, including the documents attached thereto, which I previously forwarded to you, IPI purchased directly from HMA, pursuant to the terms of the Agreement, those patient accounts receivable that are the subject of such Agreement. As you are also aware, this Firm did not represent IPI in connection with the Agreement or the transaction that is the subject of such Agreement. Rather, it is our understanding that such representation was undertaken by the law firm of DLA Piper on behalf of IPI.

Naturally, should you have any questions regarding this letter, please feel free to contact me at any time.

Very truly yours,

William L. Weiner
Partner

WLW:fs
cc:   International Portfolio, Inc., attn: Richard Shusterman, President/CEO

DUANE MORRIS LLP   A DELAWARE LIMITED LIABILITY PARTNERSHIP

FRANK A. LUCHAK, RESIDENT PARTNER

100 AMERICAN METRO BOULEVARD, SUITE 150 HAMILTON, NJ 08619-2304       PHONE: 609.631.2400   FAX: 609.631.2401
P.O. BOX 5203, PRINCETON, NJ  08543-5203
DM2\2154914.1

# EXHIBIT B

# EXHIBIT B



# Fox Rothschild LLP
### ATTORNEYS AT LAW

2700 Kelly Road, Suite 300
Warrington, PA 18976-3624
Tel 215.345.7500  Fax 215.345.7507
www.foxrothschild.com

Peter J. Tucci
Direct Dial: (215) 918-3562
Email Address: ptucci@foxrothschild.com

December 16, 2008

Re:   Internatlonal Portfolio, Inc.

To Whom It May Concern:

Please note that the law firm of Fox Rothschild LLP represents International Portfolio, Inc. ("IPI"), a Delaware corporation.

IPI is involved in the purchasing of non-performing, uncollected accounts receivable originated by hospitals across the United States. As a condition to purchasing such accounts from a hospital, IPI requires that the hospital deliver to IPI, and then IPI files with the applicable government agency, a UCC-1 financing statement containing such language as is legally sufficient to preserve, perfect, and protect IPI's interests in and to the accounts purchased by IPI.

Once IPI purchases accounts from a hospital, IPI then either (1) retains the accounts and places the accounts with appropriate law firms and collection agencies within IPI's network of approved collection specialists, or (2) sells the accounts to a third party.

At the discretion of the third party purchasing the accounts, IPI will also manage and place the accounts with appropriate law firms and collection agencies within IPI's network of approved collection specialists. IPI forwards both collection reports and funds collected to the purchasers of each portfolio of accounts. IPI also encourages the purchaser of each portfolio of accounts to file its own UCC-1 financing statement with the applicable government agency to preserve, perfect, and protect the purchaser's interests in and to the accounts purchased from IPI.

IPI will, on occasion, repurchase portfolios of accounts previously sold by IPI at a price negotiated between the two parties. IPI may then add additional, newer accounts to the portfolio of accounts, thereby creating a more valuable portfolio of accounts. Such repurchased portfolios of accounts may then be sold to various third parties.

Although IPI does not and will not, at any time, guarantee any type of portfolio performance or portfolio return, there currently continues to be a strong pool of purchasers looking to purchase

DTI 827157v1 12/16/08                        Attorneys at Law in California Delaware...

California      Delaware      Florida      Nevada      New Jersey      New York      Pennsylvania



**Fox Rothschild** LLP
ATTORNEYS AT LAW

December 16, 2008
Page 2

uncollected medical debt. Current purchasers of medical debt include, but are not limited to, publicly-traded companies, hedge funds, attorneys, collection agencies, and high-net worth individuals. Each purchaser's model varies and some purchasers will hold a portfolio of accounts for a much greater period of time than other purchasers.

Please note that this letter is not intended to be a legal opinion, but merely as a factual summary of how IPI operates. If you should have any questions concerning the foregoing summary, please do not hesitate to contact the undersigned.

Sincerely,

Peter J. Tucci

cc:    Mr. Richard Shusterman

# EXHIBIT  C

# EXHIBIT  C

DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
BOCA RATON
WILMINGTON
CHERRY HILL
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

WILLIAM L. WEINER
DIRECT DIAL: 609-631-2421
E-MAIL: wlweiner@duanemorris.com

www.duanemorris.com

December 17, 2009

Eric Raymond, C.L.U.
Greenfish Fund II, LP
112 Minfford Road
Bala Cynwyd, PA  19004

Re:   Sales of Portfolios to Third Parties by International Portfolio, Inc. ("IPI")

Dear Eric:

Please accept this letter as confirming that, effective as of January 1, 2010, with respect to any medical debt portfolio (the "Greenfish Portfolio") owned by Greenfish Fund II, LP ("Greenfish"), and to be sold on its behalf by IPI to third parties (i.e., persons or entities not owned by IPI), a certain protocol shall be followed by IPI.  Specifically, if Greenfish requests IPI to sell a particular Greenfish Portfolio, IPI shall, directly or through its agents, solicit offers to purchase such Greenfish Portfolio (the "Purchase Offers") from any prospective third party purchasers that may be identified by IPI or its agents (the "Third Party Purchasers").  Neither IPI nor its agents perform any due diligence with respect to the financial qualifications of such Third Party Purchasers; rather IPI or its agents, as the case may be, rely upon the reputation of each such Third Party Purchaser in the debt-buying industry to the extent such reputation is known by IPI or its agents.

Based upon Purchase Offers received by IPI from any Third Party Purchasers, and after consultation with Greenfish, IPI shall accept on behalf of Greenfish one such Purchase Offer, provided that such Purchase Offer is acceptable to Greenfish.  IPI shall not accept any Purchase Offer in connection any Greenfish Portfolio unless such acceptance has been expressly authorized by Greenfish.

In addition, any sale of a Greenfish Portfolio to a Third Party Purchaser shall be memorialized by a written purchase and sale agreement between Greenfish and IPI.  No closing of a sale of a Greenfish Portfolio ("Closing") shall take place without a written purchase and sale agreement having been executed between the parties to such sale.

DUANE MORRIS LLP   A DELAWARE LIMITED LIABILITY PARTNERSHIP                         FRANK A. LUCHAK, RESIDENT PARTNER

100 AMERICAN METRO BOULEVARD, SUITE 150  HAMILTON, NJ 08619-2304       PHONE: 609.631.2400   FAX: 609.631.2401
P.O. BOX 5203, PRINCETON, NJ  08543-5203
DM2\2150702.1

Eric Raymond, C.L.U.
December 17, 2009
Page 2

**DuaneMorris**

After Closing has occurred and after the proceeds from the sale of the Greenfish Portfolio have  been remitted to Greenfish, Greenfish shall no longer have any ownership interest in the Greenfish Portfolio.  Accordingly, at that point, IPI may, in its sole discretion, take certain actions with respect to such Greenfish Portfolio for purposes of subsequently selling such Greenfish Portfolio to one or more Third Party Purchasers, including, but not necessarily limited to, the following: (i) adding certain other medical accounts receivable to such Greenfish Portfolio; (ii) deleting certain medical accounts receivable from such Greenfish Portfolio; or (iii) maintaining such Greenfish Portfolio with the same medical accounts receivable as were contained therein at the time of Closing.

Finally, any services rendered by IPI or its agents in connection with the sale of any Greenfish Portfolio, including, but not limited to, any costs associated with obtaining, reviewing and analyzing any Purchase Offers, shall be provided at no additional cost to Greenfish.

Naturally, should you have any questions regarding the above protocol, please feel free to contact me at any time.

Very truly yours,


William L. Weiner




cc:  International Portfolio, Inc., attn: Richard Shusterman, President/CEO

DM2\2150702.1

# EXHIBIT D

# EXHIBIT D

## MASTER PORTFOLIO AGREEMENT

THIS MASTER PORTFOLIO AGREEMENT (this "*Agreement*") is made this __ day of February, 2009 (the "*Effective Date*"), by and between **GREENFISH FUND II, LP** ("*Greenfish II*"), a Delaware limited partnership with an address of c/o Weir and Partners LLP, 210 Haddon Avenue, Westmont, New Jersey 08108, and **INTERNATIONAL PORTFOLIO, INC.** ("*IPI*"), a Delaware corporation with an address of 200 Barr Harbor Drive, Suite 400, West Conshohocken, Pennsylvania 19428.

**WHEREAS,** IPI wishes to sell to Greenfish II certain medical debt portfolios consisting of uncollected and charged-off accounts which IPI may acquire from time to time (collectively, the "*Portfolios*") and Greenfish II desires to purchase the Portfolios from IPI on the terms and conditions hereafter set forth; and

**WHEREAS,** IPI has been engaged in the sale of medical debt portfolios to third parties and has an established record of such sales and the returns thereon.

**NOW, THEREFORE,** in consideration of the promises and respective covenants and agreements hereinafter contained, the parties hereto, intending to be legally bound, HEREBY COVENANT AND AGREE as follows:

1.      As set forth in this Agreement, IPI hereby agrees to offer to sell, transfer and assign to Greenfish II its right, title and interest in and to the Portfolios. It is anticipated that IPI will offer Portfolios to Greenfish II having a cost value between Ten Million Dollars ($10,000,000) and Thirty Million Dollars ($30,000,000) on an annual basis (the "*Annual Requirement*") in accordance with the terms and conditions of a purchase and sale agreement in substantially the form attached hereto as **Exhibit A** and incorporated herein by reference. Greenfish II shall have the right, in its sole discretion, but not the obligation to purchase the Portfolios offered by IPI. IPI agrees that Greenfish II shall have the right of first refusal to acquire the Portfolios that become available to IPI. However, Greenfish II's right of first refusal to purchase the Portfolios is exercisable only so long as such right is exercised within five (5) business days of a notification from IPI regarding its desire to sell the Portfolios.

2.      It is understood that IPI may not be able to fulfill its obligations under Section 1 above because it is unable to have access to institutions selling the medical debt portfolios or IPI is unable to purchase medical debt portfolios in an amount necessary to enable IPI to meet the Annual Requirement. If IPI does not meet the Annual Requirement for such reasons, IPI will have no liability whatsoever to Greenfish II and/or any of the investors of Greenfish II.

3.      IPI does not warrant or guarantee any specific return on the Portfolios, but IPI does warrant that, to the best of its knowledge, the Portfolios contain valid accounts that accurately reflect the debtor, the amount of debt, and the medical provider. However, IPI agrees to offer the Portfolios to Greenfish II at prices that are equal to or less than the price offered to other third-party portfolio purchasers.



4.    Upon payment by Greenfish II of the purchase price to IPI for the Portfolios, IPI, at its sole expense, agrees to perform the following services on behalf of Greenfish II (collectively, the "*Services*"):

(a)    Placing the Portfolios with designated collection agencies and/or law firms for collection and/or directly engaging in activities to collect the amounts owed on the accounts within the Portfolios;

(b)    Assisting in finding prospective buyers for the purchase of uncollected/remaining Portfolios at the end of the period of time allotted for collection (which shall be no longer than eighteen (18) months). Should Greenfish II decide to place the Portfolios longer than eighteen (18) months with such designated collection agencies or law firms, IPI agrees to assist and monitor the comprehensive collection process at no additional cost to Greenfish II. All monies realized from any such sale of the Portfolios shall belong to Greenfish II;

(c)    Initiating any collection actions in compliance with applicable laws, except that IPI shall not authorize the garnishment of wages or foreclosure on any primary residences; and

(d)    Preparing, executing, recording and monitoring all UCC-1 filings providing a security interest in the Portfolios in favor of Greenfish II.

5.    In placing the Portfolios with any collection agency or law firm, IPI shall arrange for (i) all monies due Greenfish II to be wired to Greenfish II, by Portfolio, twice a month and (ii) Greenfish II to receive a report of monies collected from each such collection agency and/or law firm twice a month. The monies due to Greenfish II shall be wired to the bank designated by Greenfish II. All funds wired to Greenfish II will be net proceeds with the collection agency and/or law firm already deducting their established fees. To the extent that IPI directly collects and/or receives payment from the medical provider that has collected the debt, IPI shall make payment and provide reports to Greenfish II as provided for above.

6.    Greenfish II agrees to indemnify and hold harmless IPI, including its officers, directors, managers, employees, stockholders, agents and assigns, from and against any claims, actions, suits or other actual or threatened procedures and all losses, judgments, damages, expenses or other costs, including reasonable fees and disbursements of counsel, incurred or suffered by IPI as a result of providing the Services, so long as IPI acted in good faith in rendering the Services, or by reason of willful misconduct or violation of applicable law, rule or regulation by Greenfish II or its employees, agents or assigns in connection with the collection or enforcement of the Portfolios.

7.    IPI agrees to indemnify and hold harmless Greenfish II, its employees, agents or assigns, from and against any claims, actions, suits or other actual or threatened procedures and all losses, judgments, damages, expenses or other costs, including reasonable fees and disbursements of counsel, incurred or suffered by Greenfish II by reason of willful misconduct or violation of applicable law, rule or regulation by IPI, or its employees, agents or assigns in connection with the collection or enforcement of the Portfolios.



2

8.     Nothing in this Agreement is intended to or shall be construed to constitute or establish an agency, joint venture, partnership or fiduciary relationship between the parties and no party shall have the right or authority to act for or on behalf of the other with respect to any matter.

9.     Greenfish II agrees any and all accounts in the Portfolios purchased in accordance with the terms of this Agreement are purchased "as is" without any of the parties having made an independent investigation as to the nature, collectability and value of the Portfolios, and Greenfish II is not relying upon any representations or warranties of IPI except as provided in Section 3 of this Agreement and as hereinafter provided in this Section 9. IPI has provided Greenfish II with an historical analysis of its sales and returns on medical debt portfolios it has purchased and managed for other parties. IPI represents and warrants that that historical analysis accurately depicts the results of those transactions. Greenfish II acknowledges that IPI is not warranting that Greenfish II will achieve the same or similar results.

10.    Except for the provisions hereof and the individual purchase and sale agreements, including all schedules, exhibits and documents related thereto, this Agreement contains the entire agreement between Greenfish II and IPI with respect to the matters contemplated in this Agreement and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning the sale of medical debt portfolios hereunder. This Agreement shall not be altered, amended, changed or modified except in writing executed by both parties.

11.    Any notice, demand, claim or communication under this Agreement shall be in writing and shall be deemed to have been given upon receipt thereof if delivered personally or sent by certified mail, return receipt requested, postage prepaid or sent overnight courier to the parties at the addresses set forth on the first page of this Agreement or at such other addresses as shall be specified by the parties by like notice.

12.    This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law principles.

13.    This Agreement shall inure to the benefit of and be binding on the parties to this Agreement, their successors, assigns, and legal representatives.

14.    Greenfish II shall have the right to purchase life insurance on the lives of Richard Shusterman and Robert F. Feldman, each an officer of IPI, in recognition that this Agreement may be materially affected by the loss of either or both IPI personnel so long as neither party is subjected to a physical examination or required to permit a review of his credit report.

15.    This Agreement may be executed in several counterparts and all executed counterparts shall constitute one Agreement binding on both parties to this Agreement even though all parties were not signatories to the original or same counterpart.

16.    The term of this Agreement shall begin on the Effective Date and continue for an initial term of three (3) years. Thereafter, this Agreement shall renew automatically for successive terms of one (1) year each, unless either party provides the other with at least sixty

DTI 830624v2 02/02/09



(60) calendar days prior written notice of its intent not to renew this Agreement at the end of the then current term.

**IN WITNESS WHEREOF,** the parties intending to be legally bound hereby have executed this Master Portfolio Agreement the date and year first above written.

GREENFISH FUND II, LP

By its General Partner,
Purplefish, LLC

By: _____
Name: _ERIC RAYMOND_____
Title: _Managing Partner_____
Dated: February _09_, 2009

By: _____
Name: _____
Title: _____
Dated: February _____, 2009


INTERNATIONAL PORTFOLIO, INC.

By: _____
Name: Richard Shusterman
Title:   President
Dated: February _10_, 2009

DTI 830624v2 02/02/09

## EXHIBIT A

### [Form of Purchase and Sale Agreement]

09/29/2009 10:07 FAX  8036312401          DUANE MORRIS LLP                      ☐002/006

## MASTER PORTFOLIO AGREEMENT

THIS MASTER PORTFOLIO AGREEMENT (this "*Agreement*") is made this 24 day of September, 2009 (the "*Effective Date*"), by and between **GREENFISH FUND II, LP** ("*Greenfish II*"), a Delaware limited partnership with an address of c/o Weir and Partners LLP, 210 Haddon Avenue, Westmont, New Jersey 08108, and **INTERNATIONAL PORTFOLIO, INC.** ("*IPI*"), a Delaware corporation with an address of 200 Barr Harbor Drive, Suite 400, West Conshohocken, Pennsylvania 19428.

WHEREAS, IPI wishes to sell to Greenfish II, or other entity owned and/or controlled by Purplefish, LLC or Eric Raymond (hereinafter collectively referred to as Greenfish II) certain medical debt portfolios consisting of uncollected and charged-off accounts which IPI may acquire from time to time (collectively, the "*Portfolios*") and Greenfish II desires to purchase the Portfolios from IPI on the terms and conditions hereafter set forth; and

WHEREAS, IPI has been engaged in the sale of medical debt portfolios to third parties and has an established record of such sales and the returns thereon.

NOW, THEREFORE, in consideration of the promises and respective covenants and agreements hereinafter contained, the parties hereto, intending to be legally bound, HEREBY COVENANT AND AGREE as follows:

I.       As set forth in this Agreement, IPI hereby agrees to offer to sell, transfer and assign to Greenfish II its right, title and interest in and to the Portfolios. It is anticipated that IPI will offer Portfolios to Greenfish II having an open ongoing cost value of Two Hundred Million Dollars ($200,000,000) (the "*Annual Requirement*") in accordance with the terms and conditions of a purchase and sale agreement in substantially the form attached hereto as Exhibit A and incorporated herein by reference (the "Purchase Agreement"). Greenfish II shall have the right, in its sole discretion, but not the obligation to purchase the Portfolios offered by IPI. IPI agrees that Greenfish II shall have the right of first refusal to acquire the Portfolios that become available to IPI (the "Right of First Refusal"). However, Greenfish II's Right of First Refusal to purchase the Portfolios is exercisable only so long as such Right of First Refusal is exercised within five (5) business days of a notification from IPI regarding its desire to sell the Portfolios. Notwithstanding the foregoing, within two (2) weeks after receiving full documented data of the Portfolios in question (the "Two-Week Period"), and which documented data shall consist of collection survey, valuations, and debtor data, Greenfish II shall have (i) the right to return the Portfolios and the right to receive a refund of all funds paid to IPI by Greenfish II for the purchase of such Portfolios (both such rights being hereinafter collectively referred to as the "Right of Return"); and/or (ii) the right to purchase another Portfolio, provided such other Portfolio is then available for purchase, as determined by IPI in its sole discretion. If the Right of Return is not exercised by Greenfish II within the Two-Week Period, such Right of Return shall terminate and expire. This Right of Return supersedes any contrary provisions of the Purchase Agreement. Further, the parties understand and agree that IPI may not be able to fulfill its obligations under Section 1 above because it is unable to have access to institutions selling the Portfolios or IPI is unable over the course of a particular year during the Initial Term (as defined in Paragraph 15 below) of this Agreement or any Renewal Term (as defined in Paragraph 15

below), as the case may be, to purchase Portfolios in amounts necessary to enable IPI to meet the Annual Requirement. If IPI does not meet the Annual Requirement for such reasons, IPI will have no liability whatsoever to Greenfish II and/or any of the investors of Greenfish II (individually and collectively, the "Investors"), and Greenfish II shall indemnify, defend and hold harmless IPI from any claims, actions, suits or other actual or threatened procedures (collectively, the "Claims"), and all losses, judgments, damages, expenses or other costs, including reasonable fees and disbursements of counsel, incurred or suffered by IPI as a result of the Claims of any such Investors.

2.     IPI does not warrant or guarantee any specific return on the Portfolios, but IPI does warrant that, to the best of its knowledge, the Portfolios contain valid accounts that accurately reflect the debtor, the amount of debt, and the medical provider. However, IPI agrees to offer the Portfolios to Greenfish II at prices that are equal to or less than the price offered to other third-party portfolio purchasers (the "Third-Party Purchase Price"). However, in the event that Richard Shusterman no longer owns a controlling interest in IPI, then IPI agrees that the marked up cost of any Portfolio sold to Greenfish II shall be not greater than 50 % more than the Third-Party Purchase Price. If Eric Raymond no longer owns a controlling interest in Purplefish, LLC, the general partner of Greenfish II, then the Right of First Refusal and the Right of Return shall be deemed to have been waived.

3.     Upon payment by Greenfish II of the purchase price to IPI for the Portfolios, and after expiration of the Two-Week Period, and provided Greenfish II has not exercised its Right of Return during such Two-Week Period, IPI, at its sole expense, agrees to perform the following services on behalf of Greenfish II (collectively, the "*Services*"):

(a)     Placing the Portfolios with designated collection agencies and/or law firms for collection and/or directly engaging in activities to collect the amounts owed on the accounts within the Portfolios;

(b)     Assisting in finding prospective buyers for the purchase of uncollected/remaining Portfolios at the end of the period of time allotted for collection (which shall be no longer than eighteen (18) months, except as otherwise provided herein). Should Greenfish II decide to place the Portfolios longer than eighteen (18) months with such designated collection agencies or law firms, IPI agrees to monitor the comprehensive collection process at no additional cost to Greenfish II. All monies realized from any sale of the Portfolios to any prospective buyer(s) as referenced by this paragraph 3(b) shall belong to Greenfish II;

(c)     Initiating any collection actions in compliance with applicable laws, except that IPI shall not authorize the garnishment of wages or foreclosure on any primary residences; and

(d)     Preparing, executing, recording and monitoring all UCC-1 filings providing a security interest in the Portfolios in favor of Greenfish II.

4.     In placing the Portfolios with any collection agency or law firm, IPI shall arrange for (i) all monies due Greenfish II to be wired to Greenfish II, by Portfolio, twice a month and (ii) Greenfish II to receive a report of monies collected from each such collection agency and/or

2

law firm twice a month.  The monies due to Greenfish II shall be wired to the bank designated by Greenfish II.  All funds wired to Greenfish II will be net proceeds with the collection agency and/or law firm already deducting their established fees.  To the extent that IPI directly collects and/or receives payment from the medical provider that has collected the debt, IPI shall make payment and provide reports to Greenfish II as provided for above.

5.      Greenfish II agrees to indemnify and hold harmless IPI, including its officers, directors, managers, employees, stockholders, agents and assigns, from and against any claims, actions, suits or other actual or threatened procedures and all losses, judgments, damages, expenses or other costs, including reasonable fees and disbursements of counsel, incurred or suffered by IPI as a result of providing the Services, so long as IPI acted in good faith in rendering the Services, or by reason of willful misconduct or violation of applicable law, rule or regulation by Greenfish II or its employees, agents or assigns in connection with the collection or enforcement of the Portfolios.

6.      IPI agrees to indemnify and hold harmless Greenfish II, its employees, agents or assigns, from and against any claims, actions, suits or other actual or threatened procedures and all losses, judgments, damages, expenses or other costs, including reasonable fees and disbursements of counsel, incurred or suffered by Greenfish II by reason of willful misconduct or violation of applicable law, rule or regulation by IPI, or its employees, agents or assigns in connection with the collection or enforcement of the Portfolios.

7.      Nothing in this Agreement is intended to or shall be construed to constitute or establish an agency, joint venture, partnership or fiduciary relationship between the parties and no party shall have the right or authority to act for or on behalf of the other with respect to any matter.

8.      Greenfish II agrees any and all accounts in the Portfolios purchased in accordance with the terms of this Agreement are purchased "as is" without any of the parties having made an independent investigation as to the nature, collectability and value of the Portfolios, and Greenfish II is not relying upon any representations or warranties of IPI except as provided in Section 3 of this Agreement and as hereinafter provided in this Section 9.  IPI has provided Greenfish II with an historical analysis of its sales and returns on medical debt portfolios it has purchased and managed for other parties.  IPI represents and warrants that that historical analysis accurately depicts the results of those transactions.  Greenfish II acknowledges that IPI is not warranting that Greenfish II will achieve the same or similar results.

9.      Except for the provisions hereof and the individual purchase and sale agreements, including all schedules, exhibits and documents related thereto, this Agreement contains the entire agreement between Greenfish II and IPI with respect to the matters contemplated in this Agreement and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning the sale of medical debt portfolios hereunder.  This Agreement shall not be altered, amended, changed or modified except in writing executed by both parties.

10.     Any notice, demand, claim or communication under this Agreement shall be in writing and shall be deemed to have been given upon receipt thereof if delivered personally or

Sep 30 2009 7:44PM   HP LASERJET FAX          6107714042              page 4

08/28/2009 10:07 FAX  6098312401        DUANE MORRIS LLP                            ☐ 005/006

sent by certified mail, return receipt requested, postage prepaid or sent overnight courier to the parties at the addresses set forth on the first page of this Agreement or at such other addresses as shall be specified by the parties by like notice.

11.    This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law principles.

12.    This Agreement shall inure to the benefit of and be binding on the parties to this Agreement, their successors, assigns, and legal representatives.

13.    Greenfish II shall have the right to purchase life insurance on the lives of Richard Shusterman and Robert F. Feldman, each an officer of IPI, in recognition that this Agreement may be materially affected by the loss of either or both IPI personnel so long as neither party is subjected to a physical examination or required to permit a review of his credit report.

14.    This Agreement may be executed in several counterparts and all executed counterparts shall constitute one Agreement binding on both parties to this Agreement even though all parties were not signatories to the original or same counterpart.

15.    The term of this Agreement shall begin on the Effective Date and continue for an initial term of five (5) years (the "Initial Term"). This Agreement shall then renew automatically for successive terms of (3) years each (each such term a "Renewal Term"), unless either party provides the other with at least three hundred sixty (360) days prior written notice of its intent not to renew or to terminate this Agreement; and in that case, this Agreement shall automatically terminate at the end of the Initial Term or at the end of then-current Renewal Term, as the case may be.

IN WITNESS WHEREOF, the parties intending to be legally bound hereby have executed this Master Portfolio Agreement the date and year first above written.

GREENFISH FUND II, LP

By its General Partner,
Purplefish, LLC

By:      _____
Name:   _____
Title:    _____

INTERNATIONAL PORTFOLIO, INC.

By:      _____
Name:  Richard Shusterman
Title:   President

DT1 830624v2 02/02/09

09/29/2009 10:08 FAX  6096312401           DUANE MORRIS LLP                        ☑006/006

## EXHIBIT A

### [Form of Purchase and Sale Agreement]

DTI 830524v2 02/02/09

# EXHIBIT E

# EXHIBIT E

| From: | Romberger, Andrew L. [ARomberger@foxrothschild.com] |
|---|---|
| Sent: | Wednesday, January 07, 2009 5:41 PM |
| To: | SAngstreich@weirpartners.com |
| Cc: | Harrington, Michael S.; Eric Raymond; rdrucker@TAXWARRIORS.com |
| Subject: | Master Portfolio Agreement |
| Attachments: | EX1-#800035-v2-Master_Portfolio_Agreement_between_IPI_and_Greenfish_II.DOC; EX1-#800035-vdoc-Master_Portfolio_Agreement_between_IPI_and_Greenfish_II.DOC |

Steve,

Attached are a few comments on the Master Portfolio Agreement. Please confirm that you are comfortable with the revisions and then I will forward the agreement to IPI's counsel.

Regards,

*Andy Romberger*

**Fox Rothschild LLP**
Eagleview Corporate Center
747 Constitution Drive
Suite 100
P. O. Box 673
Exton, PA 19341
Phone: 610.458.4982
Fax: 610.458.7337
email: aromberger@foxrothschild.com
www.foxrothschild.com


ATTENTION:

IRS CIRCULAR 230 DISCLOSURE:
Pursuant to Treasury Regulations, any tax advice contained in this communicati
(including any attachments) is not intended or written to be used, and cannot
used or relied upon by you or any other person, for the purpose of (i) avoidin
penalties under the Internal Revenue Code, or (ii) promoting, marketing or
recommending to another party any tax advice addressed herein.
---------------------------------------------
This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for
the use of the Individual(s) named above. If you are not the intended recipien
of this e-mail, or the employee or agent responsible for delivering this to th
intended recipient, you are hereby notified that any dissemination or copying
of this e-mail is strictly prohibited. If you have received this e-mail in err
please immediately notify us by telephone at (215)-299-2167 or notify us by
e-mail at helpdesk@foxrothschild.com. Also, please mail a hardcopy of the e-m
to Fox Rothschild LLP, 2000 Market Street, Philadelphia PA 19103-3291 via the
U.S. Postal Service. We will reimburse you for all expenses incurred.

Thank you.

# EXHIBIT  F

# EXHIBIT  F

| | |
|---|---|
| **From:** | RSHUSTERMAN@aol.com |
| **Sent:** | Thursday, December 13, 2007 10:18 PM |
| **To:** | khill@rshcp.com |
| **Cc:** | seanmcn@verizon.net; bpbourque@comcast.net |
| **Subject:** | Re: Update |

Dear Kevin, Sean & Basil:

I wanted to take this opportunity and wish each of you a Merry Christmas & a happy & healthy New Year. A few updates.

1. All of the accounts are now getting letters and calls.

2. The hospital system is receiving direct payments as well.

3. Cash should start to come in very soon (the next week or so).

4. We just secured more paper from the same system due in around the 3RD to 5TH of January. The files will contain even newer paper as well.

5. If all of the above is not enough great news, we are working with one of my consistent buyers to purchase your entire pool of accounts. If the transaction goes through, the deal will fund the first week in January. You would realize a cash return of 5.5% per month from the date your wired your funds until the date your return wire is sent. Additionally if any payments come in on any accounts you own from the date of purchase to the date of sale, the money is all yours as well.

6. If a sale takes place, I will wire you all of your cash invested back plus the proceeds of the profit (any accounts collected plus 5.5% return for every four weeks you were invested).

7. We will have another HMA file ready for you to go in as well.

8. If the file does not sell (70% chance of closing, I will know better next week) the cash will be forwarded every week as soon as it starts to come in -next 1-2 weeks.

I hope the above report is helpful. I am on top of everything associated with your file and will do everything possible to bring you the greatest rate of return on your investment.

Thanks,

Richard

See AOL's top rated recipes and easy ways to stay in shape for winter.

# EXHIBIT G

# EXHIBIT G

**From:** RSHUSTERMAN@aol.com
**Sent:** Tuesday, April 08, 2008 6:07 PM
**To:** bpbourque@comcast.net
**Cc:** seanmcn@verizon.net; khill@rshcp.com
**Subject:** Portfolio sell

Basil:

I hope all is well. I wanted to let you know I worked long and hard to sell all three portfolios you own. I have them all sold. I have listed the details below:

Roundstone Healthcare Investments, LLC- Purchased 12-24-07- $2,179,,247.00
sell and have funded tomorrow  for the sum of $2,453,832.10

Roundstone Healthcare Partners I LP purchased 12-24-07 - $5,447,500
sell and have funded tomorrow for the sum of $6,101,200

Roundstone Healthcare Partners II, LP- Purchased Feb 12, 2008 $3,015,500
sell and have funded tomorrow for the sum of $3,256,200


if the above is acceptable, I will have a purchase agreement sent to you tonight for all three files. I will need them signed and faxed back by Wed morning. Upon receipt of the documents and funds from the buyer, I will wire the individual funds to each of your  accounts.

Please let me know as soon as possible if you wish to move forward.

Thanks,
Richard

---

Planning your summer road trip? Check out <u>AOL Travel Guides</u>.

# EXHIBIT  H

# EXHIBIT  H

----- Original Message -----
**From:** RSHUSTERMAN@aol.com
**To:** bpbourque@comcast.net
**Cc:** seanmcn@verizon.net ; khill@rshcp.com
**Sent:** Sunday, September 07, 2008 11:09 AM
**Subject:** portfolio Update

Dear Basil, Sean & Kevin:

I hope everyone is enjoying their weekend and survived the storms that rolled through yesterday. I have a buyer who has bought many portfolios from us in the past interested and ready to buy two portfolios you own. I have listed the details below:

1. Roundstone Healthcare Partners I LP- face value size $64,606,741.57- You purchased the file- 8-6-08  for 4.45% and funded $2,875,000.00

2. Roundstone Healthcare Partners II, LP- face value size $34,943,820.22- You purchased the file 8-6-08 for 4.45% and funded $1,555,000.00

I can sell both files above with funding taking place one week from tomorrow for the sum of $4,550,000. The profit realized will be $120,000 in roughly one month. The attorney who wants to buy the file has purchased many portfolios form us in the past and will be looking to buy more files in the next month as well. I suggest you sell the files. I have more portfolios ready for sale as well.

Please confirm I can sell both portfolios above.

Thanks,

Richard

---

Psssst...Have you heard the news? There's a new fashion blog, plus the latest fall trends and hair styles at StyleList.com.

# EXHIBIT I

# EXHIBIT I

**From:**      "Sean " <seanmcn@verizon.net>
**To:**        <RSHUSTERMAN@aol.com>; <khill@rshcp.com>
**Cc:**        <bpbourque@comcast.net>; "Bob Feldman" <RobertF30@aol.com>
**Sent:**      Monday, October 08, 2007 10:22 PM
**Subject:**   RE: September DP report- Roundstone

Richard,

Please send along the Password when you get a chance. Also Basil, Kevin, and I are going to
be together in NJ next Thursday (Oct 18) and Friday (Oct 19). Are you and Bob available to
get together for lunch on Friday (Oct 19) or Thursday morning? We could meet down your
way if that is convenient for you and Bob.

Thanks,

Sean
Sean McNamara
908.630.9266
seanmcn@verizon.net

**From:** RSHUSTERMAN@aol.com [mailto:RSHUSTERMAN@aol.com]
**Sent:** Monday, October 08, 2007 8:42 PM
**To:** khill@rshcp.com
**Cc:** seanmcn@verizon.net; bpbourque@comcast.net
**Subject:** Re: September DP report- Roundstone

In a message dated 10/8/2007 8:38:59 P.M. Eastern Daylight Time, khill@rshcp.com writes:

> Thanks Richard. Should we expect the drect payments to continue on a monthly
> basis and do you typically see the amounts increase over time?

yes they will come every month and you should see a large increase in the next month or two. I would
expect the next direct to be in the $50,000 to $100,000 gross range. I am very comfortable with
everything.

Regards,

RS

See what's new at AOL.com and Make AOL Your Homepage.

# EXHIBIT  J

# EXHIBIT  J

**From:**  RSHUSTERMAN@aol.com
**Sent:**  Wednesday, January 02, 2008 4:05 PM
**To:**  bpbourque@comcast.net
**Cc:**  seanmcn@verizon.net; khill@rshcp.com
**Subject:** Re: impact of worsening credit on collections

Basil:

Charged off auto paper is the most difficult to collect. If someone is going to forgo their car, they are pretty down and out on their luck. Further credit cards and auto do not offer the possibility of insurance resubmission for payment.  We have many weapons in our collection efforts. Our paper is for the most part not the model of a distressed asset. Many of these people owe money because they were never located, talked to or had any idea how to resolve the outstanding debt owed. We also have the ability to collect from WC cases, accident subrogation and so on. (Sorry for such a long reply). So could collections slow, anything is possible, but we have many more avenues to pursue when collecting hospital debt that no other asset class can claim.

You are welcome to pursue  Hallmark Hospital in Melrose/Wakefield, MA.

Many thanks,

Richard

In a message dated 1/2/2008 12:49:54 P.M. Eastern Standard Time, bpbourque@comcast.net writes:

> Hi Richard,
>
> I have read stories that some collection agencies confirmed that collections in Nov and Dec were weaker than normal. Credit cards and auto related paper are showing increased delinquencies. Has this increased risk been reflected in the value that we are paying for our portfolios? This was asked by a potential investor. The collection agency that we recently sold to thinks the price is right, but that's all I have to say in response. Is there any other facts I can give him?
>
> Can I contact Hallmark Hospital in Melrose/Wakefield, MA?
>
> Thanks and Happy New Year
>
> Basil

See AOL's top rated recipes and easy ways to stay in shape for winter.

**From:** RSHUSTERMAN@aol.com
**Sent:** Wednesday, October 08, 2008 12:17 PM
**To:** seanmcn@verizon.net; bpbourque@comcast.net
**Cc:** khill@rshcp.com
**Subject:** Re: RHP III - remit 1653.99 10/1/08

Sean:

I hope all is well. please find my comments below:

In a message dated 10/8/2008 7:54:12 A.M. Eastern Daylight Time, seanmcn@verizon.net writes:

> Richard,
>
> A few updates:
>
> We would like to close on Fund IV next Tuesday, October 14th  as Basil is away at a funeral the remainder of the week and next Monday is a bank holiday (Columbus Day). We are going to fund either $2MM or $2.1MM. I will know final amount probably tomorrow and will send it to you so that you can prepare the files.

*I will await your final number and then work on a contract for you*

> We are now in a position to close Fund 1 as November 1st will be one year since inception. You had said previously to give you 3 weeks notice so the timing is about right. Hopefully, since more people have increased their desire to purchase paper, Fund 1 will go out on a strong note.

*So I understand, you want me to sell any accounts coded as RS HP I, regardless as to how recent the files were purchased. Please see the chart below and confirm;*

| | | | | | |
|---|---|---|---|---|---|
| *dstone Healthcare Partners I, L.P.* | *09/03/08* | *HMA accounts* | *$97,093,023.26* | *4.30%* | *$4,175,000.00* |
| *dstone Healthcare Partners I, L.P.* | *09/12/08* | *HMA accounts* | *$31,460,674.16* | *4.45%* | *$1,400,000.00* |
| *dstone Healthcare Partners I, L.P.* | *09/19/08* | *HMA accounts* | *$33,707,865.17* | *4.45%* | *$1,500,000.00* |
| | | *Subtotal* | *$162,261,562.59* | - | *$7,075,000.00* |

> Finally, we have received a few emails like the one below to Kevin from an investor. We read how banks have stopped lending (BOA won't provide funding for McDonald franchises, mortgages that are requiring 50% down payments, etc.). Is the current financial crisis limiting the ability of our secondary buyers to obtain credit to buy our portfolios? I want to provide

some "color" for current and potential investors.

*I cant speak for how the buyers of files obtain their cash. If I had to guess, many are long term players and have deployed their own money. Banks did not lend on this asset class in the past so I think it's a non issue. Once your files are sold, I need to have paper for you to buy. What is the time period you expect to redploy funds from fund I into a new portfolio?*

Regards,
RS

Kevin,

I wanted to get your opinion on the secondary market for hospital receivables.  With funds drying up in many markets I am curious about the buyers of the paper we are invested in, and the expected return of receivable pools going forward in light of the economy.

Certainly I would expect a lag in data from this event until it affects our returns, however I was wondering if there were any signs that events in the economy and in credit have impacted our investment environment.

Thanks,

Steve

Thanks for all your help with this,

Sean

Sean McNamara

908.630.9266

seanmcn@verizon.net

_____

**From:** RSHUSTERMAN@aol.com [mailto:RSHUSTERMAN@aol.com]
**Sent:** Friday, October 03, 2008 2:50 PM
**To:** bpbourque@comcast.net
**Cc:** seanmcn@verizon.net; khill@rshcp.com
**Subject:** Re: RHP III - remit 1653.99 10/1/08

Basil:

Many thanks- I will hold paper for you and await your final number next week. Many people have called and increased their desire to purchase paper since the equities market tanked. We are busier then ever!

Phillies look great! Lets keep our fingers crossed.

Have a great weekend.

Regards,

Richard

In a message dated 10/3/2008 11:15:52 A.M. Eastern Daylight Time, bpbourque@comcast.net writes:

> Hi Richard,
>
> I'm happy to send you a spread sheet every two weeks listing the reports we need.
> We are planning on funding around $2 mill next week. Money is still coming in so I think we may be ready
> toward the middle to end of the week. I will give you the exact number once we close the Fund. Have a
> great weekend and good luck to your Phillies.
>
> Regards
>
> Basil
> ---------------- Original message ----------------------
> From: RSHUSTERMAN@aol.com
> > Basil:
> >
> > I hope all is well. Attached please find a new payment report for your
> > records. If it's not to much trouble, please send me a spread sheet every two
> > weeks listing any wires you received wherein the reports are missing and I can
> > then have the reports compiled and e-mailed over.
> >
> > I await your update tomorrow of any new funding you have available so I can
> > gather your new files together.
> >
> > Thanks,
> > RS
> >
> >
> >
> > _____
> > From: Lmmvars
> > To: RSHUSTERMAN
> > Sent: 10/1/2008 3:51:31 P.M. Eastern  Daylight Time
> > Subj: Fwd: RHP III - remit 1653.99 10/1/08
> >

> 
> 
> 
> Lina Monterosso
> Vice President of OPS
> International Portfolio, Inc
> Cell: 717-587-9007
> Fax: 954-747-0633
> 
> 
> 
> _____
> From: CTurner@escallate.com
> To: Lmmvars@aol.com
> CC:  MMoyer@escallate.com
> Sent: 10/1/2008 3:50:06 P.M. Eastern Daylight  Time
> Subj: RHP III - remit 1653.99
> 
> 
> 
> HMA
> RHP III
> amount remitted $1,653.99
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> 
> _____
>  Looking for simple solutions to your real-life financial challenges? _Check
> out WalletPop for the latest news and information, tips  and calculators_
> (http://pr.atwola.com/promoclk/100000075x1209382257x1200540686/aol?redir=http://
> www
> .walletpop.com/?NCID=emlcntuswall00000001) .
> 
> 
> 
> 
> **************Looking for simple solutions to your real-life financial
> challenges?  Check out WalletPop for the latest news and information, tips and
> calculators.      (http://www.walletpop.com/?NCID=emlcntuswall00000001)


From:   RSHUSTERMAN@aol.com
To:     bpbourque@comcast.net
Subject:    Fwd: RHP III - remit 1653.99 10/1/08
Date:   Thu, 2 Oct 2008 11:01:03 +0000
Content-Type: Multipart/mixed;
boundary="NextPart_Webmail_9m3u9jl4l_10715_1223046922_1"


Basil:

I hope all is well. Attached please find a new payment report for your records. If it's not to much trouble, please send me a spread sheet every two weeks listing any wires you received wherein the reports are missing and I can then have the reports compiled and e-mailed over.

I await your update tomorrow of any new funding you have available so I can gather your new files together.

Thanks,

RS

From: Lmmvars
To: RSHUSTERMAN
Sent: 10/1/2008 3:51:31 P.M. Eastern Daylight Time
Subj: Fwd: RHP III - remit 1653.99 10/1/08

*Lina Monterosso*
Vice President of OPS
International Portfolio, Inc
Cell: 717-587-9007
Fax: 954-747-0633

From: CTurner@escallate.com
To: Lmmvars@aol.com
CC: MMoyer@escallate.com
Sent: 10/1/2008 3:50:06 P.M. Eastern Daylight Time
Subj: RHP III - remit 1653.99

HMA
RHP III
amount remitted $1,653.99

Candy Turner
Supervisor - Business Administration
5200 Stoneham Rd Suite 200
North Canton, OH 44720
P 330-232-8120 ext 8232
F 330-232-8169
cturner@escallate.com

# ESCALLATE LLC

*"Collections...Perfected""*

Looking for simple solutions to your real-life financial challenges? Check out WalletPop for the latest news and information, tips and calculators.

Looking for simple solutions to your real-life financial challenges? Check out WalletPop for the latest news and information, tips and calculators.

New **MapQuest Local** shows what's happening at your destination. Dining, Movies, Events, News & more. Try it out!

New **MapQuest Local** shows what's happening at your destination. Dining, Movies, Events, News & more. Try it out!

# EXHIBIT K

EXHIBIT K

From: RSHUSTERMAN@aol.com
Sent: Monday, January 14, 2008 8:49 AM
To: khill@rshcp.com
Cc: smcnamara@roundstoneadvisors.com; bpbourque@roundstoneadvisors.com
Subject: Re: Question/Update

Kevin:

I hope all is well. What a great weekend of football. I am happy to reply to your last question first.

We sent the HMA files out to get appended and learned numerous files when produced by HMA were truncated. The files will be back in our hands before the end of the month. We lost a small amount of time, but will make that up by completing the remaining scrub (append) in 24 hours instead of one week. We can immediately continue where we stopped and therefore will have the file fully appended in roughly one day after receiving it back from HMA.

All of the agencies are on standby for the file and will quickly get all of the letters out on all files in under 10 days instead of 4-6 weeks.. This will allow us to catch up on any of the time lost rerunning the files. I suspect you will start to get weekly wires within the next 2-3 weeks. Once they start, they will occur every week with a greatly reduced ramp up period..

The next question...The agencies are all paid on commission. That said, it's in every service providers best interest to collect as much money on each account as they can in order to maximize the profitability on each account. They would not commit the staffing, time and investment in the collection of the files if they did not believe in the files. The desire to return the greatest profit on each file relates to my desire to enter into a long term relationship with you and make this venture as profitable as possible. I also view everyone's interests as the same... Top tier service, fewest patient complaints, with the greatest possible return to the investment group owning the file. I also personally invest in files and like you, want to see a steady stream of collections coupled with a sale down the road that equates to a profit for all.

I hope that helps.. Please let me know if you have any other questions on the above...

Any updates on the amount of the next portfolio you plan on buying this month?

Best regards,

RS

In a message dated 1/14/2008 8:28:26 A.M. Eastern Standard Time, khill@rshcp.com writes:

Hi Richard,


I hope you enjoyed your weekend.


I met with several potential investors last week who all shared a similar question that I wasn't sure how to answer. They all understand IPI purchases paper directly which is then resold to investors at a higher level to cover operating expenses and profit. The question is if IPI makes its profit through the sale to investors, what is the incentive to maximize the return for those investors? We assume the answer is along the lines that IPI is also co-investing in these deals AND IPI has an incentive to produce superior investment results to help secure future capital for growth. Please let us know how to properly answer this issue so we can finalize some fund raising.

We also hope the HMA deal is progressing as you hope and we look forward to our first weekly wire.


Thanks, Kevin Hill

---

Start the year off right. Easy ways to stay in shape in the new year.

| | |
|---|---|
| **From:** | RSHUSTERMAN@aol.com |
| **Sent:** | Friday, February 22, 2008 6:29 PM |
| **To:** | khill@rshcp.com; seanmcn@verizon.net; TheFeldmanGroup@mac.com |
| **Cc:** | bpbourque@comcast.net |
| **Subject:** | Re: FW: Follow-up |

Thank you. I will do the best I can for the entire group at all times. If I had the same batting average in baseball I have in the portfolio world the Yankees would be paying me BIG $$ :)

Regards,
RS

In a message dated 2/22/2008 6:24:38 P.M. Eastern Standard Time, khill@rshcp.com writes:

> Thanks Richard. I hope you were not offended by our questions and we truly appreciate your expertise. Sometimes our curiosity gets the best of us. We will obviously continue to follow your lead for our existing and all future files. Have a great weekend.
>
> Kevin Hill
>
> -----Original Message-----
> **From:** RSHUSTERMAN@aol.com [mailto:RSHUSTERMAN@aol.com]
> **Sent:** Friday, February 22, 2008 05:57 PM
> **To:** seanmcn@verizon.net, TheFeldmanGroup@mac.com
> **Cc:** khill@rshcp.com, bpbourque@comcast.net
> **Subject:** Re: FW: Follow-up

Delicious ideas to please the pickiest eaters. Watch the video on AOL Living.
Sean:

The hospital listed below is acceptable to go after.

*Richard, is it okay for me to contact the Blue Mountain Health Systems? They are in the Pocono are the insurance broker who I know wants to set up a call for you and the CEO?*

Regarding another conference call, I don't feel one is necessary. I would rather focus my tin and effort on the details associated with the daily activities centered around portfolios. I thin you're spending too much time on non issues. I am always happy at anytime to have you interface directly with any collection agency you wish thereby taking over the daily activitie daily nuances.

I think the world of each of you and will do anything I can to help you. I cant teach someone do I plan on teaching anyone) what took me 28 years to learn.

I will follow your direction and guidance as to how you would like me to move forward.

Many thanks,

Richard


In a message dated 2/22/2008 2:47:00 P.M. Eastern Standard Time, seanmcn@verizon.net writes:

> Richard,
>
>
> Are you available for a call on Monday (anytime) or Tuesday morning for a follow up
> call? Kevin's email below recaps the issue we are trying to get a better understanding
> of.
>
>
> Best regards,
>
>
> Sean
>
>
> Sean McNamara
>
> 908.630.9266
>
> seanmcn@verizon.net
>
>
> _____
>
> **From:** Kevin and Carolyn Hill [mailto:kevhill4@verizon.net]
> **Sent:** Friday, February 22, 2008 1:31 PM
> **To:** Sean McNamara
> **Cc:** SEAN MCNAMARA
> **Subject:** Follow-up
>
>
> Sean and Basil,
>
>
> Based on Sean's discussion with Bob, I thought it might be useful to have the below 3
> spreadsheets available for when we discuss with Richard. The spreadsheets are for our Nov '07,
> Dec '07 and Feb '08 purchases. It will be useful to get Richard's perspective on this - and
> although we will never get into this detail with investors, it would be helpful if we better
> understood what other variables, in addition to dates and amounts of discharge, are critical to
> the pricing of a deal. It is clear we only understand a fraction of what goes into the deal pricing,

but the more we learn the better.

Since I am working from home and do not have Richard's e-mail, perhaps you can send this note along to him as is.

Richard, is it okay for me to contact the Blue Mountain Health Systems? They are in the Pocono area and the insurance broker who I know wants to set up a call for you and the CEO?

**Nov 2007 Purchase**        **$5 Million Purchae Price**

| Discharge Date | # of Receivables | Current Balance | Percentage |
|---|---|---|---|
| 1997 | 1 | $8,091.38 | 0.0039% |
| 1998 | 6 | $11,497.38 | 0.0056% |
| 1999 | 17 | $11,460.52 | 0.0055% |
| 2000 | 191 | $119,228.15 | 0.0577% |
| 2001 | 7,420 | $4,790,556.09 | 2.3168% |
| 2002 | 26,801 | $18,262,478.30 | 8.8321% |
| 2003 | 34,589 | $25,731,767.39 | 12.4444% |
| 2004 | 43,710 | $32,102,189.51 | 15.5253% |
| 2005 | 58,481 | $50,262,911.22 | 24.3082% |
| 2006 | 62,218 | $72,604,819.50 | 35.1133% |
| 2007 | 864 | $2,868,192.03 | 1.3871% |
| | | | |
| Totals | 234,298 | $206,773,191.47 | |

**Decemember 26th, 2007**        **Abou $5,449,000 Purchase Price**

| Discharge Date | # of Receivables | Current Balance | Percentage |
|---|---|---|---|
| 1907 | 1 | $82.44 | 0.00005% |
| 1984 | 1 | $26.10 | 0.00001% |
| 1988 | 4 | $7,850.85 | 0.00432% |
| 1989 | 5 | $5,791.30 | 0.00319% |
| 1990 | 11 | $8,952.01 | 0.00493% |
| 1991 | 12 | $15,950.48 | 0.00878% |
| 1992 | 41 | $19,875.02 | 0.01094% |
| 1993 | 196 | $110,341.53 | 0.06076% |
| 1994 | 2364 | $1,330,849.08 | 0.73283% |

| | | | |
|---|---|---|---|
| 1995 | 8395 | $4,908,483.28 | 2.70284% |
| 1996 | 10,113 | $5,808,377.82 | 3.19836% |
| 1997 | 14,564 | $8,424,121.51 | 4.63871% |
| 1998 | 20,991 | $11,949,224.20 | 6.57979% |
| 1999 | 27,306 | $15,516,941.41 | 8.54434% |
| 2000 | 28,929 | $16,267,697.45 | 8.95774% |
| 2001 | 33,759 | $21,806,641.34 | 12.00773% |
| 2002 | 37,673 | $25,890,666.38 | 14.25659% |
| 2003 | 33,300 | $24,234,568.63 | 13.34466% |
| 2004 | 17,903 | $11,738,474.90 | 6.46374% |
| 2005 | 17,264 | $13,868,180.41 | 7.63645% |
| 2006 | 16,510 | $19,480,343.18 | 10.72677% |
| 2007 | 56 | $211,525.20 | |
| | | | |
| | Total:269,398 | $181,604,964.52 | |

**Feb 08 Purchase**    __$3,000,015 Purchase Price__

| Discharge Date | # of Receivables | Current Balance | Percentage |
|---|---|---|---|
| 1984 | 1 | $2,076.90 | 0.00% |
| 1985 | 1 | $1,925.00 | 0.00% |
| 1989 | 2 | $2,508.30 | 0.00% |
| 1990 | 3 | $11,104.00 | 0.01% |
| 1991 | 6 | $9,630.69 | 0.01% |
| 1992 | 27 | $25,512.26 | 0.03% |
| 1993 | 209 | $67,651.82 | 0.07% |
| 1994 | 1,323 | $809,119.56 | 0.81% |
| 1995 | 4,585 | $2,657,750.76 | 2.65% |
| 1996 | 5,419 | $3,157,936.44 | 3.15% |
| 1997 | 7,551 | $3,979,509.79 | 3.98% |
| 1998 | 8,520 | $4,927,851.69 | 4.92% |
| 1999 | 10,089 | $5,985,357.68 | 5.98% |
| 2000 | 11,270 | $6,467,355.58 | 6.46% |
| 2001 | 13,467 | $8,134,702.69 | 8.13% |
| 2002 | 13,969 | $8,366,571.80 | 8.36% |
| 2003 | 13,814 | $8,605,451.54 | 8.60% |
| 2004 | 15,685 | $10,007,509.99 | 10.00% |
| 2005 | 18,954 | $14,642,110.26 | 14.63% |
| 2006 | 18,623 | $22,122,313.19 | 22.10% |
| 2007 | 25 | $125,021.55 | 0.12% |
| | | | |
| | Total: | $100,108,981.49 | |

Thanks to all and have a nice weekend.

Delicious ideas to please the pickiest eaters. Watch the video on AOL Living.

# EXHIBIT L

# EXHIBIT L

# SUMMARY TERMS FOR ROUNDSTONE FUNDS

| | General Partner | Purchase | Face Value | Cost | Buy Rate | Start Date |
|---|---|---|---|---|---|---|
| Roundstone Healthcare Partners III, LP | Roundstone Healthcare Partners, LLC | 9/12/2008 | $41,348,703 | $1,840,000 | $0.0445 | 8/7/2008 |
| | | 9/19/2008 | $46,217,160 | $2,050,000 | | |
| | | subtotals | | | | |
| Roundstone Healthcare Partners IV, LP | Roundstone Healthcare Partners, LLC | 10/14/2008 | $50,027,497 | $2,000,000 | $0.0400 | 10/14/2008 |
| Roundstone Healthcare Partners VI, LP | Roundstone Healthcare Partners, LLC | 12/24/2008 | $69,484,487 | $4,030,000 | $0.0580 | 12/24/2008 |
| Roundstone Healthcare Partners VII, LP | Roundstone Healthcare Partners, LLC | 4/9/2009 | $9,094,581 | $1,000,000 | $0.1100 | 4/9/2009 |
| Roundstone Healthcare Partners, VIII, LP | Roundstone Healthcare Partners, LLC | 9/25/2009 | $84,152,544 | $4,801,400 | $0.0575 | 9/25/2009 |
| JGUN Hospital Receivables Resolution I, LP | Roundstone Healthcare Partners, LLC | 3/2/2009 | $14,200,093 | $710,005 | $0.0500 | 2/25/2009 |
| Roundstone Healthcare Capital, V, LP | Roundstone Healthcare Capital Management V, LLC | 3/30/2009 | $42,001,570 | $2,700,000 | $0.060 | 8/5/2009 |
| | | 4/9/2009 | $4,667,923 | $280,000 | $0.060 | |
| | Roundstone Healthcare Partners, LLC is managing member of the GP | 5/15/2009 | $14,188,377 | $850,000 | $0.060 | |
| | | 6/8/2009 | $4,774,626 | $525,000 | $0.110 | |
| | | 6/29/2009 | $18,750,284 | $1,500,000 | $0.080 | |
| | | subtotals | | | | |
| Roundstone Healthcare Capital X, LP (National Securities) | Roundstone Healthcare Partners, LLC | 12/16/2009 | $8,496,721 | $487,000 | $0.058 | 4/30/2010 |
| | | 2/1/2010 | $7,637,838 | $420,000 | $0.055 | |
| | | 4/1/2010 | $8,001,516 | $800,000 | $0.100 | |
| | | 5/3/2010 | $25,714,476 | $1,800,000 | $0.070 | |
| | | subtotals | | | | |
| Two Rivers Healthcare Capital XI, LP | Two Rivers Healthcare Cap Mgmt, LLC | 6/7/2010 | $10,714,285 | $750,000 | $0.070 | 6/30/2010 |
| | | 6/30/2010 | $12,142,857 | $850,000 | $0.070 | |
| | | subtotals | | | | |
| Roundstone Healthcare Investments, LLC (Founders) | | 9/19/2008 | $61,068,374 | $2,700,000 | $0.045 | 6/25/2007 |
| | | | $532,683,911 | $30,093,405 | $0.056 | |

387727-1

# EXHIBIT M

# EXHIBIT M

PURCHASE AND SALE AGREEMENT


BETWEEN


INTERNATIONAL PORTFOLIO, INC.

(AS SELLER)


- - AND - -


ROUNDSTONE HEALTHCARE PARTNERS VI, L.P.

(AS BUYER)


Dated and Effective as of

December 24, 2008

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "Agreement") is entered into this 24th day of December, 2008, by and between International Portfolio, Inc., a Delaware corporation ("Seller"), and Roundstone Healthcare Partners VI, L.P., a Delaware limited partnership ("Buyer").

## BACKGROUND

A.      Seller owns and desires to sell certain Accounts (as defined herein).

B.      Buyer has reviewed and evaluated the Accounts to Buyer's full satisfaction and desires to purchase the Accounts.

**NOW, THEREFORE,** in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

"**Account Document(s)**" means any application, agreement, billing statements, patient records, status codes, notices, correspondence or other evidence of indebtedness reasonably necessary to establish the validity of an Account, which is in Seller's possession or which Seller has the right to obtain and relates to an Account.  Such Account Documents may include, without limitation, any microfilm, microfiche, photocopy or machine-readable format documents.

"**Accounts**" means those accounts which are being sold to Buyer hereunder, and further described on the Account Schedule.

"**Account Schedule**" means the schedule, attached as **Exhibit A** hereto, setting forth a summary of the Accounts purchased hereunder including: the aggregate number of Accounts, the aggregate Current Balances of the Accounts, Purchase Price Percentage, and aggregate Purchase Price.

"**Affiliate**" means an entity controlling, controlled by, or under common control with a party to this Agreement.

"**Agreement**" means this Purchase and Sale Agreement, including the cover page and all Exhibits and Schedules hereto, which are incorporated by this reference herein.

"**Bill of Sale and Assignment**" means the document to be delivered to Buyer on or before the Closing Date, in the form attached hereto as **Exhibit B**.

"**Business Day**" means any day on which Seller is open for business other than a Saturday, a Sunday or a federal holiday.

"**Claim**" means any claim, action, suit or other actual or threatened proceeding, loss, judgment, damage, liability, cost and expense.

"**Closing Date**" means December 24, 2008.

"**Computer File**" means that certain computer file or files, to be provided by Seller to Buyer, where available, setting forth all relevant information on the Accounts and the Obligor(s), including but not limited to Current Balance, Provider, account number (Seller and Provider), name, address, phone number, social security number, payment history, open date, original balance, date of last payment, discharge date, date of first delinquency, charge-off date, interest rate, accrued interest and other charges, and procedure codes.

"**Current Balance**" means the unpaid principal balance in United States dollars for each Account identified in the Account Schedule and specified as the Current Balance as of the close of business on the Cutoff Date. The Current Balance shall not include any interest, fees or other charges accrued after the charge-off date of the Account.

"**Cutoff Date**" means December 24, 2008.

"**Net Collections**" means the amounts collected by Buyer on the Accounts, after subtracting all collection expenses.

"**Obligor**" means the current and unreleased obligor(s) on or under the Account and/or Account Documents, including, without limitation, any and all patients, guarantors, sureties or other persons or entities liable on the Account.

"**Obligor Payments**" means any payments or other consideration distributed or paid by or on behalf of an Obligor, including but not limited to direct payments from Obligors, payments from third party servicers, payments from insurance/warranty companies, and payments from state taxation authorities.

"**Provider**" means Health Management Associates, Inc.

"**Provider Agreement**" means that certain Master Purchase and Sale Agreement between Health Management Associates, Inc., a Delaware corporation, and Seller dated as of September 28, 2007.

"**Purchase Price**" means the amount, in United States dollars, to purchase the Accounts as stated in Section 2.4, calculated by multiplying the aggregate Current Balance as shown on the Account Schedule by the Purchase Price Percentage. Seller's wire transfer instructions are set forth on **Exhibit C** attached hereto.

"**Purchase Price Percentage**" means the percentage price bid by Buyer to purchase the Accounts, which is multiplied by the aggregate Current Balances as shown on the Account Schedule to determine the Purchase Price.

"**Transfer Documents**" means all documents that are required to be delivered on the Closing Date by Seller or Buyer including those set forth in Sections 2.2 and 2.3 of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF THE ACCOUNTS

**Section 2.1**   **Agreement to Sell and Purchase Accounts**.   Seller agrees to sell, and Buyer agrees to purchase all of Seller's right, title and interest in and to the Accounts described in the Account Schedule on the Closing Date, subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement.   The parties acknowledge and agree that the Accounts to be sold by Seller to Buyer hereunder do not constitute a "security" or "securities" within the meaning of any applicable federal or state securities laws.

**Section 2.2**   **Agreement to Assign/Buyer's Right to Act**.   On the Closing Date, Seller shall deliver to Buyer a Bill of Sale and Assignment, in the form of **Exhibit B** hereto, executed by Seller, which Bill of Sale and Assignment shall sell, transfer, set-over, quitclaim and convey, in each case without recourse (except as expressly provided for in Article VI, VII and VIII of this Agreement), to Buyer all right, title and interest of Seller in and to each of the Accounts sold and the proceeds of the Accounts, if any, received on or after the Cutoff Date.   Buyer shall have no right to communicate with any Obligor or otherwise take any action with respect to any Account or any Obligor until the Closing Date.

**Section 2.3**   **Account Schedule and Computer File**.   Seller has provided as **Exhibit A** hereto the Account Schedule setting forth all of the Accounts and their corresponding Current Balances which Buyer has agreed to purchase and Buyer acknowledges that the same has been reviewed to Buyer's full satisfaction.   Seller shall deliver to Buyer on or prior to the Closing Date, a Computer File with information as of the Closing Date, in format reasonably acceptable to Buyer.   To the extent that the Computer File or any other information provided by Seller to Buyer is not legible on computer disks, Seller shall use all reasonable efforts to reproduce such information for Buyer.   Seller shall further provide Buyer a written explanation of the meaning of each procedure code included in the Computer File.

**Section 2.4**   **Purchase Price/Payment**.   On or before 5:00 p.m. EST on the Closing Date, Buyer shall pay to Seller the Purchase Price of Four Million Thirty Thousand Dollars and Zero Cents ($4,030,000.00), which represents the Purchase Price Percentage of 5.80% multiplied by the aggregate Current Balances of the Accounts of Sixty-Nine Million Four Hundred Eighty-Two Thousand Seven Hundred Fifty-Eight Dollars and Sixty-Two Cents ($69,482,758.62).   All of such funds must be in immediately available funds in United States dollars by wire transfer according to the instructions of Seller as set forth on **Exhibit C** hereto, made payable to Seller.

**Section 2.5**   **Payments Received After the Closing Date**.   To the extent that Seller receives any credits, payments or other consideration in respect of an Account from and after the Closing Date, Seller shall promptly remit such amounts to Buyer.   To the extent that, following the Closing Date, Buyer receives any credits, payments or other consideration in respect of an

Account relating to periods prior to the Closing Date, Buyer shall promptly remit such amounts to Seller.

Section 2.6    No Sale of a Security. The transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of either party shall create any inference that the transactions involve any "security" or "securities".

Section 2.7    No Guaranty. The parties expressly acknowledge that Seller does not warrant or guarantee any specific return on any Accounts purchased by Buyer hereunder.

## ARTICLE III
## ACCOUNTS AND DOCUMENTS

Section 3.1    Account Documents. From the Closing Date, and for so long as Seller is permitted access to the Account Documents pursuant to the terms of the Provider Agreement, but only to the extent Account Documents are not available via remote access, Seller will: (A) digitally copy all electronic records, files and documentation under the possession or control of the Provider by downloading such data on to computer systems and other electronic storage media of Buyer or its designee; (B) upon reasonable notice, enter the premises of the Provider at such times and places as Seller determines is necessary to physically access and copy any necessary files, records and documentation relating to the Accounts under the possession or control of the Provider; and (C) deliver to Buyer any Account Documents electronically requested by Buyer, but only to the extent such list identifies the Accounts and the specific type of Account Document requested in connection with each Account.   Notwithstanding the foregoing, Buyer shall only deliver requests for Account Documents under subclause (C) once per calendar month, except that this limitation shall not apply with respect to demands for debt verification initiated by a Patient ("Disputed Account").   Buyer shall reimburse Seller for the cost associated with any Account Documents delivered pursuant to sub-clause (C) of this section in an amount equal to Seller's actual costs for the production of such documents, but in no case greater than Five Dollars ($5.00) per document.   Seller shall use reasonable and good faith efforts to deliver Account Documents to Buyer within ninety (90) days from the date of receipt of request from Buyer and within thirty (30) days for Disputed Accounts.

Section 3.2    Copies and Expenses. Seller reserves the right to retain copies of all or any of the Account Documents it provides to Buyer under Section 3.1.  Except as otherwise provided in Section 3.1, all expenses of production and transportation of the Account Documents and the other documents, instruments and files to be delivered to Buyer pursuant to this Article III shall be borne by Buyer.

## ARTICLE IV
## SERVICING/COLLECTION

**Section 4.1**   <u>Servicing After Closing Date</u>.  The Accounts shall be sold and conveyed to Buyer on a servicing-released basis.  As of the Closing Date, all rights, obligations and responsibilities with respect to the servicing of the Accounts, except as elsewhere provided in this Agreement, shall pass to Buyer, and Seller shall take no further action against the Accounts, or incur any expenses relating to the Accounts, except as provided in this Agreement.  In the event that any Accounts are assigned to any collection agency or third party attorney, Seller shall, at the written direction of Buyer, recall any Accounts and/or terminate any such agreements and fully assist and cooperate with Buyer in any way whatsoever.  Seller shall, within ten (10) Business Days of the Closing Date, report to any credit reporting agency to which an Account has been reported that such Account has been sold and assigned to Buyer.  Seller agrees that it shall not direct the credit bureaus to list the account as "charged off", but only as being owned or serviced by Buyer.  At the request and cost of Buyer, Seller shall send written notification to all Obligors of the sale of the Accounts from Seller to Buyer.  In the event that any Account Obligors continue to contact Seller after the Closing Date, Seller shall notify the Obligors that the Accounts have been sold to Buyer and shall provide the contact name, address and phone number of Buyer.  Seller shall forward to Buyer, within ten (10) days of receipt, any and all correspondence, notices and other documents received on any Account.

**Section 4.2**   <u>Debt Collection of Accounts</u>.  Buyer agrees that Buyer will at all times comply with all state and federal laws applicable to debt collection, including without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and any state deficiency laws.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants and covenants, as of the date of this Agreement, and as of the Closing Date that:

**Section 5.1**   <u>Existence; Good Standing</u>.  Buyer is a limited partnership duly organized and in good standing under the laws of the State of Delaware.

**Section 5.2**   <u>Authorization</u>.  Buyer is duly authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions, and limited partnership agreements to which it may be subject and the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

**Section 5.3**   <u>Binding Obligations</u>.   Assuming due authorization, execution and delivery by each other party hereto, this Agreement, and all of the obligations of Buyer hereunder, are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights

generally and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 5.4    Conflicts.**  The execution and delivery of this Agreement by Buyer and Buyer's performance and compliance with the terms of this Agreement will not:

(a)    violate Buyer's charter documents or limited partnership agreement,

(b)    violate any administrative or judicial decree or order or any material law, rule or regulation to which Buyer is subject, or

(c)    constitute a default (or, an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, agreement or other instrument to which Buyer is a party or which may be applicable to Buyer or any of Buyer's assets, or result in the creation of a lien on any of Buyer's assets.

**Section 5.5    Litigation.**  There is no proceeding, action, investigation or litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Buyer's obligations contemplated herein, or which would be likely to impair materially Buyer's ability to perform under the terms of this Agreement.

**Section 5.6    Consents.**  No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Buyer with this Agreement or the consummation of any other transaction contemplated hereby.

**Section 5.7    Independent Evaluation.**  Buyer represents that Buyer is a sophisticated investor, has knowledge and experience in financial and business matters that enable Buyer to evaluate the merits and risks of the transaction contemplated by this Agreement.  Buyer further represents that Buyer's bid for and decision to purchase the Accounts pursuant to this Agreement is and was based upon Buyer's independent evaluation of the information made available by Seller or Seller's personnel, agents, representatives or independent contractors to Buyer.  Buyer has made such independent investigations as Buyer deemed to be warranted into the nature, collectability and value of the Accounts, and all other facts Buyer deemed material to Buyer's purchase and is entering into this transaction solely on the basis of that investigation, the information provided by Seller, the terms and conditions of this Agreement and Buyer's own judgment.  Buyer acknowledges, understands and agrees that the acquisition of these Accounts involves a high degree of risk and is suitable only for persons or entities of substantial financial means.

**Section 5.8    Nondisclosure.**  Buyer is in full compliance with its obligations under the terms of the Confidentiality Agreement executed by the parties, and dated as of December 22, 2008, to review the information made available by Seller or its personnel, agents, representatives or independent contractors to all potential bidders for the Accounts.

**Section 5.9    Status of Buyer.**  Buyer represents, warrants and certifies to Seller that Buyer is (i) a financial institution; or (ii) a sophisticated institutional purchaser that is in the

business of buying or originating or collecting Accounts of the type being purchased or that otherwise deals in such Accounts in the ordinary course of Buyer's business, or (iii) an accredited investor under the federal securities laws.

**Section 5.10   Broker.**  Buyer has had no dealings with any broker, sale advisor or agent in connection with this Agreement, or if Buyer has, any commission or fee associated with the sale of the Accounts to Seller shall be Buyer's responsibility.

**Section 5.11   Survival.**  The representations and warranties set forth in this Section shall survive the Closing for a period of twelve (12) months, and are subject to the provisions contained herein with respect to the limitation of remedies.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents, warrants, and agrees that as of date of this Agreement and as of the Closing Date:

**Section 6.1   Existence; Good Standing.**  Seller is a corporation duly organized and in good standing under the laws of the State of Delaware.

**Section 6.2   Authorization.**  Seller is duly authorized to enter into this Agreement and has complied with all laws, rules, regulations, charter provisions and bylaws to which it may be subject and the undersigned representative is authorized to act on behalf of and bind Seller to the terms of this Agreement.

**Section 6.3   Binding Obligations.**  Assuming the due authorization, execution and delivery of this Agreement by each party hereto, this Agreement and all of the obligations of Seller hereunder are the legal, valid, and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 6.4   Title.**  Seller has acquired all of the Accounts pursuant to the terms of the Provider Agreement.  Seller has title to the Accounts, is the lawful holder of the Accounts and Account Documents and is duly and legally authorized to sell, transfer, convey and assign Seller's rights therein to Buyer.  The Accounts are being sold free and clear of all liens and encumbrances created by Seller.

**Section 6.5   Conflicts.**  The execution and delivery of this Agreement by Seller and Seller's performance and compliance with the terms of this Agreement will not:

     (a)    violate Seller's charter documents or bylaws,

     (b)    violate any administrative or judicial decree or order or any material law, rule or regulation to which Seller is subject, or

(c)     constitute a default (or, an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, agreement or other instrument to which Seller is a party or which may be applicable to Seller or any of Seller's assets, or result in the creation of a lien on any of Seller's assets.

Section 6.6     **Litigation**.  There is no proceeding, action, investigation or litigation pending or, to the best of Seller's knowledge, threatened against Seller which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Seller's obligations contemplated herein, or which would be likely to impair materially Seller's ability to perform under the terms of this Agreement.

Section 6.7     **Consents**.  No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Seller with this Agreement or the consummation of any other transaction contemplated hereby.

Section 6.8     **Broker**.  Seller has had no dealings with any broker, sale advisor or agent in connection with this Agreement, or if Seller has, any commission or fee associated with the sale of the Accounts to Buyer shall be Seller's responsibility.

Section 6.9     **Survival**.  The representations and warranties set forth in this Section shall survive the Closing for a period of eighteen (18) months, and are subject to the provisions contained herein with respect to the limitation of remedies, except with respect to the representation and warranty set forth in Section 6.4, which shall survive indefinitely.

## ARTICLE VII
## POST-CLOSING AGREEMENTS

Section 7.1     **Post-Closing Agreements**.  From and after the Closing Date, the parties shall have the respective rights and obligations which are set forth in the remainder of this Article VII.

Section 7.2     **Assignment Compliance with Obligations under Provider Agreement**. Seller hereby agrees to sell, assign and transfer the Accounts and assign Seller's rights, if any, under the Provider Agreement with respect to the Accounts.  In addition, Buyer hereby agrees to comply with all of the obligations of the buyer, with respect to the Accounts, as set forth in the Provider Agreement, as if Buyer were originally a party to such Provider Agreement.

Section 7.3     **Fair Debt Collection Practices**.  Buyer shall comply and shall be responsible for compliance with all applicable laws, rules, regulations, ordinances and judgments relating to or in any way affecting its collection procedures, including, but not limited to: (a) compliance with the federal Fair Debt Collection Practices Act ("FDCPA") and any and all implementing regulations, as well as all state laws relating to debt collection practices; and (b) compliance with the federal Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act, and any and all implementing regulations, as well as all state laws relating to credit reporting.

**Section 7.4    HIPAA Compliance**.  Buyer hereby agrees to comply with the applicable provisions of HIPAA, and the requirements of any regulations promulgated thereunder, including, without limitation, the federal privacy regulations as contained in 45 CFR Parts 160 and 164 (the "Federal Privacy Standards"), the Electronic Transaction Standards (45 CFR Parts 160 and 162) and the Security Standards (45 CFR Parts 160, 162 and 164) (collectively, HIPAA and the regulations promulgated thereunder shall be referred to herein as the "HIPAA Standards").  As a result of the obligations created under this Agreement for Buyer, it is possible that Buyer could be deemed a "subcontractor" of Seller as that term is defined in the Federal Privacy Standards.  As such, Buyer agrees to be bound by the HIPAA Standards and shall act at all times in accordance with the Subcontractor Business Associate Agreement attached hereto as Exhibit D (the "Business Associate Agreement").  Notwithstanding anything to the contrary contained herein, Buyer agrees, at Provider's request, to enter into a Business Associate Agreement with Provider, in a form reasonably acceptable to Provider.

**Section 7.5    Insurance**.  Each party shall maintain: (i) comprehensive general liability coverage, including contractual liability coverage, with limits of no less than One Million Dollars ($1,000,000) per claim/Three Million Dollars ($3,000,000) annual aggregate; and (ii) errors and omissions coverage with limits of no less than One Million Dollars ($1,000,000) per claim/Three Million Dollars ($3,000,000) annual aggregate.  Each party, upon request, shall provide the other party with certificates of insurance to evidence compliance therewith.

**Section 7.6    Assistance**.  In partial consideration for Buyer entering into this Agreement, Seller agrees to arrange for the collection of the Accounts through collection agencies with which Seller has relationships, and to have such agencies either remit the Net Collections of such Accounts to Seller, which in turn shall remit such amounts to Buyer, or remit such amounts directly to Buyer.  Buyer and Seller acknowledge and agree that such collection activity is being undertaken as an accommodation to Buyer, and Seller shall not bear any liability or responsibility in connection with such collection activity, other than timely delivery of such collected amounts to Buyer.

**Section 7.7    Use of Seller's Name**.  To the extent Buyer desires to use Seller's name for any purpose in connection with Buyer's ownership and control of the Accounts following the Closing Date, Seller, in its discretion, may grant to Buyer a non-exclusive license for the use of Seller's name upon such terms as are reasonably acceptable to Seller.

**ARTICLE VIII**
**MUTUAL INDEMNIFICATION**

**Section 8.1    Seller Indemnification**.  From and after the date of this Agreement, Buyer shall indemnify, defend and hold harmless Seller (for the purposes of this indemnification, Seller shall include Seller's affiliates, shareholders, officers, partners, members, managers, employees and agents) from and against any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of any claim, demand, cost, expense, or judgment of any type, kind, character or nature (including reasonable attorneys' fees), which Seller shall incur or suffer as a result of: (i) any act or omission of Buyer or Buyer's agents in connection with the Accounts and Buyer's purchase of Accounts pursuant to the Agreement; (ii)

the inaccuracy of any of Buyer's representations or warranties herein; (iii) the breach of any of Buyer's covenants herein; (iv) any claim by any Obligor regarding assignment, subsequent enforcement, servicing or administration of the Accounts by Buyer; or (v) any other act or omission of Buyer relating to the Accounts and the Obligors after the Closing Date.

**Section 8.2    Buyer Indemnification.**    From and after the date of this Agreement, Seller shall indemnify, defend and hold harmless Buyer (for the purposes of this indemnification, Buyer shall include Buyer's affiliates, shareholders, officers, partners, members, managers, employees and agents) from and against any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of any claim, demand, cost, expense, or judgment of any type, kind, character or nature (including reasonable attorneys' fees), which Buyer shall incur or suffer as a result of: (i) any act or omission of Seller or Seller's agents in connection with the Accounts and Seller's sale of the Accounts pursuant to the Agreement; (ii) the inaccuracy of any of Seller's representations or warranties herein; (iii) the breach of any of Seller's covenants herein; (iv) any claim by any Obligor regarding assignment, subsequent enforcement, origination, servicing or administration of the Accounts by Seller, the Provider, or either such party's agents; or (v) any other act or omission of Seller, Seller's agents or the Provider or Provider's agents relating to the Accounts and the Obligors.  For purposes of this Agreement, no collection agency with which Seller has an arrangement to provide collection services for the Accounts shall be deemed an employee or agent of Seller.

The indemnification obligations of each of Buyer and Seller shall not exceed fifteen percent (15%) of the Purchase Price.  Notwithstanding anything to the contrary contained herein, the foregoing limitations shall not apply with respect to any indemnification to which: (a) Seller shall be entitled pursuant to Article VII above relating to Buyer's (i) HIPAA-related obligations under applicable federal and/or state laws and regulations, (ii) compliance with the Fair Credit Reporting Act and the Fair and Accurate Credit Transactions Act and/or (iii) a material breach by Buyer under the Provider Agreement; or (b) Buyer shall be entitled with respect to any breach of the representation contained in Section 6.4 of this Agreement.

**Section 8.3    Third Party Claims.**    Forthwith following the receipt of notice of a third party claim, the party receiving the notice of the third party claim shall notify the other party of its existence setting forth with reasonable specificity the facts and circumstances of which such party has received notice, and if the party giving such notice is an indemnified party, specifying the basis hereunder upon which the indemnified party's claim for indemnification is asserted. The indemnified party may, upon reasonable notice, tender the defense of a third party claim to the indemnifying party.  If:

(a)    the defense of a third party claim is so tendered and within thirty (30) days thereafter such tender is accepted without qualification by the indemnifying party; or

(b)    within thirty (30) days after the date on which written notice of a Third Party Claim has been given pursuant to this Section 8.3, the indemnifying party shall acknowledge without qualification its indemnification obligations as provided in this Section 8.3 in writing to the indemnified party and accept the defense thereof;

then, except as herein provided, the indemnified party shall not, and the indemnifying party shall, have the right to contest, defend, litigate or settle such third party claim.  The indemnified party shall have the right to be represented by counsel at its own expense in any such contest, defense, litigation or settlement conducted by the indemnifying party, provided that the indemnified party shall be entitled to reimbursement therefor if the indemnifying party shall lose its right to contest, defend, litigate and settle the third party claim as herein provided.  The indemnifying party shall lose its right to contest, defend, litigate and settle the third party claim if it shall fail to diligently contest the third party claim.  So long as the indemnifying party has not lost its right and/or obligation to contest, defend, litigate and settle as herein provided, the indemnifying party shall have the exclusive right to contest, defend and litigate the third party claim and shall have the exclusive right, in its discretion exercised in good faith, and upon the advice of counsel, to settle any such matter, either before or after the initiation of litigation, at such time and upon such terms as it deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle shall be given to the indemnified party.  All expenses (including without limitation attorneys' fees) incurred by the indemnifying party in connection with the foregoing shall be paid by the indemnifying party.   No failure by an indemnifying party to acknowledge in writing its indemnification obligations under this Section 8.3 shall relieve it of such obligations to the extent they exist.  If an indemnified party is entitled to indemnification against a third party claim, and the indemnifying party fails to accept a tender of, or assume, the defense of a third party claim pursuant to this Section 8.3, or if, in accordance with the foregoing, the indemnifying party shall lose its right to contest, defend, litigate and settle such a third party claim, the indemnified party shall have the right, without prejudice to its right of indemnification hereunder, in its discretion exercised in good faith and upon the advice of counsel, to contest, defend and litigate such third party claim, and may settle such third party claim, either before or after the initiation of litigation, at such time and upon such terms as the indemnified party deems fair and reasonable, provided that at least ten (10) days prior to any such settlement, written notice of its intention to settle is given to the indemnifying party.  If, pursuant to this Section 8.3, the indemnified party so contests, defends, litigates or settles a third party claim for which it is entitled to indemnification hereunder, the indemnified party shall be reimbursed by the indemnifying party for the reasonable attorneys' fees and other expenses of contesting, defending, litigating and/or settling the third party claim which are incurred from time to time, forthwith following the presentation to the indemnifying party of itemized bills for said attorneys' fees and other expenses.

## ARTICLE IX
## FILES AND RECORDS

Each party agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling and maintenance of all Accounts and all documents and records relating to the Accounts purchased hereunder including, but not limited to, the length of time such documents and records are to be retained and making any disclosures to Obligors as may be required by law.

# ARTICLE X
# MISCELLANEOUS

**Section 10.1  Notices.**  Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing to the parties delivered to the addresses below and shall be delivered by certified mail return receipt requested or express mail, and if to Seller, also via facsimile.  Such notice shall be deemed to have been received on the date delivered.

If to Seller:

International Portfolio, Inc.
200 Barr Harbor Drive
Suite 400
West Conshohocken, Pennsylvania 19428
Telephone:  (610) 724-7064
Facsimile:  (610) 825-8299
Attn: Richard Shusterman

With a copy to:

Albert R. Riviezzo, Esquire
Fox Rothschild LLP
P.O. Box 673
747 Constitution Drive, Suite 100
Exton, PA  19341-0673

If to Buyer:

Roundstone Healthcare Partners VI, L.P.
289 Great Road, Suite 304
Acton, MA  01720
Telephone:  (908) 630-9266
Facsimile:  (908) 630-0384
Attention:  Basil P. Bourque

**Section 10.2  Severability.**  If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**Section 10.3  Rights Cumulative: Waivers.**  The rights of each of the parties under this Agreement are cumulative and may be exercised as often as any party considers appropriate under the terms and conditions specifically set forth.  The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing.  Any failure to exercise or any delay in exercising any of such rights shall not operate

as a waiver or variation of that or any other such right. Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

Section 10.4  **Headings**.  The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of the Agreement or any provision hereof.

Section 10.5  **Construction**.  Unless the context otherwise requires, singular nouns and pronouns when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

Section 10.6  **Prior Understandings**.  This Agreement supersedes any and all prior discussions and agreements between Seller and Buyer with respect to the purchase of the Accounts and other related matters contained herein, and this Agreement contains the sole and entire understanding between the parties hereto with respect to the transactions contemplated herein.

Section 10.7  **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall constitute one and the same instrument, and either party hereto may execute this Agreement by signing any such counterpart.

Section 10.8  **Governing Law/Choice of Forum**.  This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the law of the Commonwealth of Pennsylvania.  The parties agree that any legal actions between Buyer and Seller regarding the purchase of the Accounts hereunder shall be originated in a court of competent jurisdiction in the Commonwealth of Pennsylvania, and each party hereby consents to the jurisdiction of such court in connection with any action or proceeding initiated concerning this Agreement and agrees that service by mail to the address specified in Section 10.1 of this Agreement shall be sufficient to confer jurisdiction over such party in such court.  In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs.

Section 10.9  **No Third-Party Beneficiaries**.  This Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

Section 10.10  **Expenses**.  Except as otherwise expressly provided in this Agreement, Buyer and Seller will each bear its own out-of-pocket expenses, including fees and disbursements of its attorneys, brokers, consultants and any other agents or representatives, in connection with the transaction contemplated by this Agreement.

Section 10.11  **Publicity**.  Except as otherwise required by law or other applicable rules and regulations, press releases concerning this transaction shall be made only with the prior agreement of the Seller and Buyer. Except as otherwise required by law or other applicable rules and regulations, no such press releases or other publicity shall at any time state the amount of the Purchase Price.

**Section 10.12 Entire Agreement.**   This Agreement, the Confidentiality Agreement between the parties dated as of December 22, 2008, and the instruments to be delivered by the parties pursuant to the provisions hereof constitute the entire agreement between the parties and supersedes all prior agreements between the parties.  To the extent there exists any inconsistency between the provisions of this Agreement and any other agreement entered into between the parties, the provisions of this Agreement shall govern.   Each exhibit or schedule shall be considered incorporated into this Agreement.  Any amendments, or alternative or supplementary provisions to this Agreement, must be made in writing and duly executed by an authorized representative or agent of each of the parties hereto.

**Section 10.13 Confidentiality.**   With respect to any confidential information provided by either party hereto in connection with the transactions contemplated hereby, the parties hereto shall be bound by the provisions of that certain Confidentiality Agreement between the parties dated as of December 22, 2008, for so long as any obligations hereunder and thereunder remain outstanding.

**Section 10.14 Non-Waiver.**   The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement conferred, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.  No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.  A breach of any representation, warranty or covenant shall not be affected by the fact that a more general or more specific representation, warranty or covenant was not also breached.

**Section 10.15 Binding Effect; Benefit.**   This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**Section 10.16 Transfer/Assignability.**   Buyer may not sell, transfer, assign or convey all or a portion of its right, title and interest in and to the Accounts or the Provider Agreement without (i) the prior written consent of Seller, which consent shall not be unreasonably withheld, and (ii) such purchaser of the Accounts agreeing to be bound by all of the terms and conditions of this Agreement and the Provider Agreement.  Neither party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

**Section 10.17 Amendments.**   This Agreement shall not be modified or amended except pursuant to a written instrument executed and delivered on behalf of each of the parties hereto.

**[Signature page follows]**

12/22/2008  19:07 FAX                          FOX ROTHSCHILD                          @003/005

**IN WITNESS WHEREOF,** the parties hereto have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:                                          BUYER:

INTERNATIONAL PORTFOLIO, INC.                    ROUNDSTONE HEALTHCARE
                                                 PARTNERS VI, L.P.

By: _____                    By its General Partner,
Name: Richard Shusterman                         Roundstone Healthcare Partners, LLC
Title:  President

                                                 By: _____
                                                 Name: Basil F. Bourque
                                                 Title:  Member

DT1 827671v2 12/22/08                    15

p.3                    5614652618                    Richard Shusterman    Dec 23 08 05:11p

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:                                BUYER:

INTERNATIONAL PORTFOLIO, INC.          ROUNDSTONE HEALTHCARE
                                       PARTNERS VI, L.P.

By:_____             By its General Partner,
Name: Richard Shusterman               Roundstone Healthcare Partners, LLC
Title:  President

                                       By:
                                       Name: Basil P. Bourque
                                       Title:  Member

DT1 827671v2 12/22/08                   15

EXHIBIT A
ACCOUNT SCHEDULE

| # OF ACCOUNTS | CURRENT BALANCE | PURCHASE PRICE PERCENTAGE | PURCHASE PRICE |
|---|---|---|---|
|  | $69,482,758.62 | 5.80% | $4,030,000.00 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

(See Computer File for detailed list)

12/22/2008 19:07 FAX          FOX ROTHSCHILD                          @004/005

**EXHIBIT B**
**BILL OF SALE AND ASSIGNMENT OF ACCOUNTS**

International Portfolio, Inc. ("Seller" or "Assignor"), hereby absolutely sells, transfers, assigns, sets over and conveys to Roundstone Healthcare Partners VI, L.P., a Delaware limited partnership ("Assignee"), without recourse and without representations or warranties except those as outlined in the Agreement (as defined below), express or implied, of any type, kind or nature:

(a)  all of Assignor's right, title, and interest in and to each of the Accounts identified in the Account Schedule attached to the Agreement as Exhibit "A" (the "Accounts") together with other evidence of indebtedness, if any; and

(b)  all principal, interest or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Assignor prior to the Cutoff Date (as defined in the Agreement) with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between Assignor and Assignee dated December 24, 2008 (the "Agreement"). The Accounts are defined and described in the Agreement and are being conveyed hereby subject to the terms, conditions and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the Commonwealth of Pennsylvania without regard to the conflicts-of-laws rules thereof.

DATED:  12/22/08

SELLER:  International Portfolio, Inc.

By:
Name:  Richard Shusterman
Title:  President

COMMONWEALTH OF PENNSYLVANIA     )
                                 ) ss.
COUNTY OF _____               )

This Bill of Sale was acknowledged before me on the _____ day of _____, 2008 by _____ as Attorney-in-Fact on behalf of Seller.

_____
Notary Public
My Commission Expires: _____

DT1 827871v2 12/22/08

**EXHIBIT C**
**WIRE INSTRUCTIONS**

*Funds must be wired as follows:*

| | |
|---|---|
| Bank Name: | Wilmington Trust |
| Bank Address: | 2003 S. Easton Road, Suite 204<br>Doylestown, PA  18901 |
| ABA Number: | 031901929 |
| Credit to Account: | International Portfolio, Inc. |
| Account Number: | 400-2868-3464 |

In order to assure proper allocation of funds to Buyer's balance due, this information must be included on all wire transfers.

**EXHIBIT D**
**Subcontractor Business Associate Agreement**

This **SUBCONTRACTOR BUSINESS ASSOCIATE AGREEMENT** (this *"Subcontractor Agreement"*) is made and entered into as of the 24th day of December, 2008 (the *"Effective Date"*), by and between International Portfolio, Inc. (*"Business Associate"*) and Roundstone Healthcare Partners VI, L.P. (*"Subcontractor"*).

## RECITALS:

**WHEREAS,** Business Associate has entered into an agreement to service certain uncollected patient accounts (the *"Accounts"*) that were originated by Health Management Associates, Inc. (*"Covered Entity"*);

**WHEREAS,** Business Associate is required to comply with certain requirements with respect to the Use and/or Disclosure of Protected Health Information (*"PHI"*) as mandated by the Privacy Standards (45 C.F.R. Parts 160 and 164) and electronic PHI as mandated by the Security Standards (45 C.F.R. Parts 160, 162 and 164) promulgated under the Administrative Simplifications subtitle of the Health Insurance Portability and Accountability Act of 1996 (*"HIPAA"*) as set forth in the applicable business associate addendum (the *"BAA"*) between Business Associate and Covered Entity;

**WHEREAS,** pursuant to the terms and conditions of the Purchase and Sale Agreement between Business Associate and Subcontractor of even date herewith, Subcontractor has agreed to purchase and may also service certain of the Accounts (the *"Services"*); and

**WHEREAS,** in connection therewith, Subcontractor will have access to PHI and, therefore, agrees to abide by the Privacy Standards and Security Standards, as well any applicable requirements of the BAA, when using and/or disclosing such PHI.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to the foregoing and as follows:

## I. DEFINITIONS

All capitalized terms used herein that are not otherwise defined shall have the same meaning as those terms are defined in the Privacy Standards and Security Standards.

D-1

## II.    OBLIGATIONS OF SUBCONTRACTOR

### A.    Privacy Regulations.

*1.    General.*  Subcontractor acknowledges and agrees that from and after the Effective Date, Subcontractor shall comply with the following provisions with respect to an Individual's PHI:

(a)    <u>Safeguards Against Misuse of Information</u>.  Subcontractor shall implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of PHI, and to prevent Use and/or Disclosure of PHI other than as provided for in this Subcontractor Agreement.

(b)    <u>Reporting of Violations</u>.  Subcontractor shall notify Business Associate within twenty-four (24) hours, and shall provide written notice no later than forty-eight (48) hours, of becoming aware of a Use or Disclosure of Protected Health Information in violation of this Subcontractor Agreement by Subcontractor, its officers, directors, employees, representatives or agents, or by a third party to whom Subcontractor disclosed PHI, and shall report any such Use or Disclosure to Business Associate.

(c)    <u>Disclosures to Third Parties</u>.  Subcontractor shall ensure that any representatives or agents to whom Subcontractor provides PHI received from, or created or received by Subcontractor on behalf of, Business Associate agree to the same restrictions and conditions that apply to Subcontractor with respect to such PHI.

(d)    <u>Availability of PHI</u>.    At Business Associate's request, Subcontractor shall provide access to any PHI not otherwise available to Business Associate, within five (5) days from the date Subcontractor receives any such request so that Covered Entity can respond to a request from an Individual to have access to, provide a copy of and account for Disclosures of PHI pursuant to HIPAA, including, but not limited to, 45 C.F.R. §§ 164.524 and 164.528.  If Subcontractor receives any requests directly from an Individual for access to PHI, Subcontractor shall first notify Business Associate before responding to any such requests.

(e)    <u>Amendment of PHI</u>.    At Business Associate's request, Subcontractor shall provide PHI not otherwise available to Business Associate that is in Subcontractor's possession, within five (5) days from the date Subcontractor receives any such request so that Covered Entity can respond to a request from an Individual to amend PHI in accordance with 45 C.F.R. § 164.526. If Subcontractor receives any requests directly from an Individual to amend PHI, Subcontractor shall first notify Business Associate before responding to any such requests.  Additionally, upon notice from Business Associate, Subcontractor will make any necessary amendments to PHI in its possession.

D-2

(f)   **Documentation of Disclosures**.   At the request of Business Associate, Subcontractor shall provide an accounting of disclosures of PHI, other than disclosures excepted under 45 C.F.R. § 164.528(a)(1), to Business Associate in a time and manner designated by Business Associate.   Subcontractor shall document any Disclosure of PHI and information related to such Disclosure as required for the Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528(d).   At a minimum, Subcontractor shall document the following information: (A) the date of the Disclosure; (B) the name of the entity or person who received the PHI and, if known, the address of such entity or person; (C) a brief description of the PHI Disclosed; and (D) a brief statement of the purpose of such Disclosure that reasonably informs the Individual of the basis for the Disclosure or, in lieu of such statement, a copy of a written request, if any, for a disclosure under 45 C.F.R. §§ 164.502(a)(2)(ii) or 164.512.

(g)   **Internal Practices**.   Subcontractor shall make available its practices, books, and records relating to the Use and Disclosure of PHI received from, or created or received by Subcontractor on behalf of Business Associate, available to Business Associate, or at the request of Business Associate, to Covered Entity and/or the Secretary, in a time and manner designated by Business Associate or the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Standards and Security Standards.

(h)   **Minimum Necessary Use and Disclosure**.   In conducting functions and/or activities under this Subcontractor Agreement that involve the Use and/or Disclosure of PHI, Subcontractor shall make reasonable efforts to limit the Use and/or Disclosure of PHI to the minimum necessary in accordance with 45 C.F.R. § 164.514(d) to accomplish the intended purpose of the Use or Disclosure.

*2.   Permitted Uses and Disclosures of PHI*.   Subcontractor may only Use or Disclose PHI to secure payments from patients and such other functions, activities, or services for, or on behalf of, Business Associate as specified in this Subcontractor Agreement and/or the BAA or as required by law. Notwithstanding the foregoing, Subcontractor shall not, and shall ensure that its directors, officers, representatives, agents and employees do not, disclose PHI if such Use or Disclosure would violate HIPAA.

**B.**   **Security Standards**.   Subcontractor agrees that it will comply, and cause all of its employees, agents and representatives to comply, with the applicable requirements of the Security Standards, including, but not limited to the following:

*1.   Security Safeguards*.   Subcontractor shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI that it creates, receives, maintains or transmits on behalf of Business Associate as required by the Security Standards;

DT1 827671v2 12/22/08

    **2.**   ***Disclosure to Third Parties.***  Subcontractor shall ensure that any agent, including a subcontractor, to whom it provides electronic PHI agrees to implement reasonable and appropriate safeguards to protect such information; and

    **3.**   **Reporting of Violations.**  Subcontractor shall report to Business Associate any Security Incident of which it becomes aware within twenty-four (24) hours, and shall provide written notice no later than forty-eight (48) hours of such Security Incident.

## III.   TERM AND TERMINATION

    **A.**   **Term.**  The term of this Subcontractor Agreement shall be effective as of the Effective Date, and shall terminate when Subcontractor no longer owns the Accounts or provides the Services; provided, however, that notwithstanding the termination of this Subcontractor Agreement; Subcontractor shall be required to comply with **Section III.C.** below.

    **B.**   **Failure to Comply with HIPAA Obligations.**

    **1.**   ***Mitigation Obligation.***  If, following the Effective Date, Subcontractor violates any of its obligations under **Section II**, at its sole cost and expense, Subcontractor immediately shall take all steps necessary to mitigate the harmful effects of such violation, if any.

    **2.**   ***Termination.***  If, following the Effective Date, Subcontractor notifies Business Associate or Business Associate otherwise has reason to believe, that Subcontractor has violated a material term of any of the requirements set forth in this Subcontractor Agreement, Business Associate shall have the right, in its sole discretion, to immediately terminate this Subcontractor Agreement. Further, Business Associate may terminate this Subcontractor Agreement effective immediately, if (i) Subcontractor is named as a defendant in a criminal or administrative proceeding for a violation of HIPAA, or (ii) a finding or stipulation that Subcontractor has violated any standard or requirement of HIPAA (or other security or privacy law) is made in any administrative or civil proceeding.

    **C.**   **Effect of Termination.**  Except as set forth in this **Section III.C.**, upon termination of this Subcontractor Agreement for any reason, at the request of Business Associate, Subcontractor shall return or destroy all PHI received from Business Associate, or created or received by Subcontractor on behalf of Business Associate. This provision shall also apply to PHI that is in the possession of employees, representatives or agents of Subcontractor. Subcontractor and its employees, agents and representatives shall not retain any copies of the PHI. In the event that Subcontractor determines that returning or destroying the PHI is infeasible, Subcontractor shall provide to Business Associate written notification of the conditions that make return or destruction infeasible. If Business Associate agrees that return or destruction of PHI is infeasible, Subcontractor shall extend the protections of this Subcontractor Agreement to such PHI and limit further Uses and Disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Subcontractor maintains such PHI. Notwithstanding the foregoing, if the parties determine that return or destruction of PHI is

DT1 827671v2 12/22/08

infeasible, Subcontractor shall continue to make PHI available to Business Associate and Covered Entity, so that Business Associate and Covered Entity can comply with **Sections II.A.1(d)-(g)** of this Subcontractor Agreement.

## IV.   MISCELLANEOUS

A.    **State Law Requirements.**  To the extent the applicable laws and regulations of any state that apply to this Subcontractor Agreement are More Stringent than those set forth in the Privacy Standards, any Use or Disclosure of PHI by Subcontractor shall be made in accordance with such laws and regulations.

B.    **Training of Subcontractor's Employees.**  Subcontractor represents and warrants to Business Associate that Subcontractor's employees, agents, representatives, and subcontractors who will have access to PHI after the Effective Date will have: (1) been provided with general HIPAA-related training and education; and (2) specific knowledge of Subcontractor's HIPAA-related responsibilities and contractual requirements to Business Associate (including applicable state laws and regulations), in each case prior to being allowed to have access to PHI.

C.    **Interpretation.**  This Subcontractor Agreement shall be interpreted as broadly as necessary to implement and comply with HIPAA, the HIPAA Regulations and applicable state laws.  The parties agree that any ambiguity in this Subcontractor Agreement shall be resolved in favor of a meaning that complies and is consistent with HIPAA and the HIPAA Regulations.

D.    **Changes or Modifications to HIPAA and/or HIPAA Regulations.**  If, following the Effective Date, HIPAA and/or the Privacy Standards or the Security Standards are modified, and/or additional regulations are issued pursuant to HIPAA, the parties agree to work together in good faith to amend this Subcontractor Agreement so that the parties hereto remain in compliance with such regulations.

E.    **Indemnity for Third Party Claims.**  In the event of a breach of this Subcontractor Agreement, Subcontractor shall indemnify, defend and hold Business Associate and Covered Entity and their affiliates, respective members, directors, officers, shareholders, employees, representatives, agents, attorneys, successors, and assigns, harmless from and against any and all third-party claims, damages, liabilities, judgments, fines, assessments and/or other losses and expenses (including reasonable attorneys' fees) arising out of or relating to any failure by Subcontractor to comply with the terms of this Subcontractor Agreement (including any HIPAA-related obligations under applicable state laws and regulations).

F.    **Injunctive Relief.**  Subcontractor agrees that the remedies at law for a breach by it of the terms of this Subcontractor Agreement may be inadequate and that monetary damages resulting from such breach may not be readily measured.  Accordingly, in the event of a breach or threatened breach by Subcontractor of the terms of this Subcontractor Agreement, Business Associate shall be entitled to immediate injunctive relief.  Nothing herein shall prohibit Business Associate from pursuing any other remedies that may be available to it for such breach.

D-5

**G.     Counterparts; Attachments.** This Subcontractor Agreement may be executed in counterparts, by manual or facsimile signature, each of which will be deemed an original and all of which together will constitute one and the same instrument.

**H.     Survival.** The obligations of Subcontractor under **Sections III.C.** and **IV.E.** of this Subcontractor Agreement shall survive the termination of this Subcontractor Agreement.

**I.     Entire Agreement.** This Subcontractor Agreement constitutes the entire agreement between the parties and supersedes all prior negotiations, discussions, representations, or proposals, whether oral or written, unless expressly incorporated herein, related to the subject matter of this Subcontractor Agreement. Unless otherwise expressly provided herein, this Subcontractor Agreement may not be modified unless in writing signed by the duly authorized representatives of the parties. If any provision or part thereof is found to be invalid, the remaining provisions shall remain in full force and effect.

**J.     Third Party Beneficiaries.** Except as otherwise provided for in the Privacy Standards or this Subcontractor Agreement, Covered Entity shall be the only third party beneficiary to this Subcontractor Agreement. Subcontractor's obligations are to Business Associate and Covered Entity with respect to the handling of PHI.

**K.     Successors and Assigns.** This Subcontractor Agreement will inure to the benefit of and be binding upon the successors and assigns of the parties. However, this Subcontractor Agreement is not assignable by any party without the prior written consent of the other parties.

**L.     Assistance in Litigation or Administrative Proceedings.** Subcontractor shall make itself, and any employees, agents or representatives assisting Subcontractor in the performance of its obligations under this Subcontractor Agreement, available to Business Associate and/or Covered Entity upon reasonable notice, at Business Associate's and/or Covered Entity's expense, to testify as witnesses, for document production, or otherwise, in the event of litigation or administrative proceedings being commenced against Business Associate and/or Covered Entity, their respective members, trustees, officers, agents or employees based upon claimed violation of HIPAA, the HIPAA Regulations or other laws relating to security and privacy, except where Subcontractor or its employee, agent or representative is a named adverse party. In such event, such adverse party shall be responsible for all its expenses.

**M.     Location of Services.** Subcontractor shall perform all Services in the United States.

**N.     Independent Contractor.** The relationship between the parties will be solely that of independent contractors contracting with each other solely for the purposes of effecting the provisions of this Subcontractor Agreement.   .

**O.     Expenses.** Any and all expenses incurred by Subcontractor in compliance with the terms of this Subcontractor Agreement shall be borne by Subcontractor.

*[signature page to follow]*

D-6

12/22/2008  19:01 FAX                    FOX ROTHSCHILD                          ☒ 005/005

IN WITNESS WHEREOF, duly authorized representatives of the parties have executed this Subcontractor Business Associate Agreement as of the Effective Date.

BUSINESS ASSOCIATE:                     SUBCONTRACTOR:

INTERNATIONAL PORTFOLIO, INC.           ROUNDSTONE HEALTHCARE
                                        PARTNERS VI, L.P.

By:_____               By its General Partner,
Name:  Richard Shusterman               Roundstone Healthcare Partners, LLC
Title:   President

                                        By:_____
                                        Name:  Basil P. Bourque
                                        Title:   Member

D-7

DT1 827871v2 12/22/08

p.5                    5614552518                    Richard Shusterman    Dec 23 08 05:12p

IN WITNESS WHEREOF, duly authorized representatives of the parties have executed this Subcontractor Business Associate Agreement as of the Effective Date.

BUSINESS ASSOCIATE:                    SUBCONTRACTOR:

INTERNATIONAL PORTFOLIO, INC.          ROUNDSTONE HEALTHCARE
                                       PARTNERS VI, L.P.

By:_____               By its General Partner,
Name:  Richard Shusterman              Roundstone Healthcare Partners, LLC
Title:   President

                                       By: _____
                                       Name:  Basil P. Bourque
                                       Title:   Member

D-7

# EXHIBIT  N

# EXHIBIT  N

**From:** Romaszewski, Sandra A. [SRomaszewski@foxrothschild.com]
**Sent:** Tuesday, December 23, 2008 5:41 PM
**To:** Basil Bourque
**Cc:** rshusterman@aol.com
**Subject:** RE: New Contract for RHP VI
**Attachments:** RHP VI PSA.PDF; RHP VI NDA.PDF

Thank you, Basil. I received your fax.

Attached please find fully-executed copies of each of the Confidentiality Agreement and the Purchase and Sale Agreement with IPI's signatures. Please note that I will send you a notarized Bill of Sale when I return to you a fully-executed original.

Please let us know know when the wire is sent so that Richard can track it and confirm receipt.

You also have a great holiday and a Happy and Healthy New Year!

Regards,
Sandy

**From:** Basil Bourque [mailto:bpbourque@roundstoneadvisors.com]
**Sent:** Tuesday, December 23, 2008 9:15 AM
**To:** Romaszewski, Sandra A.
**Cc:** rshusterman@aol.com
**Subject:** RE: New Contract for RHP VI

Hi Sandy,

Please look for the fax coming thru now. Have a great holiday and a Happy New Year.

Regards

Basil

Basil Bourque
Managing Director
Roundstone Advisors, LLC
p. 978-635-3700
f. 978-635-3711
m. 978-835-4039
bpbourque@roundstoneadvisors.com

**From:** Romaszewski, Sandra A. [mailto:SRomaszewski@foxrothschild.com]
**Sent:** Monday, December 22, 2008 6:01 PM
**To:** Basil Bourque
**Cc:** rshusterman@aol.com; Sean McNamara; Kevin Hill
**Subject:** New Contract for RHP VI

Basil, attached please find the Purchase and Sale Agreement, effective as of December 24th, in connection with the purchase by Roundstone Healthcare Partners VI, L.P. of HMA accounts with a current balance of $69,482,758.62 at a buy rate of 5.80% for a purchase price of $4,030,000. For ease of your review, I have also attached a blackline version comparing this P&SA to the 10/14/08 P&SA with RHP IV.

Also, I have attached a Confidentiality Agreement between IPI and RHP VI since this is the first transaction between these two entities.  For ease of your review, I have also attached a blackline version comparing it to the Confidentiality Agreement between IPI and RHP IV.

If all is in order, please sign the signature page for each of the P&SA and Confidentiality Agreement and kindly fax a set to me.  Also, please send 3 sets of original signature pages for each document to my attention at the address listed below so that I may have Richard countersign them.  I will then return to you a fully-executed copy of each document for your files.

If you should have any questions, please do not hesitate to contact me.  Happy Holidays!

Thank you and regards,
Sandy


**Sandra A. Romaszewski**
Attorney at Law
**Fox Rothschild LLP**
2700 Kelly Road, Suite 300
Warrington, PA 18976
215-918-3543 (direct)
215-345-7507 (fax)
215-837-7141 (cell)
sromaszewski@foxrothschild.com
www.foxrothschild.com


ATTENTION:

IRS CIRCULAR 230 DISCLOSURE:
Pursuant to Treasury Regulations, any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used or relied upon by you or any other person, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any tax advice addressed herein.
-------------------------------------------
This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for the use of the Individual(s) named above. If you are not the intended recipient of this e-mail, or the employee or agent responsible for delivering this to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify us by telephone at (215)-299-2167 or notify us by e-mail at helpdesk@foxrothschild.com.  Also, please mail a hardcopy of the e-mail to Fox Rothschild LLP, 2000 Market Street, Philadelphia PA 19103-3291 via the U.S. Postal Service.  We will reimburse you for all expenses incurred.

Thank you.


The information contained in this electronic message and any attached document (s) is intended only for the personal and confidential use of the designated recipients named above. This message may be an Advisor/Client communication, and such is privileged and confidential. If the reader of this message is not the intended recipient, you are hereby notified that you have this document/information in error, and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (978) 635-3700. Thank You.

12/9/2011

Roundstone Advisors does not warrant the correctness of any information
herein or the appropriateness of any transaction. Trading in futures,
securities, options or other derivatives and OTC products entails significant
risk which must be understood prior to trading and may not be appropriate for
all investors. Past performance of actual trades or strategies cited herein
is not necessarily indicative of future performance.

ATTENTION:

IRS CIRCULAR 230 DISCLOSURE:
Pursuant to Treasury Regulations, any tax advice contained in this communication
(including any attachments) is not intended or written to be used, and cannot be
used or relied upon by you or any other person, for the purpose of (i) avoiding
penalties under the Internal Revenue Code, or (ii) promoting, marketing or
recommending to another party any tax advice addressed herein.
------------------------------------------------
This e-mail contains PRIVILEGED AND CONFIDENTIAL INFORMATION intended only for
the use of the Individual(s) named above. If you are not the intended recipient
of this e-mail, or the employee or agent responsible for delivering this to the
intended recipient, you are hereby notified that any dissemination or copying
of this e-mail is strictly prohibited. If you have received this e-mail in error,
please immediately notify us by telephone at (215)-299-2167 or notify us by
e-mail at helpdesk@foxrothschild.com.  Also, please mail a hardcopy of the e-mail
to Fox Rothschild LLP, 2000 Market Street, Philadelphia PA 19103-3291 via the
U.S. Postal Service.  We will reimburse you for all expenses incurred.

Thank you.

# EXHIBIT O

# EXHIBIT O

From: rshusterman@aol.com [mailto:rshusterman@aol.com]
Sent: Saturday, November 07, 2009 7:35 PM
To: Eric Raymond
Subject: Re: Portfolio sale options (2)

Perfect see you tomorrow

Sent from my Verizon Wireless BlackBerry

---

From: Eric Raymond <eric@theraymonds.com>
Date: Sat, 7 Nov 2009 19:34:00 -0500
To: rshusterman@aol.com<rshusterman@aol.com>
Subject: RE: Portfolio sale options (2)


Yes sir!

---

From: rshusterman@aol.com [mailto:rshusterman@aol.com]
Sent: Saturday, November 07, 2009 7:33 PM
To: Eric Raymond
Subject: Re: Portfolio sale options (2)


Can we meet at famous at 930 on 19th street?

Sent from my Verizon Wireless BlackBerry

---

From: Eric Raymond <eric@theraymonds.com>

Date: Sat, 7 Nov 2009 19:30:29 -0500

To: RSHUSTERMAN@aol.com<RSHUSTERMAN@aol.com>

Subject: RE: Portfolio sale options (2)

1

Thanks

Maybe instead of Wednesday we meet tomorrow to discuss and finalize these options?

930?

---

**From:** RSHUSTERMAN@aol.com [mailto:RSHUSTERMAN@aol.com]
**Sent:** Saturday, November 07, 2009 5:55 PM
**To:** Eric Raymond
**Subject:** Portfolio sale optrions (2)

1. Portfolio funding  amount $2,280,977.89 average purchase date 3-25-09 by Greenfish- - Options for purchase:

A. cash option $2,950,000 (First Quarter funding)

B. Four pay  installment option- $3.2M over four monthly installments- starting 12-26-09 - 3-26-10

C. Cash offer $2.5M- Close on or by Jan 30TH

D. Cash Option $2.55M- Scrub and remove BK, Deceased with 15% hold back for 60 days

E. $2.160M- one payment Jan 2010(Date to be finialized).

2. Portfolio funding amount $1.4M..  Purchase date by Greenfish 6-16-09- Options for purchase:

A. Cash option $1.750M (First Quarter funding)

B. Four pay installment option $1.9M over four months starting 1-30-10 - 4-30-10

C. $1.0M Cash- Funding Jan 2010

D. $1.255M cash Funding Jan 2010

E. $1.350M paid in 2 installments J an and Feb 2010

3. Portfolio funding amount $3.525M. Purchase date by Greenfish 7-28-09. Options for purchase:

A. Cash option $4,406,000 (First Quarter funding)

B. Four pay installment option $4.6M over four months starting 3-15-10.

C.Cash $2.88M (Closing take place between Jan 15TH and Feb 30TH)

D. $3.8M two pay (Jan and March) with a 20% hold back for 60 days to cover BK, Dispute and Deceased files

E. Divide the file into three buyers- total aggregate price $4.125M payable over three months starting Jan, Feb and March

4. Portfolio funding amount $1,149,889.44. Purchase date by Greenfish 2-25-09. Options for purchase:

A. Divide the portfolio into two.$5.453M face and will close the end of Jan in the amount of $770,481.00. the balance of the portfolio ($5M face) and will fund by Feb 15Th in the amount of $730,000.

B. Cash sale $875,000 close December 31, 2009

D. Cash Sale $1.2M minus 25% hold back for 60 days minus scrub for BK, Deceased and disputed files. Close December 31, 2009

E. Cash sale $1.3M close on or before Jan 30TH

Please email me the options you would like for each portfolio. Upon receipt I will instruct Sandy to create the necessary contracts.

Thanks,

RS

**From:** Eric Raymond
**Sent:** Saturday, December 05, 2009 10:49 PM
**To:** Eric Raymond; RSHUSTERMAN@aol.com
**Subject:** lets review these again maybe even with your notes in the morning thanks

4. Greenfish sale Files

A. Portfolio 2- Greenfish Portfolio funding amount $2,280,977.89- Option A will not move up the date of funding so please confirm you want me to move forward with option B which is a four pay- I was unable to nail down the first funding date until we go to contract. Meaning Jan 15TH is an approximate  date.

B. Portfolio 3- Greenfish Funding amount $1.4M- Option B is ready to move forward (Four pay installment $2.50M) starting in late Feb early March.

C. Portfolio 4 Greenfish Funding amount $3.525M- $4.55M looks ok but will fund around March 25th. date to be completed in a contract.

D. Portfolio 1-  $1.650M minus 25% hold back for 60 days. Funding date Mid to end of Feb.

** Please note all files will be repurchased by IPI. The dates could change slightly until contracts are signed. IPI will repurchase the files and insert additional  files owned by IPI  thereby creating new portfolios for sale. The figures listed are net figures to your fund but would include any direct payments received and forwarded by either the hospital or patient from the contract signing date. Repurchase contracts will also include a provision that IPI has at it's option and discretion the ability to extend funding by 120 days if needed and if your notified first. The repurchase price would remain the same

**From:** RSHUSTERMAN@aol.com [mailto:RSHUSTERMAN@aol.com]
**Sent:** Friday, November 20, 2009 10:07 AM
**To:** Eric Raymond
**Subject:** Re: Portfolio sale options (2) WITH REVISED OFFERS ADDING NEWER PAPER

Eric:

I will work on the email you forwarded below and have feedback for you late next week. please also advise how much you expect to purchase in new portfolios in November.

Thanks,

Richard

In a message dated 11/19/2009 3:01:22 P.M. Eastern Standard Time, eric@theraymonds.com writes:

Dear Richie,

1

As a follow up to our conversation :

We appreciate the additional bids!

Our preference for portfolio sales are as follows, including objective for the final negotiations:

Again I am open to review and prefer a reasonable lower purchase price to obtain a closing date in 2009.

## _Portfolio 1 ( which is actually port 2):_

_Portfolio funding  amount $2,280,977.89 average purchase date 3-25-09 by Greenfish-_
_Options for purchase:_

_REVISED PRICING WITH NEWER PAPER ADDED:_

_A. CASH OPTION $3,150,000 (FUNDING IN FEB)_

_B. FOUR PAY INSTALLMENT OPTION- $3.35M OVER FOUR MONTHS- STARTING 1-15-_
_10_

_In order:  a funding in December or b_

## _Portfolio 2 ( actually portfolio 3);_

*Portfolio funding amount $1.4M..  Purchase date by Greenfish 6-16-09-*
*Options for purchase:*

*REVISED OFFER WITH NEWER PAPER ADDED;*

*A. CASH OPTION $1.825M (FIRST QUARTER FUNDING)*

*B. FOUR PAY INSTALLMENT OPTION $2.50M OVER FIVE MONTHS STARTING IN FEB*

*Preference is the B but first payment starting in December  or option A.  in December*

*Portfolio 3 (actually four);*

*3. Portfolio funding amount $3.525M. Purchase date by Greenfish 7-28-09.*
*Options for purchase:*

*Additional bid*

A. *CASH OPTION $4.55M END OF FIRST QUARTER FUNDING*

*Selection is A: But some payment starting in December.*

## _Portfolio Four (which we have as named portfolio one)_

_REVISED OFFER WITH NEWER PAPER ADDED:_

_A. CUT THE PORTFOLIO INTO TWO FILES. FUNDING FOR BOTH BY FEB 28TH. TOTAL SALE FOR BOTH FILES (AGGREGIATE) $1.5M_

_C. CASH SALE $1.650M MINUS 25% HOLD BACK FOR 60 DAYS._

_Desired buyer bid preference in order:  c  with a closing date of end of December  or a with a closing date end of December._

All purchased as always are based on the presumption and agreement that:

      All bid are net of any additional costs for the paper added and the repackaging of or the original portfolios.

      That all 7 bids are from different buyers and all are unrelated to you and each other

      That each buyer that we select has a history of living up to their contractual obligations to purchase the portfolios.

As always Thank you

Look forward to the results of you working your magic and going to contract on these.

Eric

**From:** RSHUSTERMAN@aol.com [mailto:RSHUSTERMAN@aol.com]
**Sent:** Saturday, November 14, 2009 9:26 AM
**To:** Eric Raymond
**Subject:** Fwd: Portfolio sale optrions (2) WITH REVISED OFFERS ADDING NEWER PAPER

Eric:

By adding fresher paper the portfolio, I have listed the revised prices below in capital letters and in bold print:

From: RSHUSTERMAN
To: eric@theraymonds.com
BCC: RSHUSTERMAN
Sent: 11/7/2009 5:54:31 P.M. Eastern Standard Time
Subj: Portfolio sale optrions (2)

1. Portfolio funding  amount $2,280,977.89 average purchase date 3-25-09 by Greenfish- – Options for purchase:

A. cash option $2,950,000 (First Quarter funding)

B. Four pay  installment option- $3.2M over four monthly installments- starting 12-26-09 - 3-26-10

C. Cash offer $2.5M- Close on or by Jan 30TH

D. Cash Option $2.55M- Scrub and remove BK, Deceased with 15% hold back for 60 days

E. $2.160M- one payment Jan 2010(Date to be finalized).

REVISED PRICING WITH NEWER PAPER ADDED:

A. CASH OPTION $3,150,000 (FUNDING IN FEB)

B. FOUR PAY INSTALLMENT OPTION- $3.35M OVER FOUR MONTHS- STARTING 1-15-10

C. CASH OFFER $2.65M ( CLOSING DATE TO BE FINIALIZED- JAN OR FEB)

2. Portfolio funding amount $1.4M..  Purchase date by Greenfish 6-16-09- Options for purchase:

A. Cash option $1.750M (First Quarter funding)

B. Four pay installment option $1.9M over four months starting 1-30-10 – 4-30-10

C. $1.0M Cash- Funding Jan 2010

D. $1.255M cash Funding Jan 2010

E. $1.350M paid in 2 installments J an and Feb 2010

REVISED OFFER WITH NEWER PAPER ADDED;

A. CASH OPTION $1.825M (FIRST QUARTER FUNDING)

B. FOUR PAY INSTALLMENT OPTION $2.50M OVER FIVE MONTHS STARTING IN FEB

C. CASH OFFER 1.5M (END OF JAN CLOSE)

3. Portfolio funding amount $3.525M. Purchase date by Greenfish 7-28-09. Options for purchase:

A. Cash option $4,406,000 (First Quarter funding)

B. Four pay installment option $4.6M over four months starting 3-15-10.

C. Cash $2.88M (Closing take place between Jan 15TH and Feb 30TH)

D. $3.8M two pay (Jan and March) with a 20% hold back for 60 days to cover BK, Dispute and Deceased files

E. Divide the file into three buyers- total aggregate price $4.125M payable over three months starting Jan, Feb and March

REVISED OFFER WITH NEWER PAPER ADDED:

A. CASH OPTION $4.55M END OF FIRST QUARTER FUNDING

B. FIVE PAY INSTALLMENT OPTION $4.7M STARTING MARCH 15

C. CASH OPTION 3.0M (CLOSING TO TAKE PLACE THIRD OR FOURTH WEEK IN FEB)

4. Portfolio funding amount $1,149,889.44. Purchase date by Greenfish 2-25-09. Options for purchase:

A. Divide the portfolio into two.$5.453M face and will close the end of Jan in the amount of $770,481.00. the balance of the portfolio ($5M face) and will fund by Feb 15Th in the amount of $730,000.

B. Cash sale $875,000 close December 31, 2009

C. Cash Sale $1.2M minus 25% hold back for 60 days minus scrub for BK, Deceased and disputed files. Close December 31,  2009

E. Cash sale $1.3M close on or before Jan 30TH

REVISED OFFER WITH NEWER PAPER ADDED:

A. CUT THE PORTFOLIO INTO TWO FILES. FUNDING FOR BOTH BY FEB 28TH. TOTAL SALE FOR BOTH FILES (AGGREGIATE) $1.5M

B. CASH SALE CLOSE MID FIRST QUARTER $1.250M

C. CASH SALE $1.650M MINUS 25% HOLD BACK FOR 60 DAYS.

Please email me the options you would like for each portfolio. Upon receipt I will instruct Sandy to create the necessary contracts.

Thanks,

RS

# EXHIBIT P

# EXHIBIT P

DuaneMorris°

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
BOCA RATON
WILMINGTON
CHERRY HILL
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

WILLIAM L. WEINER
DIRECT DIAL: 609-631-2421
E-MAIL: wlweiner@duanemorris.com

www.duanemorris.com

October 14, 2009

VIA E-MAIL

Mr. Eric Raymond
c/o Greenfish Fund II, LP
112 Minfford Road
Bala Cynwyd, PA  19004

     Re:    International Portfolio, Inc. ("IPI")

Dear Mr. Raymond:

    You have requested that IPI provide you with a brief summary of the nature of its business.  Therefore, as outside general counsel to IPI, I have prepared the following for your information: IPI engages in the purchase of uncollected hospital receivables, excluding those that are reimbursed by Medicare or Medicaid (such receivables are sometimes referred to herein as "Portfolios").

    Further, IPI sells, without promise or guarantee as to the nature or extent of any investment return, Portfolios to various buyers unaffiliated with IPI, including, but not necessarily limited to, high net worth individuals, Hedge Funds, financial asset management firms, and collection law firms.  From time-to-time, IPI, as a means of assisting a buyer that has purchased a Portfolio from IPI, will repurchase and modify such Portfolio by breaking-up such Portfolio into various sets of accounts receivable (the "Sets of Accounts"), and then selling such Sets of Accounts to one or more other buyers that are also unaffiliated with IPI.

    IPI does not realize a profit on the management of Portfolios or on the repurchase of Portfolios, which may or may not result in a profit to the owner of record of such Portfolios. Portfolio owners can benefit from the network of agencies and law firms IPI has engaged in connection with the collection of such Portfolios; and such owners are also able to receive wires directly from such agencies and law firms that are sent to such owners' respective bank accounts.

DUANE MORRIS LLP   A DELAWARE LIMITED LIABILITY PARTNERSHIP

FRANK A. LUCHAK, RESIDENT PARTNER

100 AMERICAN METRO BOULEVARD, SUITE 150  HAMILTON, NJ 08619-2304
P.O. BOX 5203, PRINCETON, NJ  08543-5203
DM2\2081327.3

PHONE: 609.631.2400   FAX: 609.631.2401

Mr. Eric Raymond
October 14, 2009
Page 2

**Duane**Morris

Naturally, should you have any questions, please feel free to contact me at any time.

Very truly yours,

William L. Weiner

WLW/mhh