# EXHIBIT Q

Part 2

# EXHIBIT Q

Part 2

PURCHASE AND SALE AGREEMENT


BETWEEN


GREENFISH FUND II, L.P.
(AS SELLER)


- - AND - -


INTERNATIONAL PORTFOLIO, INC.
(AS BUYER)


DATED AS OF

DECEMBER 14, 2009


[FOR THE PORTFOLIO REFERRED TO AS PORTFOLIO 3]

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is entered into this 14th day of December, 2009, by and between Greenfish Fund II, L.P., a Delaware limited partnership ("**Seller**"), and International Portfolio, Inc., a Delaware corporation ("**Buyer**").

### WITNESSETH:

**WHEREAS,** Seller purchased from Buyer the Accounts (as defined herein) with an aggregate current balance of $18,751,935.75 at a purchase price percentage of 8% for an aggregate purchase price of $1,400,000.00, pursuant to the P&S Agreements (as defined below);

**WHEREAS,** Seller desires to sell the Accounts to Buyer; and

**WHEREAS,** Buyer has reviewed and evaluated the Accounts to Buyer's full satisfaction and desires to purchase the Accounts;

**NOW, THEREFORE,** in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Seller and Buyer agree as follows:

### ARTICLE I
### DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

"**Accounts**" means those accounts acquired by Seller pursuant to the P&S Agreements, which are (i) being sold to Buyer hereunder, (ii) further described in the Account Schedule, (iii) further described in the P&S Agreements and corresponding Purchase Schedules, and (iv) are referred to by Seller as "Portfolio 3".

"**Account Document(s)**" means any application, agreement, billing statements, patient records, status codes, notices, correspondence or other evidence of indebtedness reasonably necessary to establish the validity of an Account, which is in Seller's possession or which Seller has the right to obtain and relates to an Account. Such Account Documents may include, without limitation, any microfilm, microfiche, photocopy or machine-readable format documents.

"**Account Schedule**" means Schedule 1 hereto, which sets forth a summary of the Accounts including: the aggregate number of Accounts, the aggregate Current Balances of Accounts, the Purchase Price Percentage, and the aggregate Purchase Price for the Accounts.

"**Affiliate**" means an entity controlling, controlled by, or under common control with a party to this Agreement.

"**Agreement**" means this Purchase and Sale Agreement, including the cover page and all Exhibits and Schedules hereto, which are incorporated by this reference herein.

"**Bill of Sale and Assignment**" means the document to be delivered to Buyer on or before the Closing Date, in the form attached hereto as <u>Exhibit A</u>.

"**Business Associate Agreement**" shall have the meaning set forth in Section 7.4.

"**Business Day**" means any day on which Seller is open for business other than a Saturday, a Sunday or a federal holiday.

"**Claim**" means any claim, action, suit or other actual or threatened proceeding, loss, judgment, damage, liability, cost and expense.

"**Closing Date**" means March 5, 2010, or such other date as Buyer may designate pursuant to Section 2.4(d).

"**Computer Files**" mean those certain computer files, to be provided by Seller to Buyer, setting forth all relevant information regarding the Accounts and the Obligor(s), including, but not limited to, the Current Balance, Provider, Seller account number, Provider account number, name, address, phone number, social security number, payment history, open date, original balance, date of last payment, discharge date, date of first delinquency, charge-off date, interest rate, accrued interest and other charges, and procedure codes.

"**Confidentiality Agreement**" shall mean the Confidentiality Agreement, dated February 9, 2009, between Buyer and Seller, together with any other confidentiality agreements executed by Buyer and Seller in connection with this Agreement.

"**Current Balance**" means the unpaid principal balance in United States dollars for each Account identified in the Account Schedule and specified as the Current Balance as of the close of business on the Cutoff Date. The Current Balance shall not include any interest, fees or other charges accrued after the charge-off date of the Account.

"**Cutoff Date**" means March 4, 2010, or such other date as Buyer may designate pursuant to Section 2.4(d).

"**Disputed Account**" shall have the meaning set forth in Section 3.1.

"**FDCPA**" shall have the meaning set forth in Section 7.3.

"**Federal Privacy Standards**" shall have the meaning set forth in Section 7.4.

"**HIPAA**" shall have the meaning set forth in Section 4.2

"**HIPAA Standards**" shall have the meaning set forth in Section 7.4.

"**Obligor**" means the current and unreleased obligor(s) on or under an Account and/or Account Documents, including, without limitation, any and all patients, guarantors, sureties or

other persons or entities liable on such Account.  "Obligor" includes without limitation any person who is a "Patient" as that term is used in the Provider Agreement.

**"Obligor Payments"** means any payments or other consideration distributed or paid by or on behalf of an Obligor, including but not limited to direct payments from Obligors, payments from third-party service providers, payments from insurance/warranty companies, and payments from state taxation authorities.

**"P&S Agreements"** means those certain Purchase and Sale Agreements and corresponding Purchase Schedules between Buyer and Seller pursuant to which Seller purchased the Accounts from Buyer as follows:  (i) Purchase and Sale Agreement, dated February 25, 2009, including Purchase Schedule No. 4 dated June 16, 2009 (pertaining to the JMH accounts); (ii) Purchase and Sale Agreement, dated June 16, 2009, including Purchase Schedule No. 1 dated June 16, 2009 (pertaining to the HMA accounts); and (iii) Purchase and Sale Agreement, dated June 16, 2009, including Purchase Schedule No. 1 dated June 16, 2009 (pertaining to the Grapevine accounts) .

**"Providers"** means each of Jackson Memorial Hospital, Health Management Associates, and Grapevine Radiology Associates, respectively and as applicable.

**"Provider Agreements"** means each of the following, respectively and as applicable: (i) that certain Master Purchase and Sale Agreement, dated December 19, 2006, by and between Buyer and the Public Health Trust of Miami-Dade County, Florida which, as an agency and instrumentality of Miami-Dade County, governs and operates Jackson Memorial Hospital; (ii) those certain Master Purchase and Sale Agreements by and between Buyer and Health Management Associates, Inc., as amended; and (iii) that certain Master Purchase and Sale Agreement, dated January 2, 2009, by and between Buyer and Grapevine Radiology Associates, as amended.

**"Purchase Price"** means the sum listed in the fourth column of the Account Schedule. The Purchase Price listed in the Account Schedule is calculated by multiplying the aggregate Current Balance by the Purchase Price Percentage set forth in the Account Schedule.

**"Purchase Price Percentage"** means the percentage set forth in the purchase price percentage column of the Account Schedule.

**"Transfer Documents"** means all documents that are required to be delivered on the Closing Date by Seller or Buyer, including those set forth in Sections 2.2 and 2.3 of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF THE ACCOUNTS

**Section 2.1**    <u>Agreement to Sell and Purchase Accounts</u>.  Seller agrees to sell, and Buyer agrees to purchase, all of Seller's right, title and interest in and to the Accounts described in the Account Schedule on the Closing Date, subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement.

**Section 2.2**   **Agreement to Assign/Buyer's Right to Act**.  On the Closing Date, Seller shall deliver to Buyer a Bill of Sale and Assignment, in the form of **Exhibit A** attached hereto, executed by an authorized representative of Seller, which Bill of Sale and Assignment shall sell, transfer, set-over, quitclaim and convey, in each case without recourse (except as expressly provided for in Articles VI, VII, VIII and IX of this Agreement), to Buyer all right, title and interest of Seller in and to each of the Accounts and the proceeds of the Accounts, if any, received on or after the Cutoff Date.

**Section 2.3**   **Account Schedule and Computer File**.  Seller has provided, as **Schedule 1** attached hereto, the Account Schedule setting forth all of the Accounts and their corresponding Current Balances.  Buyer acknowledges that the same has been reviewed to Buyer's full satisfaction.  Seller shall deliver Computer Files to Buyer on or prior to the Closing Date, with information as of the Closing Date, in a format reasonably acceptable to Buyer.  To the extent that the Computer Files or any other information provided by Seller to Buyer is not legible, Seller shall use all reasonable efforts to reproduce such information for Buyer.  Seller shall further provide Buyer a written explanation of the meaning of each procedure code included in the Computer File on or prior to the Closing Date.

**Section 2.4**   **Purchase Price/Payment**.

(a)   Buyer shall pay to Seller the Purchase Price in the amount of Two Million Five Hundred Thousand Dollars and Zero Cents ($2,500,000.00), which represents the aggregate Current Balance of the Accounts of Eighteen Million Seven Hundred Fifty-One Thousand Nine Hundred Thirty-Five Dollars and Seventy-Five Cents ($18,751,935.75) multiplied by the Purchase Price Percentage of 13.331956942%.

(b)   Buyer shall pay to Seller the Purchase Price in four (4) equal monthly installments according to the following payment schedule:

(i)   The first installment in the amount of Six Hundred Twenty-Five Thousand Dollars and Zero Cents ($625,000.00) shall be paid by Buyer to Seller on or before the Closing Date;

(ii)   The second installment in the amount of Six Hundred Twenty-Five Thousand Dollars and Zero Cents ($625,000.00)shall be paid by Buyer to Seller on or before April 5, 2010;

(iii)   The third installment in the amount of Six Hundred Twenty-Five Thousand Dollars and Zero Cents ($625,000.00)shall be paid by Buyer to Seller on or before May 5, 2010; and

(iv)   The fourth and final installment in the amount of Six Hundred Twenty-Five Thousand Dollars and Zero Cents ($625,000.00)shall be paid by Buyer to Seller on or before June 5, 2010.

(c)   All of such funds shall be paid to Seller in immediately available funds in United States dollars by wire transfer according to the instructions of Seller as set forth on **Exhibit C** attached hereto.

(d)    Notwithstanding the foregoing, Buyer and Seller hereby agree as follows:

(i)    Buyer may, at its sole option and with prior written notice to Seller, accelerate the Closing Date.  In the event Buyer accelerates the Closing Date pursuant to this Section 2.3(d)(i), the Cutoff Date shall also be accelerated for the same period of time as the Closing Date;

(ii)    Buyer may, at its sole option and with prior written notice to Seller, extend the Closing Date for a period not to exceed sixty (60) calendar days. In the event Buyer extends the Closing Date pursuant to this Section 2.3(d)(ii), the Cutoff Date shall also be extended for the same period of time as the Closing Date, and Buyer shall not pay Seller any additional amount above the Purchase Price; and

(iii)    Buyer may, at its sole option and with prior written notice to Seller, terminate this Agreement and, therefore, not purchase the Accounts from Seller. In the event Buyer terminates this Agreement, Buyer shall pay Seller an additional Fifty Thousand Dollars and Zero Cents ($50,000.00) (i.e., 2% of the Purchase Price) as liquidated damages, and Seller shall not be entitled to any other remedy, at law or in equity.

**Section 2.5    Payments Received After the Cutoff Date**.  To the extent that Seller receives any credits, payments or other consideration in respect of an Account from and after the Cutoff Date, Seller shall promptly remit such amounts to Buyer.  To the extent that following the Closing Date, Buyer receives any credits, payments or other consideration in respect of an Account relating to periods prior to the Cutoff Date, Buyer shall promptly remit such amounts to Seller.

**Section 2.6    No Sale of a Security**.  The parties acknowledge and agree: (i) that the Accounts to be sold by Seller to Buyer hereunder do not constitute a "security" or "securities" within the meaning of any applicable federal or state securities laws; (ii) that the transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws; (iii) that none of the representations, warranties or agreements of either party shall create any inference that the transactions involve any "security" or "securities"; and (iv) that they shall take no position to the contrary to any of the foregoing.

**ARTICLE III**
**ACCOUNTS AND DOCUMENTS**

**Section 3.1    Intentionally Omitted**.

**ARTICLE IV**
**SERVICING/COLLECTION**

**Section 4.1    Servicing After Closing Date**.  The Accounts shall be sold and conveyed to Buyer on a servicing-released basis.  As of the Closing Date and except as provided in this Agreement, (i) all rights, obligations and responsibilities with respect to the servicing of the

Accounts shall pass to Buyer, and (ii) Seller shall take no further action against the Accounts or incur any expenses relating to the Accounts. In the event that any Accounts are assigned to any collection agency or third party attorney, Seller shall, at the written direction of Buyer, recall any Accounts and/or terminate any such agreements and fully assist and cooperate with Buyer in any way whatsoever. Seller shall, within ten (10) Business Days of the Closing Date, report to any credit reporting agency to which an Account has been reported that such Account has been sold and assigned to Buyer. Seller agrees that it shall not direct the credit bureaus to list the account as "charged off", but only as being owned or serviced by Buyer. At the request and expense of Buyer, Seller shall use reasonable business efforts, as provided by and in accordance with federal and state laws, to notify all of the Obligors in writing that Seller has transferred the Accounts to Buyer. In the event that any Obligors continue to contact Seller after the Closing Date, Seller shall notify the Obligors that the Accounts have been sold to Buyer and shall provide the contact name, address and phone number of Buyer. Seller shall forward to Buyer, within ten (10) Business Days of receipt, any and all correspondence, notices and other documents received on any Account. In addition to the foregoing, the parties acknowledge and agree that (i) Buyer will be solely responsible for any costs associated with the closing of the Accounts with the respective collection agency or third-party attorney; (ii) Buyer will, at no additional cost to Seller, perform searches to update new address and telephone numbers on the Accounts; and (iii) Buyer will, at its own cost and if necessary, credit score any Account being purchased from Seller.

**Section 4.2**   <u>Debt Collection of Accounts</u>. Buyer agrees that Buyer will at all times comply with all state and federal laws applicable to debt collection, including without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and any state deficiency laws.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants, and covenants that as of the date of this Agreement and as of the Closing Date:

**Section 5.1**   <u>Existence; Good Standing</u>. Buyer is a corporation, duly organized and in good standing under the laws of the State of Delaware.

**Section 5.2**   <u>Authorization</u>. Buyer is duly authorized to enter into this Agreement and has complied with its charter provisions and bylaws as well as all laws, rules, and regulations to which it may be subject. The undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

**Section 5.3**   <u>Binding Obligations</u>. Assuming the due authorization, execution and delivery of this Agreement by Seller, this Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights

generally and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

Section 5.4   **Conflicts.**   The execution and delivery of this Agreement by Buyer and Buyer's performance and compliance with the terms of this Agreement will not:

        (a)    violate Buyer's charter documents or bylaws,

        (b)    violate any administrative or judicial decree or order or any material law, rule or regulation to which Buyer is subject, or

        (c)    constitute a default (or, an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, agreement or other instrument to which Buyer is a party or which may be applicable to Buyer or any of Buyer's assets, or result in the creation of a lien on any of Buyer's assets.

Section 5.5   **Litigation.**   There is no proceeding, action, investigation or litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Buyer's obligations contemplated herein, or which would be likely to impair materially Buyer's ability to perform under the terms of this Agreement.

Section 5.6   **Consents.**   No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Buyer with this Agreement or the consummation of any other transaction contemplated hereby.

Section 5.7   **Independent Evaluation.**   Buyer is a sophisticated acquiror, has knowledge and experience in financial and business matters that enable Buyer to evaluate the merits and risks of the transaction contemplated by this Agreement.   Buyer further represents that Buyer's bid for and decision to purchase the Accounts pursuant to this Agreement is and was based upon Buyer's independent evaluation of the information made available by Seller or Seller's personnel, agents, representatives or independent contractors to Buyer.   Buyer has made such independent investigations as Buyer deemed to be warranted into the nature, collectability and value of the Accounts, and all other facts Buyer deemed to be material to Buyer's purchase, and is entering into this Agreement solely on the basis of that investigation, the information provided by Seller, the terms and conditions of this Agreement, and Buyer's own judgment. Buyer acknowledges, understands and agrees that the acquisition of these Accounts involves a high degree of risk and is suitable only for persons or entities of substantial financial means.

Section 5.8   **Nondisclosure.**   Buyer is in full compliance with its obligations under the terms of the Confidentiality Agreement executed by the parties to review the information made available by Seller or its personnel, agents, representatives or independent contractors to all potential bidders for the Accounts.

Section 5.9   **Status of Buyer.**   Buyer represents, warrants and certifies to Seller that Buyer is a sophisticated institutional purchaser that is in the business of buying or collecting

Accounts of the type being purchased or that otherwise deals in such Accounts in the ordinary course of Buyer's business.

Section 5.10   **Broker**.   Buyer has had no dealings with any broker, sale advisor or agent in connection with this Agreement, or if Buyer has, any commission or fee associated with the sale of the Accounts to Buyer shall be Buyer's sole and exclusive responsibility.

Section 5.11   **Survival**.   The representations and warranties set forth in this Article V shall survive the Closing Date for a period of eighteen (18) months, and are subject to the provisions contained herein with respect to the limitation of remedies.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents, warrants, and covenants that as of the date of this Agreement and as of the Closing Date:

Section 6.1   **Existence; Good Standing**.   Seller is a limited partnership duly organized and in good standing under the laws of the State of Delaware.

Section 6.2   **Authorization**.   Seller is duly authorized to enter into this Agreement and has complied with its charter provisions and limited partnership agreement as well as all laws, rules, regulations, charter provisions and bylaws to which it may be subject. The undersigned representative is authorized to act on behalf of and bind Seller to the terms of this Agreement.

Section 6.3   **Binding Obligations**.   Assuming the due authorization, execution and delivery of this Agreement by Buyer, this Agreement and all of the obligations of Seller hereunder are the legal, valid, and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

Section 6.4   **Title**.   Seller has acquired all of the Accounts pursuant to the terms of the P&S Agreement. Seller has title to the Accounts, is the lawful holder of the Accounts and Account Documents and is duly and legally authorized to sell, transfer, convey and assign Seller's rights therein to Buyer. The Accounts are being sold free and clear of all liens and encumbrances. To Seller's knowledge, the information provided regarding the Accounts (including without limitation the information provided in the Account Schedule attached hereto as Schedule 1 and the Computer File(s) provided to Buyer in connection therewith) is true, correct and complete in all respects to the best of Seller's knowledge and, to the extent any of the information regarding the Accounts is not true, correct and complete, Seller shall exchange such Account(s) with Buyer for other accounts of Seller that are acceptable to Buyer and of comparable value.

Section 6.5   **Conflicts**.   The execution and delivery of this Agreement by Seller and Seller's performance and compliance with the terms of this Agreement will not:

(a)     violate Seller's charter documents or limited partnership agreement,

(b)     violate any administrative or judicial decree or order or any material law, rule or regulation to which Seller is subject, or

(c)     constitute a default (or, an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, agreement or other instrument to which Seller is a party or which may be applicable to Seller or any of Seller's assets, or result in the creation of a lien on any of Seller's assets.

Section 6.6    <u>Litigation</u>.    There is no proceeding, action, investigation or litigation pending or, to the best of Seller's knowledge, threatened against Seller which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Seller's obligations contemplated herein, or which would be likely to impair materially Seller's ability to perform under the terms of this Agreement.

Section 6.7    <u>Consents</u>.    No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Seller with this Agreement or the consummation of any other transaction contemplated hereby.

Section 6.8    <u>Broker</u>.    Seller has had no dealings with any broker, sale advisor or agent in connection with this Agreement, or if Seller has, any commission or fee associated with the sale of the Accounts to Buyer shall be Seller's responsibility.

Section 6.9    <u>Survival</u>.    The representations and warranties set forth in this Article VI shall survive the Closing Date for a period of eighteen (18) months, and are subject to the provisions contained herein with respect to the limitation of remedies, except with respect to the representation and warranty set forth in Section 6.4, which shall survive indefinitely.

## ARTICLE VII
## POST-CLOSING AGREEMENTS

Section 7.1    <u>Post-Closing Agreements</u>.    From and after the Closing Date, the parties shall have the respective rights and obligations which are set forth in the remainder of this Article VII.

Section 7.2    <u>Assignment and Compliance with Obligations under the Provider Agreement</u>.    On the Closing Date, Seller hereby agrees to sell, assign and transfer the Accounts and assign Seller's rights, if any, under the P&S Agreement and Provider Agreement with respect to the Accounts.

Section 7.3    <u>Fair Debt Collection Practices</u>.    Buyer shall comply and shall be responsible for compliance with all applicable laws, rules, regulations, ordinances and judgments relating to or in any way affecting its collection procedures, including, but not limited to: (a) compliance with the federal Fair Debt Collection Practices Act ("**FDCPA**") and any and all implementing regulations, as well as all state laws relating to debt collection practices; and (b)

compliance with the federal Fair Credit Reporting Act, as amended by the Fair and Accurate Credit Transactions Act, and any and all implementing regulations, as well as all state laws relating to credit reporting.

**Section 7.4   HIPAA Compliance**. Buyer hereby agrees to comply with the applicable provisions of HIPAA, and the applicable requirements of any regulations promulgated thereunder, including, without limitation, the federal privacy regulations as contained in 45 C.F.R. Parts 160 and 164 (the "**Federal Privacy Standards**"), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164) (collectively, HIPAA and the regulations promulgated thereunder shall be referred to herein as the "**HIPAA Standards**"). As a result of the obligations created for Buyer under this Agreement, it is possible that Buyer could be deemed a "subcontractor" of Seller as that term is defined in the Federal Privacy Standards. As such, Buyer agrees to act at all times in accordance with the Subcontractor Business Associate Agreement attached hereto as **Exhibit C** (the "**Business Associate Agreement**"). Notwithstanding anything to the contrary contained herein, Buyer agrees, at the Provider's request, to enter into a Business Associate Agreement with the Provider, in a form reasonably acceptable to the Provider.

**Section 7.5   Insurance**. Buyer shall maintain: (i) comprehensive general liability coverage, including contractual liability coverage, with limits of no less than One Million Dollars ($1,000,000) per claim/Three Million Dollars ($3,000,000) annual aggregate; and (ii) errors and omissions coverage with limits of no less than One Million Dollars ($1,000,000) per claim/Three Million Dollars ($3,000,000) annual aggregate. Buyer, upon request, shall provide Seller with certificates of insurance to evidence compliance with this Section 7.5.

**Section 7.6   Termination of Financing Statements**. To the extent that Seller has filed any UCC financing statements in any jurisdiction with respect to any or all of the Accounts, on or immediately following the Closing Date, Seller shall take all appropriate steps to terminate such financing statements and to release any liens in connection therewith effective as of the Closing Date.

**ARTICLE VIII**
**MUTUAL INDEMNIFICATION**

**Section 8.1   Seller's Indemnification**. From and after the date of this Agreement, Buyer shall indemnify, defend and hold harmless Seller (for the purposes of this indemnification, Seller shall include Seller's affiliates, shareholders, officers, partners, members, managers, employees and agents) from and against any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature (including reasonable attorneys' fees), which Seller shall incur or suffer as a result of: (i) any act or omission of Buyer or Buyer's agents in connection with the Accounts and Buyer's purchase of the Accounts pursuant to this Agreement; (ii) the inaccuracy of any of Buyer's representations or warranties herein; (iii) the breach of any of Buyer's covenants herein; (iv) any claim by any Obligor regarding enforcement, servicing or

administration of the Accounts by Buyer; or (v) any other act or omission of Buyer relating to the Accounts and the Obligors from and after the Closing Date.

Section 8.2   **Buyer's Indemnification**.   From and after the date of this Agreement, Seller shall indemnify, defend and hold harmless Buyer (for the purposes of this indemnification, Buyer shall include Buyer's affiliates, shareholders, officers, partners, members, managers, employees and agents) from and against any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature (including reasonable attorneys' fees), which Buyer shall incur or suffer as a result of: (i) any act or omission of Seller or Seller's agents in connection with the Accounts and Seller's sale of the Accounts pursuant to this Agreement; (ii) the inaccuracy of any of Seller's representations or warranties herein; (iii) the breach of any of Seller's covenants herein; (iv) any claim by any Obligor regarding assignment of the Accounts to Buyer, or subsequent enforcement, servicing or administration of the Accounts by Seller, the Provider, or either such party's agents; or (v) any other act or omission of Seller, Seller's agents or the Provider or the Provider's agents relating to the Accounts and the Obligors.  For purposes of this Agreement, no collection agency with which Seller has an arrangement to provide collection services for the Accounts shall be deemed an employee or agent of Seller.

Section 8.3   **Limitations on Indemnification**.   The indemnification obligations of each of Buyer and Seller shall not exceed fifteen percent (15%) of the Purchase Price of the Accounts.  Notwithstanding anything to the contrary contained herein, the foregoing limitations shall not apply with respect to any indemnification to which: (a) Seller shall be entitled pursuant to Section 7.4 above relating to Buyer's (i) HIPAA-related obligations under applicable federal and/or state laws and regulations, (ii) compliance with the Fair Credit Reporting Act and the Fair and Accurate Credit Transactions Act and/or (iii) a material breach by Buyer under the Provider Agreement; or (b) Buyer shall be entitled with respect to any breach of the representation contained in Sections 6.4 or 6.5 of this Agreement.

Section 8.4   **Third Party Claims**.   Immediately following the receipt of notice of a third party claim, the party receiving the notice of the third party claim shall notify the other party of its existence setting forth with reasonable specificity the facts and circumstances of which such party has received notice, and if the party giving such notice is an indemnified party, specifying the basis hereunder upon which the indemnified party's claim for indemnification is asserted.  The indemnified party may, upon reasonable notice, tender the defense of a third party claim to the indemnifying party. If:

(a)   the defense of a third party claim is so tendered and within thirty (30) calendar days thereafter such tender is accepted without qualification by the indemnifying party; or

(b)   within thirty (30) calendar days after the date on which written notice of a third party claim has been given pursuant to this Section 8.4, the indemnifying party shall acknowledge without qualification its indemnification obligations as provided in this Section 8.4 in writing to the indemnified party and accept the defense thereof;

then, except as herein provided, the indemnified party shall not, and the indemnifying party shall, have the right to contest, defend, litigate or settle such third party claim. The indemnified party shall have the right to be represented by counsel at its own expense in any such contest, defense, litigation or settlement conducted by the indemnifying party, provided that the indemnified party shall be entitled to reimbursement therefor if the indemnifying party shall lose its right to contest, defend, litigate and settle the third party claim as herein provided. The indemnifying party shall lose its right to contest, defend, litigate and settle the third party claim if it shall fail to diligently contest the third party claim. So long as the indemnifying party has not lost its right and/or obligation to contest, defend, litigate and settle as herein provided, the indemnifying party shall have the exclusive right to contest, defend and litigate the third party claim and shall have the exclusive right, in its discretion exercised in good faith, and upon the advice of counsel, to settle any such matter, either before or after the initiation of litigation, at such time and upon such terms as it deems fair and reasonable, provided that at least ten (10) calendar days prior to any such settlement, written notice of its intention to settle shall be given to the indemnified party and such settlement shall include a full release of the indemnified party. All expenses (including without limitation attorneys' fees) incurred by the indemnifying party in connection with the foregoing shall be paid by the indemnifying party. No failure by an indemnifying party to acknowledge in writing its indemnification obligations under this Section 8.4 shall relieve it of such obligations to the extent they exist. If an indemnified party is entitled to indemnification against a third party claim, and the indemnifying party fails to accept a tender of, or assume, the defense of a third party claim pursuant to this Section 8.4, or if, in accordance with the foregoing, the indemnifying party shall lose its right to contest, defend, litigate and settle such a third party claim, the indemnified party shall have the right, without prejudice to its right of indemnification hereunder, in its discretion exercised in good faith and upon the advice of counsel, to contest, defend and litigate such third party claim, and may settle such third party claim, either before or after the initiation of litigation, at such time and upon such terms as the indemnified party deems fair and reasonable, provided that at least ten (10) calendar days prior to any such settlement, written notice of its intention to settle is given to the indemnifying party. If, pursuant to this Section 8.4, the indemnified party so contests, defends, litigates or settles a third party claim for which it is entitled to indemnification hereunder, the indemnified party shall be reimbursed by the indemnifying party for the reasonable attorneys' fees and other expenses of contesting, defending, litigating and/or settling the third party claim which are incurred from time to time, forthwith following the presentation to the indemnifying party of itemized bills for said attorneys' fees and other expenses.

## ARTICLE IX
## FILES AND RECORDS

**Section 9.1    Applicable Laws.** Each party agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling and maintenance of all Accounts and all documents and records relating to the Accounts purchased hereunder including, but not limited to, the length of time such documents and records are to be retained and making any disclosures to Obligors as may be required by law.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1   Notices.**   Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing to the parties and addresses below and shall be delivered by certified mail, return receipt requested or express mail, and, if to Seller, also via facsimile.   Such notice shall be deemed to have been received on the date delivered.

If to Seller:

> Greenfish Fund II, LP
> c/o Weir and Partners LLP
> The Widener Building, Suite 500
> 1339 Chestnut Street
> Philadelphia, PA 19103
> Attn:  Steven E. Angstreich, Esq.

If to Buyer:

> International Portfolio, Inc.
> 200 Barr Harbor Drive Suite 400
> West Conshohocken, Pennsylvania 19428
> Attn:  Richard Shusterman
> Telephone:  (610) 724-7064
> Facsimile:  (610) 825-8299

**Section 10.2   Severability.**   If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**Section 10.3   Rights Cumulative: Waivers.**   The rights of each of the parties under this Agreement are cumulative and may be exercised as often as either party considers appropriate under the terms and conditions specifically set forth.   The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing.   Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right.   Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right.  No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

**Section 10.4   Headings.**   The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**Section 10.5   Construction.** Unless the context otherwise requires, singular nouns and pronouns when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

**Section 10.6   Prior Understandings; Entire Agreement.** This Agreement, the Confidentiality Agreement, and the instruments to be delivered by the parties pursuant to the provisions hereof constitute the entire agreement between the parties and supersedes all prior agreements between the parties with respect to the subject matter hereof and thereof. To the extent there exists any inconsistency between the provisions of this Agreement and any other agreement entered into between the parties, the provisions of this Agreement shall govern. Each exhibit or schedule shall be considered incorporated into this Agreement. Any amendments, or alternative or supplementary provisions to this Agreement, must be made in writing and duly executed by an authorized representative or agent of each of the parties hereto.

**Section 10.7   Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. The counterparts of this Agreement may be delivered by email in a .pdf file or facsimile by either party to the other party. An emailed .pdf file or facsimile signature page shall be deemed an original.

**Section 10.8   Governing Law/Choice of Forum.** This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the laws of the Commonwealth of Pennsylvania. The parties agree that any legal actions between Buyer and Seller regarding the purchase of the Accounts hereunder shall be originated in a court of competent jurisdiction in the Commonwealth of Pennsylvania with venue in Montgomery County, Pennsylvania, and each party hereby consents to the jurisdiction of such court in connection with any action or proceeding initiated concerning this Agreement and agrees that service by mail to the address specified in Section 10.1 of this Agreement shall be sufficient to confer jurisdiction over such party in such court. In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs.

**Section 10.9   No Third-Party Beneficiaries.** Subject to Section 10.14 below, this Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

**Section 10.10   Expenses.** Except as otherwise expressly provided in this Agreement, Buyer and Seller will each bear its own out-of-pocket expenses, including fees and disbursements of its attorneys, brokers, consultants and any other agents or representatives, in connection with the transaction contemplated by this Agreement.

**Section 10.11   Publicity.** Except as otherwise required by law or other applicable rules and regulations, press releases concerning this transaction shall be made only with the prior agreement of Seller and Buyer. Except as otherwise required by law or other applicable rules and regulations, no such press releases or other publicity shall at any time state the amount of the Purchase Price.

**Section 10.12 <u>Non-Waiver</u>.**  The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.  No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.  A breach of any representation, warranty or covenant shall not be affected by the fact that a more general or more specific representation, warranty or covenant was not also breached.

**Section 10.13 <u>Binding Effect; Benefit</u>.**  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto, and their respective successors and permitted assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

**Section 10.14 <u>Transfer/Assignability</u>.**  Buyer may sell, transfer, assign or convey all or a portion of its right, title and interest in and to the Accounts or the Provider Agreement without the prior written consent of Seller.  Neither party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

**Section 10.15 <u>Amendments</u>.**  This Agreement shall not be modified or amended except pursuant to a written instrument executed and delivered on behalf of each of the parties hereto.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:

GREENFISH FUND II, L.P.

By its General Partner,
Purplefish LLC

By:_____
Name: Eric Raymond
Title:  Managing Partner

BUYER:

INTERNATIONAL PORTFOLIO, INC.

By:_____
Name: Richard Shusterman
Title:   President

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the day and year first above written.

**SELLER:**

**GREENFISH FUND II, L.P.**

By its General Partner,
Purplefish LLC

By:_____
Name: Eric Raymond
Title:  Managing Partner

**BUYER:**

**INTERNATIONAL PORTFOLIO, INC.**

By:_____
Name: Richard Shusterman
Title:  President

SCHEDULE No. 1
ACCOUNT SCHEDULE

| PROVIDER | AGGREGATE # OF ACCOUNTS | AGGREGATE CURRENT BALANCE OF THE ACCOUNTS | | PURCHASE PRICE PERCENTAGE | | AGGREGATE PURCHASE PRICE |
|---|---|---|---|---|---|---|
| JMH | | $12,867,504.02 | x | 13.331956942% | = | $1,715,490.10 |
| HMA | | $2,361,782.33 | x | 13.331956942% | = | 314,871.80 |
| Grapevine | | $3,522,649.40 | x | 13.331956942% | = | 469,638.10 |
| | | | x | | = | |
| | | $18,751,935.75 | x | 13.331956942% | = | $2,500,000.00 |

(See Computer Files for detailed list)

EXHIBIT A
BILL OF SALE AND ASSIGNMENT OF ACCOUNTS

On the Closing Date, Greenfish Fund II, L.P., a Delaware limited partnership ("Assignor"), hereby absolutely sells, transfers, assigns, sets over and conveys to International Portfolio, Inc. ("Assignee"), without recourse and without representations or warranties except those as outlined in the Agreement (as defined below), express or implied, of any type, kind or nature:

(a)   all of Assignor's right, title, and interest in and to each of the Accounts identified in Schedule No. 1 (Account Schedule) to the Agreement (the "Accounts" which are also referred to by Assignor as Portfolio 3) together with other evidence of indebtedness, if any; and

(b)   all principal, interest or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Assignor prior to the Cutoff Date (as defined in the Agreement) with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between Assignor and Assignee dated December 14, 2009 (the "Agreement"). The Accounts are defined and described in the Agreement, and are being conveyed hereby subject to the terms, conditions and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the Commonwealth of Pennsylvania without regard to the conflicts-of-laws rules thereof.

DATED:     December 14, 2009

SELLER:     GREENFISH FUND II, L.P.

By its General Partner,
Purplefish LLC

By: _____
Name:   Eric Raymond
Title:     Managing Partner

A-1

## Exhibit B
## Wire Instructions

*Funds must be wired as follows:*

ABA #: 021000089

Bank: Citibank N.Y.

For Benefit of: Morgan Stanley

Beneficiary Account: 40611172

For further credit to: Greenfish Fund II, LP Port 3

Account #: 476-073120

In order to assure proper allocation of the funds owed to Seller by Buyer, the information listed above must be included on all wire transfers by Buyer to Seller.

DTI 858588v2 12/13/09

EXHIBIT C
SUBCONTRACTOR BUSINESS ASSOCIATE AGREEMENT

This **SUBCONTRACTOR BUSINESS ASSOCIATE AGREEMENT** (this *"Subcontractor Agreement"*) is made and entered into on December 14, 2009 but shall become effective on March 5, 2010 (the *"Effective Date"*), by and between Greenfish Fund II, L.P. (*"Business Associate"*) and International Portfolio, Inc. (*"Subcontractor"*).

## RECITALS:

WHEREAS, Business Associate has acquired certain uncollected patient accounts (the "Accounts") that were originated by Jackson Memorial Hospital, Health Management Associates, and Grapevine Radiology Associates (each a *"Covered Entity"*);

WHEREAS, Business Associate is required to comply with certain requirements with respect to the Use and/or Disclosure of Protected Health Information (*"PHI"*) as mandated by the Privacy Standards (45 C.F.R. Parts 160 and 164) and electronic PHI as mandated by the Security Standards (45 C.F.R. Parts 160, 162 and 164) promulgated under the Administrative Simplifications subtitle of the Health Insurance Portability and Accountability Act of 1996 (*"HIPAA"*) as set forth in the applicable business associate addendum (the *"BAA"*) between Subcontractor and Covered Entity;

WHEREAS, pursuant to the terms and conditions of the Purchase and Sale Agreement between Business Associate and Subcontractor of even date herewith, Subcontractor has agreed to purchase and service certain of the Accounts (the *"Services"*); and

WHEREAS, in connection with providing the Services, Subcontractor will have access to PHI and, therefore, agrees to abide by the Privacy Standards and Security Standards, as well any applicable requirements of the BAA, when using and/or disclosing such PHI.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to the foregoing and as follows:

## I. DEFINITIONS

All capitalized terms used herein that are not otherwise defined shall have the same meaning as those terms are defined in the Privacy Standards and Security Standards.

DTI 858588v2 12/13/09

II.     OBLIGATIONS OF SUBCONTRACTOR

A.     **Privacy Standards.**

*1.     General.* Subcontractor acknowledges and agrees that from and after the Effective Date, Subcontractor shall comply with the following provisions with respect to an Individual's PHI:

(a)     <u>Safeguards Against Misuse of Information</u>.  Subcontractor shall implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of PHI, and to prevent Use and/or Disclosure of PHI other than as provided for in this Subcontractor Agreement.

(b)     <u>Reporting of Violations</u>.  Subcontractor shall notify Business Associate within twenty-four (24) hours, and shall provide written notice no later than forty-eight (48) hours, of becoming aware of a Use or Disclosure of Protected Health Information in violation of this Subcontractor Agreement by Subcontractor, its officers, directors, employees, representatives or agents, or by a third party to whom Subcontractor has disclosed PHI, and shall immediately report any such Use or Disclosure to Business Associate.

(c)     <u>Disclosures to Third Parties</u>.  Subcontractor shall ensure that any representatives or agents to whom Subcontractor provides PHI received from, or created or received by Subcontractor on behalf of, Business Associate agree to the same restrictions and conditions that apply to Subcontractor with respect to such PHI.

(d)     <u>Availability of PHI</u>. .  At Business Associate's request, Subcontractor shall provide access to any PHI not otherwise available to Business Associate, within five (5) calendar days from the date Subcontractor receives any such request so that the Covered Entity can respond to a request from an Individual to have access to, provide a copy of, and account for Disclosures of PHI pursuant to HIPAA, including, but not limited to, 45 C.F.R. §§ 164.524 and 164.528.  If Subcontractor receives any requests directly from an Individual for access to PHI, Subcontractor shall first notify Business Associate before responding to any such requests.

(e)     <u>Amendment of PHI</u>.  At Business Associate's request, Subcontractor shall provide access to any PHI not otherwise available to Business Associate that is in Subcontractor's possession, within five (5) calendar days from the date Subcontractor receives any such request so that the Covered Entity can respond to a request from an Individual to amend PHI in accordance with 45 C.F.R. § 164.526.  If Subcontractor receives any requests directly from an Individual to amend PHI, Subcontractor shall first notify Business Associate before responding to any such requests.  Additionally, upon notice from Business

Associate, Subcontractor will make any necessary amendments to PHI in Subcontractor's possession.

(f) **Documentation of Disclosures**.   At the request of Business Associate, Subcontractor shall provide an accounting of disclosures of PHI, other than disclosures excepted under 45 C.F.R. § 164.528(a)(1), to Business Associate in a time and manner designated by Business Associate.   Subcontractor shall document any Disclosure of PHI and information related to such Disclosure as required for the Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528(d).   At a minimum, Subcontractor shall document the following information: (A) the date of the Disclosure; (B) the name of the entity or person who received the PHI and, if known, the address of such entity or person; (C) a brief description of the PHI Disclosed; and (D) a brief statement of the purpose of such Disclosure that reasonably informs the Individual of the basis for the Disclosure or, in lieu of such statement, a copy of a written request, if any, for a disclosure under 45 C.F.R. §§ 164.502(a)(2)(ii) or 164.512.

(g) **Internal Practices**.  For purposes of the Secretary determining the Covered Entity's compliance with the Privacy Standards and Security Standards, Subcontractor shall make available to the Covered Entity and/or the Secretary, in a time and manner designated by Business Associate or the Secretary, Subcontractor's practices, books, and records relating to the Use and Disclosure of PHI received from Business Associate, created or received by Subcontractor on behalf of or at the request of Business Associate, or made available to Business Associate.

(h) **Minimum Necessary Use and Disclosure**.   In conducting functions and/or activities under this Subcontractor Agreement that involve the Use and/or Disclosure of PHI, Subcontractor shall make reasonable efforts to limit the Use and/or Disclosure of PHI to the minimum necessary in accordance with 45 C.F.R. § 164.514(d) to accomplish the intended purpose of the Use or Disclosure.

2.   *Permitted Uses and Disclosures of PHI*.  Subcontractor may only Use or Disclose PHI to secure payments from patients and such other functions, activities, or services for, or on behalf of, Business Associate as specified in this Subcontractor Agreement and/or the BAA or as required by law.   Notwithstanding the foregoing, Subcontractor shall not, and shall ensure that its directors, officers, representatives, agents and employees do not, disclose PHI if such Use or Disclosure would violate HIPAA.

B.   **Security Standards**. Subcontractor agrees that it will comply, and cause all of its employees, agents and representatives to comply, with the applicable requirements of the Security Standards, including, but not limited to the following:

> *1.* *Security Safeguards.* Subcontractor shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic PHI that it creates, receives, maintains or transmits on behalf of Business Associate as required by the Security Standards;

> *2.* *Disclosure to Third Parties.* Subcontractor shall ensure that any agent, including a subcontractor, to whom it provides the electronic PHI agrees to implement reasonable and appropriate safeguards to protect such information; and

> *3.* *Reporting of Violations.* Subcontractor shall report to Business Associate any Security Incident of which it becomes aware within twenty-four (24) hours, and shall provide written notice no later than forty-eight (48) hours of such Security Incident.

## III.   TERM AND TERMINATION

**A.   Term.** The term of this Subcontractor Agreement shall be effective as of the Effective Date, and shall terminate when Subcontractor no longer owns the Accounts or provides the Services; provided, however, that notwithstanding the termination of this Subcontractor Agreement, Subcontractor shall be required to comply with **Section III.C.** below.

**B.   Failure to Comply with HIPAA Obligations.**

> *1.* *Mitigation Obligation.* If, following the Effective Date, Subcontractor violates any of its obligations under **Section II**, Subcontractor shall, at its sole cost and expense, immediately take all steps necessary to mitigate the harmful effects of such violation, if any.

> *2.* *Termination.* If, following the Effective Date, Subcontractor notifies Business Associate or Business Associate otherwise has reason to believe, that Subcontractor has violated a material term of any of the requirements set forth in this Subcontractor Agreement, Business Associate shall have the right, in its sole discretion, to immediately terminate this Subcontractor Agreement. Further, Business Associate may terminate this Subcontractor Agreement effective immediately, if (i) Subcontractor is named as a defendant in a criminal or administrative proceeding for a violation of HIPAA, or (ii) a finding or stipulation that Subcontractor has violated any standard or requirement of HIPAA (or other security or privacy law) is made in any administrative or civil proceeding.

**C.   Effect of Termination.** Except as set forth in this **Section III.C.**, upon termination of this Subcontractor Agreement for any reason, at the request of Business Associate, Subcontractor shall return or destroy all PHI received from Business Associate, or created or received by Subcontractor on behalf of Business Associate. This provision shall also apply to PHI that is in the possession of employees, representatives or agents of Subcontractor. Subcontractor and its employees, representatives and agents shall not retain any copies of the

DTI 858588v2 12/13/09

PHI.  In the event that Subcontractor determines that returning or destroying the PHI is infeasible, Subcontractor shall provide to Business Associate written notification of the conditions that make return or destruction infeasible.  If Business Associate agrees that return or destruction of PHI is infeasible, Subcontractor shall extend the protections of this Subcontractor Agreement to such PHI and limit further Uses and Disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Subcontractor maintains such PHI. Notwithstanding the foregoing, if the parties determine that return or destruction of PHI is infeasible, Subcontractor shall continue to make PHI available to Business Associate and the Covered Entity, so that Business Associate and the Covered Entity can comply with **Sections II.A.1(d)-(g)** of this Subcontractor Agreement.

## IV.    MISCELLANEOUS

**A.**    **State Law Requirements.**  To the extent the applicable laws and regulations of any state that apply to this Subcontractor Agreement are More Stringent than those set forth in the Privacy Standards, any Use or Disclosure of PHI by Subcontractor shall be made in accordance with such laws and regulations.

**B.**    **Training of Subcontractor's Employees.**  Subcontractor represents and warrants to Business Associate that Subcontractor's employees, agents, representatives, and subcontractors who will have access to PHI after the Effective Date will have: (1) been provided with general HIPAA-related training and education; and (2) specific knowledge of Subcontractor's HIPAA-related responsibilities and contractual requirements to Business Associate (including applicable state laws and regulations), in each case prior to being allowed to have access to PHI.

**C.**    **Interpretation.**  This Subcontractor Agreement shall be interpreted as broadly as necessary to implement and comply with HIPAA, the HIPAA Regulations and applicable state laws.  The parties agree that any ambiguity in this Subcontractor Agreement shall be resolved in favor of a meaning that complies and is consistent with HIPAA and the HIPAA Regulations.

**D.**    **Changes or Modifications to HIPAA and/or HIPAA Regulations.**  If, following the Effective Date, HIPAA and/or the Privacy Standards or the Security Standards are modified, and/or additional regulations are issued pursuant to HIPAA, the parties agree to work together in good faith to amend this Subcontractor Agreement so that the parties hereto remain in compliance with such regulations.

**E.**    **Indemnity for Third Party Claims.**  In the event of a breach of this Subcontractor Agreement, Subcontractor shall indemnify, defend and hold Business Associate and the Covered Entity and their affiliates, respective members, directors, officers, shareholders, employees, representatives, agents, attorneys, successors, and assigns, harmless from and against any and all third-party claims, damages, liabilities, judgments, fines, assessments and/or other losses and expenses (including reasonable attorneys' fees) arising out of or relating to any failure by Subcontractor to comply with the terms of this Subcontractor Agreement (including any HIPAA-related obligations under applicable state laws and regulations).

DTI 858588v2 12/13/09 .

F.    **Injunctive Relief.**  Subcontractor agrees that the remedies at law for a breach by it of the terms of this Subcontractor Agreement may be inadequate and that monetary damages resulting from such breach may not be readily measured.  Accordingly, in the event of a breach or threatened breach by Subcontractor of the terms of this Subcontractor Agreement, Business Associate shall be entitled to immediate injunctive relief.  Nothing herein shall prohibit Business Associate from pursuing any other remedies that may be available to it for such breach.

G.    **Counterparts; Attachments.**  This Subcontractor Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.  The counterparts of this Subcontractor Agreement may be executed and delivered by facsimile or .pdf signature by either party to the other party.  A facsimile or emailed .pdf file signature page shall be deemed an original.

H.    **Survival.**  The obligations of Subcontractor under **Sections III.C. and IV.E.** of this Subcontractor Agreement shall survive the termination of this Subcontractor Agreement.

I.    **Entire Agreement.**   This Subcontractor Agreement constitutes the entire agreement between the parties and supersedes all prior negotiations, discussions, representations, or proposals, whether oral or written, unless expressly incorporated herein, related to the subject matter of this Subcontractor Agreement.   Unless otherwise expressly provided herein, this Subcontractor Agreement may not be modified unless in writing signed by the duly authorized representatives of the parties.   If any provision or part thereof is found to be invalid, the remaining provisions shall remain in full force and effect.

J.    **Third Party Beneficiaries.**  Except as otherwise provided for in the Privacy Standards or this Subcontractor Agreement, the Covered Entity shall be the only third party beneficiary to this Subcontractor Agreement.   Subcontractor's obligations are to Business Associate and the Covered Entity with respect to the handling of PHI.

K.    **Successors and Assigns.**  This Subcontractor Agreement will inure to the benefit of and be binding upon the successors and assigns of both parties.  However, this Subcontractor Agreement is not assignable by any party without the prior written consent of the other party.

L.    **Assistance in Litigation or Administrative Proceedings.**  Subcontractor shall make itself, and any employees, agents or representatives assisting Subcontractor in the performance of its obligations under this Subcontractor Agreement, available to Business Associate and/or the Covered Entity upon reasonable notice, at Business Associate's and/or the Covered Entity's expense, to testify as witnesses, for document production, or otherwise, in the event of litigation or administrative proceedings being commenced against Business Associate and/or the Covered Entity, their respective members, trustees, officers, agents or employees based upon an alleged violation of HIPAA, the HIPAA Regulations or other laws relating to security and privacy, except where Subcontractor or its employee, agent or representative is a named adverse party.   In such event, such adverse party shall be responsible for all of its expenses.

M.   **Location of Services.**   Subcontractor shall perform all Services in the United States.

N.   **Independent Contractor.**   The relationship between the parties will be solely that of independent contractors contracting with each other solely for the purposes of effecting the provisions of this Subcontractor Agreement.

O.   **Expenses.**   Any and all expenses incurred by Subcontractor in compliance with the terms of this Subcontractor Agreement shall be borne by Subcontractor.


**IN WITNESS WHEREOF,** duly authorized representatives of the parties have executed this Subcontractor Business Associate Agreement as of the Effective Date.


<u>BUSINESS ASSOCIATE</u>:

GREENFISH FUND II, L.P.

By its General Partner,
Purplefish LLC


By:_____
Name: Eric Raymond
Title:   Managing Partner


<u>SUBCONTRACTOR</u>:

INTERNATIONAL PORTFOLIO, INC.


By:_____
Name: Richard Shusterman
Title:   President

C-7

M.   **Location of Services.**  Subcontractor shall perform all Services in the United States.

N.   **Independent Contractor.**  The relationship between the parties will be solely that of independent contractors contracting with each other solely for the purposes of effecting the provisions of this Subcontractor Agreement.

O.   **Expenses.**  Any and all expenses incurred by Subcontractor in compliance with the terms of this Subcontractor Agreement shall be borne by Subcontractor.


**IN WITNESS WHEREOF,** duly authorized representatives of the parties have executed this Subcontractor Business Associate Agreement as of the Effective Date.


**BUSINESS ASSOCIATE:**

**GREENFISH FUND II, L.P.**

By its General Partner,
Purplefish LLC

By:_____
Name: Eric Raymond
Title:  Managing Partner


**SUBCONTRACTOR:**

**INTERNATIONAL PORTFOLIO, INC.**

By:_____
Name: Richard Shusterman
Title:  President

DTI 858588v2 12/13/09

PURCHASE AND SALE AGREEMENT

BETWEEN

GREENFISH FUND II, L.P.
(AS SELLER)

- - AND - -

INTERNATIONAL PORTFOLIO, INC.
(AS BUYER)

DATED AS OF

DECEMBER 14, 2009

[FOR THE PORTFOLIO REFERRED TO AS PORTFOLIO 4]

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is entered into this 14th day of December, 2009, by and between Greenfish Fund II, L.P., a Delaware limited partnership ("Seller"), and International Portfolio, Inc., a Delaware corporation ("Buyer").

## WITNESSETH:

WHEREAS, Seller purchased from Buyer the Accounts (as defined herein) with an aggregate current balance of $45,409,090.91 for an aggregate purchase price of $3,525,000.00, pursuant to the P&S Agreements (as defined below);

WHEREAS, Seller desires to sell the Accounts to Buyer; and

WHEREAS, Buyer has reviewed and evaluated the Accounts to Buyer's full satisfaction and desires to purchase the Accounts;

NOW, THEREFORE, in consideration of the mutual promises herein set forth and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, Seller and Buyer agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

"Accounts" means those accounts acquired by Seller pursuant to the P&S Agreements, which are (i) being sold to Buyer hereunder, (ii) further described in the Account Schedule, (iii) further described in the P&S Agreements and corresponding Purchase Schedules, and (iv) are referred to by Seller as "Portfolio 4".

"Account Document(s)" means any application, agreement, billing statements, patient records, status codes, notices, correspondence or other evidence of indebtedness reasonably necessary to establish the validity of an Account, which is in Seller's possession or which Seller has the right to obtain and relates to an Account. Such Account Documents may include, without limitation, any microfilm, microfiche, photocopy or machine-readable format documents.

"Account Schedule" means Schedule 1 hereto, which sets forth a summary of the Accounts including: the aggregate number of Accounts, the aggregate Current Balances of Accounts, the Purchase Price Percentage, and the aggregate Purchase Price for the Accounts.

"Affiliate" means an entity controlling, controlled by, or under common control with a party to this Agreement.

"**Agreement**" means this Purchase and Sale Agreement, including the cover page and all Exhibits and Schedules hereto, which are incorporated by this reference herein.

"**Bill of Sale and Assignment**" means the document to be delivered to Buyer on or before the Closing Date, in the form attached hereto as **Exhibit A**.

"**Business Associate Agreement**" shall have the meaning set forth in Section 7.4.

"**Business Day**" means any day on which Seller is open for business other than a Saturday, a Sunday or a federal holiday.

"**Claim**" means any claim, action, suit or other actual or threatened proceeding, loss, judgment, damage, liability, cost and expense.

"**Closing Date**" means March 25, 2010, or such other date as Buyer may designate pursuant to Section 2.4(d).

"**Computer Files**" mean those certain computer files, to be provided by Seller to Buyer, setting forth all relevant information regarding the Accounts and the Obligor(s), including, but not limited to, the Current Balance, Provider, Seller account number, Provider account number, name, address, phone number, social security number, payment history, open date, original balance, date of last payment, discharge date, date of first delinquency, charge-off date, interest rate, accrued interest and other charges, and procedure codes.

"**Confidentiality Agreement**" shall mean the Confidentiality Agreement, dated February 9, 2009, between Buyer and Seller, together with any other confidentiality agreements executed by Buyer and Seller in connection with this Agreement.

"**Current Balance**" means the unpaid principal balance in United States dollars for each Account identified in the Account Schedule and specified as the Current Balance as of the close of business on the Cutoff Date. The Current Balance shall not include any interest, fees or other charges accrued after the charge-off date of the Account.

"**Cutoff Date**" means March 24, 2010, or such other date as Buyer may designate pursuant to Section 2.4(d).

"**Disputed Account**" shall have the meaning set forth in Section 3.1.

"**FDCPA**" shall have the meaning set forth in Section 7.3.

"**Federal Privacy Standards**" shall have the meaning set forth in Section 7.4.

"**HIPAA**" shall have the meaning set forth in Section 4.2

"**HIPAA Standards**" shall have the meaning set forth in Section 7.4.

"**Obligor**" means the current and unreleased obligor(s) on or under an Account and/or Account Documents, including, without limitation, any and all patients, guarantors, sureties or

other persons or entities liable on such Account. "Obligor" includes without limitation any person who is a "Patient" as that term is used in the Provider Agreement.

"**Obligor Payments**" means any payments or other consideration distributed or paid by or on behalf of an Obligor, including but not limited to direct payments from Obligors, payments from third-party service providers, payments from insurance/warranty companies, and payments from state taxation authorities.

"**P&S Agreements**" means those certain Purchase and Sale Agreements and corresponding Purchase Schedules between Buyer and Seller pursuant to which Seller purchased the Accounts from Buyer as follows: (i) Purchase and Sale Agreement, dated February 25, 2009, including Purchase Schedule No. 5 dated July 15, 2009 and Purchase Schedule No. 6 dated July 16, 2009 (pertaining to the JMH accounts); (ii) Purchase and Sale Agreement, dated June 16, 2009, including Purchase Schedule No. 2 dated July 28, 2009 and purchase Schedule No. 3 dated August 3, 2009 (pertaining to the HMA accounts).

"**Providers**" means each of Jackson Memorial Hospital and Health Management Associates, respectively and as applicable.

"**Provider Agreements**" means each of the following, respectively and as applicable: (i) that certain Master Purchase and Sale Agreement, dated December 19, 2006, by and between Buyer and the Public Health Trust of Miami-Dade County, Florida which, as an agency and instrumentality of Miami-Dade County, governs and operates Jackson Memorial Hospital; and (ii) those certain Master Purchase and Sale Agreements by and between Buyer and Health Management Associates, Inc., as amended.

"**Purchase Price**" means the sum listed in the fourth column of the Account Schedule. The Purchase Price listed in the Account Schedule is calculated by multiplying the aggregate Current Balance by the Purchase Price Percentage set forth in the Account Schedule.

"**Purchase Price Percentage**" means the percentage set forth in the purchase price percentage column of the Account Schedule.

"**Transfer Documents**" means all documents that are required to be delivered on the Closing Date by Seller or Buyer, including those set forth in Sections 2.2 and 2.3 of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF THE ACCOUNTS

**Section 2.1** <u>Agreement to Sell and Purchase Accounts</u>. Seller agrees to sell, and Buyer agrees to purchase, all of Seller's right, title and interest in and to the Accounts described in the Account Schedule on the Closing Date, subject to the terms, provisions, conditions, limitations, waivers and disclaimers set forth in this Agreement.

**Section 2.2** <u>Agreement to Assign/Buyer's Right to Act</u>. On the Closing Date, Seller shall deliver to Buyer a Bill of Sale and Assignment, in the form of <u>Exhibit A</u> attached hereto,

executed by an authorized representative of Seller, which Bill of Sale and Assignment shall sell, transfer, set-over, quitclaim and convey, in each case without recourse (except as expressly provided for in Articles VI, VII, VIII and IX of this Agreement), to Buyer all right, title and interest of Seller in and to each of the Accounts and the proceeds of the Accounts, if any, received on or after the Cutoff Date.

**Section 2.3    Account Schedule and Computer File.**    Seller has provided, as **Schedule 1** attached hereto, the Account Schedule setting forth all of the Accounts and their corresponding Current Balances. Buyer acknowledges that the same has been reviewed to Buyer's full satisfaction. Seller shall deliver Computer Files to Buyer on or prior to the Closing Date, with information as of the Closing Date, in a format reasonably acceptable to Buyer. To the extent that the Computer Files or any other information provided by Seller to Buyer is not legible, Seller shall use all reasonable efforts to reproduce such information for Buyer. Seller shall further provide Buyer a written explanation of the meaning of each procedure code included in the Computer File on or prior to the Closing Date.

**Section 2.4    Purchase Price/Payment.**

(a)    Buyer shall pay to Seller the Purchase Price in the amount of Four Million Five Hundred Fifty Thousand Dollars and Zero Cents ($4,550,000.00), which represents (i) the aggregate Current Balance of the Accounts of Forty-Five Million Four Hundred Nine Thousand Ninety Dollars and Ninety-One Cents ($45,409,090.91) multiplied by the combined Purchase Price Percentage of 10.02002%.

(b)    Buyer shall pay to Seller the Purchase Price in three (3) equal monthly installments according to the following payment schedule:

(i)    The first installment in the amount of One Million Five Hundred Sixteen Thousand Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($1,516,666.67) shall be paid by Buyer to Seller on or before the Closing Date;

(ii)    The second installment in the amount of One Million Five Hundred Sixteen Thousand Six Hundred Sixty-Six Dollars and Sixty-Seven Cents ($1,516,666.67) shall be paid by Buyer to Seller on or before April 25, 2010;

(iii)    The third and final installment in the amount of One Million Five Hundred Sixteen Thousand Six Hundred Sixty-Six Dollars and Sixty-Six Cents ($1,516,666.66) shall be paid by Buyer to Seller on or before May 25, 2010.

(c)    All of such funds shall be paid to Seller in immediately available funds in United States dollars by wire transfer according to the instructions of Seller as set forth on **Exhibit C** attached hereto.

(d)    Notwithstanding the foregoing, Buyer and Seller hereby agree as follows:

(i)    Buyer may, at its sole option and with prior written notice to Seller, accelerate the Closing Date. In the event Buyer accelerates the Closing Date

pursuant to this Section 2.3(d)(i), the Cutoff Date shall also be accelerated for the same period of time as the Closing Date;

(ii)     Buyer may, at its sole option and with prior written notice to Seller, extend the Closing Date for a period not to exceed sixty (60) calendar days. In the event Buyer extends the Closing Date pursuant to this Section 2.3(d)(ii), the Cutoff Date shall also be extended for the same period of time as the Closing Date, and Buyer shall not pay Seller any additional amount above the Purchase Price; and

(iii)     Buyer may, at its sole option and with prior written notice to Seller, terminate this Agreement and, therefore, not purchase the Accounts from Seller. In the event Buyer terminates this Agreement, Buyer shall pay Seller an additional Ninety-One Thousand Dollars and Zero Cents ($91,000.00) (i.e., 2% of the Purchase Price) as liquidated damages, and Seller shall not be entitled to any other remedy, at law or in equity.

**Section 2.5     Payments Received After the Cutoff Date**.  To the extent that Seller receives any credits, payments or other consideration in respect of an Account from and after the Cutoff Date, Seller shall promptly remit such amounts to Buyer. To the extent that following the Closing Date, Buyer receives any credits, payments or other consideration in respect of an Account relating to periods prior to the Cutoff Date, Buyer shall promptly remit such amounts to Seller.

**Section 2.6     No Sale of a Security**.  The parties acknowledge and agree:  (i) that the Accounts to be sold by Seller to Buyer hereunder do not constitute a "security" or "securities" within the meaning of any applicable federal or state securities laws; (ii) that the transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute, the sale of a "security" or "securities" within the meaning of any applicable securities laws; (iii) that none of the representations, warranties or agreements of either party shall create any inference that the transactions involve any "security" or "securities"; and (iv) that they shall take no position to the contrary to any of the foregoing.

**ARTICLE III**
**ACCOUNTS AND DOCUMENTS**

**Section 3.1     Intentionally Omitted**.

**ARTICLE IV**
**SERVICING/COLLECTION**

**Section 4.1     Servicing After Closing Date**.  The Accounts shall be sold and conveyed to Buyer on a servicing-released basis.  As of the Closing Date and except as provided in this Agreement, (i) all rights, obligations and responsibilities with respect to the servicing of the Accounts shall pass to Buyer, and (ii) Seller shall take no further action against the Accounts or incur any expenses relating to the Accounts.  In the event that any Accounts are assigned to any collection agency or third party attorney, Seller shall, at the written direction of Buyer, recall any Accounts and/or terminate any such agreements and fully assist and cooperate with Buyer in any

way whatsoever. Seller shall, within ten (10) Business Days of the Closing Date, report to any credit reporting agency to which an Account has been reported that such Account has been sold and assigned to Buyer. Seller agrees that it shall not direct the credit bureaus to list the account as "charged off", but only as being owned or serviced by Buyer. At the request and expense of Buyer, Seller shall use reasonable business efforts, as provided by and in accordance with federal and state laws, to notify all of the Obligors in writing that Seller has transferred the Accounts to Buyer. In the event that any Obligors continue to contact Seller after the Closing Date, Seller shall notify the Obligors that the Accounts have been sold to Buyer and shall provide the contact name, address and phone number of Buyer. Seller shall forward to Buyer, within ten (10) Business Days of receipt, any and all correspondence, notices and other documents received on any Account. In addition to the foregoing, the parties acknowledge and agree that (i) Buyer will be solely responsible for any costs associated with the closing of the Accounts with the respective collection agency or third-party attorney; (ii) Buyer will, at no additional cost to Seller, perform searches to update new address and telephone numbers on the Accounts; and (iii) Buyer will, at its own cost and if necessary, credit score any Account being purchased from Seller.

Section 4.2    **Debt Collection of Accounts**.  Buyer agrees that Buyer will at all times comply with all state and federal laws applicable to debt collection, including without limitation, the Consumer Credit Protection Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and any state deficiency laws.

## ARTICLE V
## REPRESENTATIONS, WARRANTIES AND COVENANTS OF BUYER

Buyer hereby represents, warrants, and covenants that as of the date of this Agreement and as of the Closing Date:

Section 5.1    **Existence; Good Standing**.  Buyer is a corporation, duly organized and in good standing under the laws of the State of Delaware.

Section 5.2    **Authorization**.  Buyer is duly authorized to enter into this Agreement and has complied with its charter provisions and bylaws as well as all laws, rules, and regulations to which it may be subject. The undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

Section 5.3    **Binding Obligations**.  Assuming the due authorization, execution and delivery of this Agreement by Seller, this Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 5.4**   **Conflicts**.   The execution and delivery of this Agreement by Buyer and Buyer's performance and compliance with the terms of this Agreement will not:

(a)   violate Buyer's charter documents or bylaws,

(b)   violate any administrative or judicial decree or order or any material law, rule or regulation to which Buyer is subject, or

(c)   constitute a default (or, an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, agreement or other instrument to which Buyer is a party or which may be applicable to Buyer or any of Buyer's assets, or result in the creation of a lien on any of Buyer's assets.

**Section 5.5**   **Litigation**.   There is no proceeding, action, investigation or litigation pending or, to the best of Buyer's knowledge, threatened against Buyer which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Buyer's obligations contemplated herein, or which would be likely to impair materially Buyer's ability to perform under the terms of this Agreement.

**Section 5.6**   **Consents**.   No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Buyer with this Agreement or the consummation of any other transaction contemplated hereby.

**Section 5.7**   **Independent Evaluation**.   Buyer is a sophisticated acquiror, has knowledge and experience in financial and business matters that enable Buyer to evaluate the merits and risks of the transaction contemplated by this Agreement.   Buyer further represents that Buyer's bid for and decision to purchase the Accounts pursuant to this Agreement is and was based upon Buyer's independent evaluation of the information made available by Seller or Seller's personnel, agents, representatives or independent contractors to Buyer.   Buyer has made such independent investigations as Buyer deemed to be warranted into the nature, collectability and value of the Accounts, and all other facts Buyer deemed to be material to Buyer's purchase, and is entering into this Agreement solely on the basis of that investigation, the information provided by Seller, the terms and conditions of this Agreement, and Buyer's own judgment. Buyer acknowledges, understands and agrees that the acquisition of these Accounts involves a high degree of risk and is suitable only for persons or entities of substantial financial means.

**Section 5.8**   **Nondisclosure**.   Buyer is in full compliance with its obligations under the terms of the Confidentiality Agreement executed by the parties to review the information made available by Seller or its personnel, agents, representatives or independent contractors to all potential bidders for the Accounts.

**Section 5.9**   **Status of Buyer**.   Buyer represents, warrants and certifies to Seller that Buyer is a sophisticated institutional purchaser that is in the business of buying or collecting Accounts of the type being purchased or that otherwise deals in such Accounts in the ordinary course of Buyer's business.

**Section 5.10   Broker**.  Buyer has had no dealings with any broker, sale advisor or agent in connection with this Agreement, or if Buyer has, any commission or fee associated with the sale of the Accounts to Buyer shall be Buyer's sole and exclusive responsibility.

**Section 5.11   Survival**.  The representations and warranties set forth in this Article V shall survive the Closing Date for a period of eighteen (18) months, and are subject to the provisions contained herein with respect to the limitation of remedies.

# ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents, warrants, and covenants that as of the date of this Agreement and as of the Closing Date:

**Section 6.1   Existence; Good Standing**.  Seller is a limited partnership duly organized and in good standing under the laws of the State of Delaware.

**Section 6.2   Authorization**.  Seller is duly authorized to enter into this Agreement and has complied with its charter provisions and limited partnership agreement as well as all laws, rules, regulations, charter provisions and bylaws to which it may be subject.  The undersigned representative is authorized to act on behalf of and bind Seller to the terms of this Agreement.

**Section 6.3   Binding Obligations**.  Assuming the due authorization, execution and delivery of this Agreement by Buyer, this Agreement and all of the obligations of Seller hereunder are the legal, valid, and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

**Section 6.4   Title**.  Seller has acquired all of the Accounts pursuant to the terms of the P&S Agreement.  Seller has title to the Accounts, is the lawful holder of the Accounts and Account Documents and is duly and legally authorized to sell, transfer, convey and assign Seller's rights therein to Buyer.  The Accounts are being sold free and clear of all liens and encumbrances. To Seller's knowledge, the information provided regarding the Accounts (including without limitation the information provided in the Account Schedule attached hereto as Schedule 1 and the Computer File(s) provided to Buyer in connection therewith) is true, correct and complete in all respects to the best of Seller's knowledge and, to the extent any of the information regarding the Accounts is not true, correct and complete, Seller shall exchange such Account(s) with Buyer for other accounts of Seller that are acceptable to Buyer and of comparable value.

**Section 6.5   Conflicts**.  The execution and delivery of this Agreement by Seller and Seller's performance and compliance with the terms of this Agreement will not:

(a)     violate Seller's charter documents or limited partnership agreement,

(b)    violate any administrative or judicial decree or order or any material law, rule or regulation to which Seller is subject, or

(c)    constitute a default (or, an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, agreement or other instrument to which Seller is a party or which may be applicable to Seller or any of Seller's assets, or result in the creation of a lien on any of Seller's assets.

**Section 6.6    Litigation.**    There is no proceeding, action, investigation or litigation pending or, to the best of Seller's knowledge, threatened against Seller which, individually or in the aggregate, may have a material adverse effect on this Agreement or any action taken or to be taken in connection with Seller's obligations contemplated herein, or which would be likely to impair materially Seller's ability to perform under the terms of this Agreement.

**Section 6.7    Consents.**    No consent, approval, authorization, or order of, registration or filing with, or notice to, any governmental authority or court is required under federal laws, or the laws of any jurisdiction, for the execution, delivery, and performance of or compliance by Seller with this Agreement or the consummation of any other transaction contemplated hereby.

**Section 6.8    Broker.**    Seller has had no dealings with any broker, sale advisor or agent in connection with this Agreement, or if Seller has, any commission or fee associated with the sale of the Accounts to Buyer shall be Seller's responsibility.

**Section 6.9    Survival.**    The representations and warranties set forth in this Article VI shall survive the Closing Date for a period of eighteen (18) months, and are subject to the provisions contained herein with respect to the limitation of remedies, except with respect to the representation and warranty set forth in Section 6.4, which shall survive indefinitely.

## ARTICLE VII
## POST-CLOSING AGREEMENTS

**Section 7.1    Post-Closing Agreements.**    From and after the Closing Date, the parties shall have the respective rights and obligations which are set forth in the remainder of this Article VII.

**Section 7.2    Assignment and Compliance with Obligations under the Provider Agreement.**    On the Closing Date, Seller hereby agrees to sell, assign and transfer the Accounts and assign Seller's rights, if any, under the P&S Agreement and Provider Agreement with respect to the Accounts.

**Section 7.3    Fair Debt Collection Practices.**    Buyer shall comply and shall be responsible for compliance with all applicable laws, rules, regulations, ordinances and judgments relating to or in any way affecting its collection procedures, including, but not limited to: (a) compliance with the federal Fair Debt Collection Practices Act ("**FDCPA**") and any and all implementing regulations, as well as all state laws relating to debt collection practices; and (b) compliance with the federal Fair Credit Reporting Act, as amended by the Fair and Accurate

Credit Transactions Act, and any and all implementing regulations, as well as all state laws relating to credit reporting.

**Section 7.4   HIPAA Compliance.**   Buyer hereby agrees to comply with the applicable provisions of HIPAA, and the applicable requirements of any regulations promulgated thereunder, including, without limitation, the federal privacy regulations as contained in 45 C.F.R. Parts 160 and 164 (the "**Federal Privacy Standards**"), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164) (collectively, HIPAA and the regulations promulgated thereunder shall be referred to herein as the "**HIPAA Standards**").   As a result of the obligations created for Buyer under this Agreement, it is possible that Buyer could be deemed a "subcontractor" of Seller as that term is defined in the Federal Privacy Standards.   As such, Buyer agrees to act at all times in accordance with the Subcontractor Business Associate Agreement attached hereto as **Exhibit C** (the "**Business Associate Agreement**").   Notwithstanding anything to the contrary contained herein, Buyer agrees, at the Provider's request, to enter into a Business Associate Agreement with the Provider, in a form reasonably acceptable to the Provider.

**Section 7.5   Insurance.**   Buyer shall maintain:   (i) comprehensive general liability coverage, including contractual liability coverage, with limits of no less than One Million Dollars ($1,000,000) per claim/Three Million Dollars ($3,000,000) annual aggregate; and (ii) errors and omissions coverage with limits of no less than One Million Dollars ($1,000,000) per claim/Three Million Dollars ($3,000,000) annual aggregate.   Buyer, upon request, shall provide Seller with certificates of insurance to evidence compliance with this Section 7.5.

**Section 7.6   Termination of Financing Statements.**   To the extent that Seller has filed any UCC financing statements in any jurisdiction with respect to any or all of the Accounts, on or immediately following the Closing Date, Seller shall take all appropriate steps to terminate such financing statements and to release any liens in connection therewith effective as of the Closing Date.


**ARTICLE VIII**
**MUTUAL INDEMNIFICATION**

**Section 8.1   Seller's Indemnification.**   From and after the date of this Agreement, Buyer shall indemnify, defend and hold harmless Seller (for the purposes of this indemnification, Seller shall include Seller's affiliates, shareholders, officers, partners, members, managers, employees and agents) from and against any and all liability for, and from and against any and all losses or damages Seller may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature (including reasonable attorneys' fees), which Seller shall incur or suffer as a result of: (i) any act or omission of Buyer or Buyer's agents in connection with the Accounts and Buyer's purchase of the Accounts pursuant to this Agreement; (ii) the inaccuracy of any of Buyer's representations or warranties herein; (iii) the breach of any of Buyer's covenants herein; (iv) any claim by any Obligor regarding enforcement, servicing or administration of the Accounts by Buyer; or (v) any other act or omission of Buyer relating to the Accounts and the Obligors from and after the Closing Date.

**Section 8.2    Buyer's Indemnification.**    From and after the date of this Agreement, Seller shall indemnify, defend and hold harmless Buyer (for the purposes of this indemnification, Buyer shall include Buyer's affiliates, shareholders, officers, partners, members, managers, employees and agents) from and against any and all liability for, and from and against any and all losses or damages Buyer may suffer as a result of, any claim, demand, cost, expense, or judgment of any type, kind, character or nature (including reasonable attorneys' fees), which Buyer shall incur or suffer as a result of: (i) any act or omission of Seller or Seller's agents in connection with the Accounts and Seller's sale of the Accounts pursuant to this Agreement; (ii) the inaccuracy of any of Seller's representations or warranties herein; (iii) the breach of any of Seller's covenants herein; (iv) any claim by any Obligor regarding assignment of the Accounts to Buyer, or subsequent enforcement, servicing or administration of the Accounts by Seller, the Provider, or either such party's agents; or (v) any other act or omission of Seller, Seller's agents or the Provider or the Provider's agents relating to the Accounts and the Obligors.  For purposes of this Agreement, no collection agency with which Seller has an arrangement to provide collection services for the Accounts shall be deemed an employee or agent of Seller.

**Section 8.3    Limitations on Indemnification.**    The indemnification obligations of each of Buyer and Seller shall not exceed fifteen percent (15%) of the Purchase Price of the Accounts.  Notwithstanding anything to the contrary contained herein, the foregoing limitations shall not apply with respect to any indemnification to which: (a) Seller shall be entitled pursuant to Section 7.4 above relating to Buyer's (i) HIPAA-related obligations under applicable federal and/or state laws and regulations, (ii) compliance with the Fair Credit Reporting Act and the Fair and Accurate Credit Transactions Act and/or (iii) a material breach by Buyer under the Provider Agreement; or (b) Buyer shall be entitled with respect to any breach of the representation contained in Sections 6.4 or 6.5 of this Agreement.

**Section 8.4    Third Party Claims.**    Immediately following the receipt of notice of a third party claim, the party receiving the notice of the third party claim shall notify the other party of its existence setting forth with reasonable specificity the facts and circumstances of which such party has received notice, and if the party giving such notice is an indemnified party, specifying the basis hereunder upon which the indemnified party's claim for indemnification is asserted.  The indemnified party may, upon reasonable notice, tender the defense of a third party claim to the indemnifying party.  If:

(a)    the defense of a third party claim is so tendered and within thirty (30) calendar days thereafter such tender is accepted without qualification by the indemnifying party; or

(b)    within thirty (30) calendar days after the date on which written notice of a third party claim has been given pursuant to this Section 8.4, the indemnifying party shall acknowledge without qualification its indemnification obligations as provided in this Section 8.4 in writing to the indemnified party and accept the defense thereof;

then, except as herein provided, the indemnified party shall not, and the indemnifying party shall, have the right to contest, defend, litigate or settle such third party claim.  The indemnified party shall have the right to be represented by counsel at its own expense in any such contest, defense, litigation or settlement conducted by the indemnifying party, provided that

the indemnified party shall be entitled to reimbursement therefor if the indemnifying party shall lose its right to contest, defend, litigate and settle the third party claim as herein provided. The indemnifying party shall lose its right to contest, defend, litigate and settle the third party claim if it shall fail to diligently contest the third party claim. So long as the indemnifying party has not lost its right and/or obligation to contest, defend, litigate and settle as herein provided, the indemnifying party shall have the exclusive right to contest, defend and litigate the third party claim and shall have the exclusive right, in its discretion exercised in good faith, and upon the advice of counsel, to settle any such matter, either before or after the initiation of litigation, at such time and upon such terms as it deems fair and reasonable, provided that at least ten (10) calendar days prior to any such settlement, written notice of its intention to settle shall be given to the indemnified party and such settlement shall include a full release of the indemnified party. All expenses (including without limitation attorneys' fees) incurred by the indemnifying party in connection with the foregoing shall be paid by the indemnifying party.   No failure by an indemnifying party to acknowledge in writing its indemnification obligations under this Section 8.4 shall relieve it of such obligations to the extent they exist.  If an indemnified party is entitled to indemnification against a third party claim, and the indemnifying party fails to accept a tender of, or assume, the defense of a third party claim pursuant to this Section 8.4, or if, in accordance with the foregoing, the indemnifying party shall lose its right to contest, defend, litigate and settle such a third party claim, the indemnified party shall have the right, without prejudice to its right of indemnification hereunder, in its discretion exercised in good faith and upon the advice of counsel, to contest, defend and litigate such third party claim, and may settle such third party claim, either before or after the initiation of litigation, at such time and upon such terms as the indemnified party deems fair and reasonable, provided that at least ten (10) calendar days prior to any such settlement, written notice of its intention to settle is given to the indemnifying party. If, pursuant to this Section 8.4, the indemnified party so contests, defends, litigates or settles a third party claim for which it is entitled to indemnification hereunder, the indemnified party shall be reimbursed by the indemnifying party for the reasonable attorneys' fees and other expenses of contesting, defending, litigating and/or settling the third party claim which are incurred from time to time, forthwith following the presentation to the indemnifying party of itemized bills for said attorneys' fees and other expenses.

## ARTICLE IX
## FILES AND RECORDS

Section 9.1   Applicable Laws. Each party agrees, at its sole cost and expense, to abide by all applicable state and federal laws, rules and regulations regarding the handling and maintenance of all Accounts and all documents and records relating to the Accounts purchased hereunder including, but not limited to, the length of time such documents and records are to be retained and making any disclosures to Obligors as may be required by law.

## ARTICLE X
## MISCELLANEOUS

Section 10.1   Notices.   Unless otherwise provided for herein, notices and other communications required or permitted hereunder shall be in writing to the parties and addresses below and shall be delivered by certified mail, return receipt requested or express mail, and, if to

Seller, also via facsimile.   Such notice shall be deemed to have been received on the date delivered.

If to Seller:

> Greenfish Fund II, LP
> c/o Weir and Partners LLP
> The Widener Building, Suite 500
> 1339 Chestnut Street
> Philadelphia, PA 19103
> Attn: Steven E. Angstreich, Esq.

If to Buyer:

> International Portfolio, Inc.
> 200 Barr Harbor Drive Suite 400
> West Conshohocken, Pennsylvania 19428
> Attn:  Richard Shusterman
> Telephone:  (610) 724-7064
> Facsimile:  (610) 825-8299

**Section 10.2   Severability.**   If any term, covenant, condition or provision hereof is unlawful, invalid, or unenforceable for any reason whatsoever, and such illegality, invalidity, or unenforceability does not affect the remaining parts of this Agreement, then all such remaining parts hereof shall be valid and enforceable and have full force and effect as if the invalid or unenforceable part had not been included.

**Section 10.3   Rights Cumulative: Waivers.**   The rights of each of the parties under this Agreement are cumulative and may be exercised as often as either party considers appropriate under the terms and conditions specifically set forth.   The rights of each of the parties hereunder shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing.  Any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other such right.  Any defective or partial exercise of any of such rights shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of any party shall in any way preclude such party from exercising any such right or constitute a suspension or any variation of any such right.

**Section 10.4   Headings.**   The headings of the Articles and Sections contained in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**Section 10.5   Construction.**   Unless the context otherwise requires, singular nouns and pronouns when used herein, shall be deemed to include the plural of such noun or pronoun and pronouns of one gender shall be deemed to include the equivalent pronoun of the other gender.

**Section 10.6   Prior Understandings: Entire Agreement.**   This Agreement, the Confidentiality Agreement, and the instruments to be delivered by the parties pursuant to the

provisions hereof constitute the entire agreement between the parties and supersedes all prior agreements between the parties with respect to the subject matter hereof and thereof. To the extent there exists any inconsistency between the provisions of this Agreement and any other agreement entered into between the parties, the provisions of this Agreement shall govern. Each exhibit or schedule shall be considered incorporated into this Agreement. Any amendments, or alternative or supplementary provisions to this Agreement, must be made in writing and duly executed by an authorized representative or agent of each of the parties hereto.

Section 10.7  Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument. The counterparts of this Agreement may be delivered by email in a .pdf file or facsimile by either party to the other party. An emailed .pdf file or facsimile signature page shall be deemed an original.

Section 10.8  Governing Law/Choice of Forum.  This Agreement shall be construed, and the rights and obligations of Seller and Buyer hereunder determined, in accordance with the laws of the Commonwealth of Pennsylvania. The parties agree that any legal actions between Buyer and Seller regarding the purchase of the Accounts hereunder shall be originated in a court of competent jurisdiction in the Commonwealth of Pennsylvania with venue in Montgomery County, Pennsylvania, and each party hereby consents to the jurisdiction of such court in connection with any action or proceeding initiated concerning this Agreement and agrees that service by mail to the address specified in Section 10.1 of this Agreement shall be sufficient to confer jurisdiction over such party in such court. In the event of litigation under this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs.

Section 10.9  No Third-Party Beneficiaries.  Subject to Section 10.14 below, this Agreement is for the sole and exclusive benefit of the parties hereto, and none of the provisions of this Agreement shall be deemed to be for the benefit of any other person or entity.

Section 10.10  Expenses.  Except as otherwise expressly provided in this Agreement, Buyer and Seller will each bear its own out-of-pocket expenses, including fees and disbursements of its attorneys, brokers, consultants and any other agents or representatives, in connection with the transaction contemplated by this Agreement.

Section 10.11  Publicity.  Except as otherwise required by law or other applicable rules and regulations, press releases concerning this transaction shall be made only with the prior agreement of Seller and Buyer. Except as otherwise required by law or other applicable rules and regulations, no such press releases or other publicity shall at any time state the amount of the Purchase Price.

Section 10.12  Non-Waiver.  The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege in this Agreement, or the waiver by said party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving

party. A breach of any representation, warranty or covenant shall not be affected by the fact that a more general or more specific representation, warranty or covenant was not also breached.

   **Section 10.13 <u>Binding Effect; Benefit</u>**. This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their successors and permitted assigns. Nothing in this Agreement, express or implied, is intended to confer on any person other than the parties hereto, *and their respective successors and permitted assigns any rights, remedies, obligations or* liabilities under or by reason of this Agreement.

   **Section 10.14 <u>Transfer/Assignability</u>**. Buyer may sell, transfer, assign or convey all or a portion of its right, title and interest in and to the Accounts or the Provider Agreement without the prior written consent of Seller. Neither party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

   **Section 10.15 <u>Amendments</u>**. This Agreement shall not be modified or amended except pursuant to a written instrument executed and delivered on behalf of each of the parties hereto.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:

GREENFISH FUND II, L.P.

By its General Partner,
Purplefish LLC

By: _____
Name: Eric Raymond
Title:   Managing Partner

BUYER:

INTERNATIONAL PORTFOLIO, INC.

By: _____
Name: Richard Shusterman
Title:   President

IN WITNESS WHEREOF, the parties hereto have executed this Purchase and Sale Agreement as of the day and year first above written.

SELLER:

GREENFISH FUND II, L.P.

By its General Partner,
Purplefish LLC

By:_____
Name: Eric Raymond
Title:  Managing Partner

BUYER:

INTERNATIONAL PORTFOLIO, INC.

By:_____
Name: Richard Shusterman
Title:  President

DT1 858589v2 12/14/09                               16

SCHEDULE NO. 1
ACCOUNT SCHEDULE

| PROVIDER | AGGREGATE # OF ACCOUNTS | AGGREGATE CURRENT BALANCE OF THE ACCOUNTS | | PURCHASE PRICE PERCENTAGE | | AGGREGATE PURCHASE PRICE |
|---|---|---|---|---|---|---|
| JMH | | $20,909,090.91 | x | 10.02002% | = | $2,095,095.10 |
| HMA | | $24,500,000.00 | x | 10.02002% | = | 2,454,904.90 |
| | | | x | | = | |
| | | $45,409,090.91 | x | 10.02002% | = | $4,550,000.00 |

(See Computer Files for detailed list)

## EXHIBIT A
## BILL OF SALE AND ASSIGNMENT OF ACCOUNTS

On the Closing Date, Greenfish Fund II, L.P., a Delaware limited partnership (**"Assignor"**), hereby absolutely sells, transfers, assigns, sets over and conveys to International Portfolio, Inc. (**"Assignee"**), without recourse and without representations or warranties except those as outlined in the Agreement (as defined below), express or implied, of any type, kind or nature:

    (a)    all of Assignor's right, title, and interest in and to each of the Accounts identified in Schedule No. 1 (Account Schedule) to the Agreement (the **"Accounts"** which are also referred to by Assignor as Portfolio 4) together with other evidence of indebtedness, if any; and

    (b)    all principal, interest or other proceeds of any kind with respect to the Accounts, but excluding any payments or other consideration received by or on behalf of Assignor prior to the Cutoff Date (as defined in the Agreement) with respect to the Accounts.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between Assignor and Assignee dated December 14, 2009 (the **"Agreement"**). The Accounts are defined and described in the Agreement, and are being conveyed hereby subject to the terms, conditions and provisions set forth in the Agreement.

This Bill of Sale shall be governed by the laws of the Commonwealth of Pennsylvania without regard to the conflicts-of-laws rules thereof.

DATED:      December 14, 2009

SELLER:     GREENFISH FUND II, L.P.

           By its General Partner,
           Purplefish LLC

           By: _____
           Name: Eric Raymond
           Title:  Managing Partner

DTI 858589v2 12/14/09

EXHIBIT B
WIRE INSTRUCTIONS

*Funds must be wired as follows:*

ABA #:  021000089

Bank:  Citibank N.Y.

For Benefit of:  Morgan Stanley

Beneficiary Account:  40611172

For further credit to:  Greenfish Fund II, LP Port 4

Account #:  476-073121

In order to assure proper allocation of the funds owed to Seller by Buyer, the information listed above must be included on all wire transfers by Buyer to Seller.

B-1

EXHIBIT C
SUBCONTRACTOR BUSINESS ASSOCIATE AGREEMENT

This **SUBCONTRACTOR BUSINESS ASSOCIATE AGREEMENT** (this *"Subcontractor Agreement"*) is made and entered into on December 14, 2009 but shall become effective on March 25, 2010 (the *"Effective Date"*), by and between Greenfish Fund II, L.P. (*"Business Associate"*) and International Portfolio, Inc. (*"Subcontractor"*).

## RECITALS:

WHEREAS, Business Associate has acquired certain uncollected patient accounts (the "Accounts") that were originated by Jackson Memorial Hospital and Health Management Associates (each a *"Covered Entity"*);

WHEREAS, Business Associate is required to comply with certain requirements with respect to the Use and/or Disclosure of Protected Health Information (*"PHI"*) as mandated by the Privacy Standards (45 C.F.R. Parts 160 and 164) and electronic PHI as mandated by the Security Standards (45 C.F.R. Parts 160, 162 and 164) promulgated under the Administrative Simplifications subtitle of the Health Insurance Portability and Accountability Act of 1996 (*"HIPAA"*) as set forth in the applicable business associate addendum (the *"BAA"*) between Subcontractor and Covered Entity;

WHEREAS, pursuant to the terms and conditions of the Purchase and Sale Agreement between Business Associate and Subcontractor of even date herewith, Subcontractor has agreed to purchase and service certain of the Accounts (the *"Services"*); and

WHEREAS, in connection with providing the Services, Subcontractor will have access to PHI and, therefore, agrees to abide by the Privacy Standards and Security Standards, as well any applicable requirements of the BAA, when using and/or disclosing such PHI.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree to the foregoing and as follows:

I.    **DEFINITIONS**

All capitalized terms used herein that are not otherwise defined shall have the same meaning as those terms are defined in the Privacy Standards and Security Standards.

C-1

II.   **OBLIGATIONS OF SUBCONTRACTOR**

A.   **Privacy Standards.**

   *1.   General.* Subcontractor acknowledges and agrees that from and after the Effective Date, Subcontractor shall comply with the following provisions with respect to an Individual's PHI:

   (a)   <u>Safeguards Against Misuse of Information</u>.  Subcontractor shall implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of PHI, and to prevent Use and/or Disclosure of PHI other than as provided for in this Subcontractor Agreement.

   (b)   <u>Reporting of Violations</u>.  Subcontractor shall notify Business Associate within twenty-four (24) hours, and shall provide written notice no later than forty-eight (48) hours, of becoming aware of a Use or Disclosure of Protected Health Information in violation of this Subcontractor Agreement by Subcontractor, its officers, directors, employees, representatives or agents, or by a third party to whom Subcontractor has disclosed PHI, and shall immediately report any such Use or Disclosure to Business Associate.

   (c)   <u>Disclosures to Third Parties</u>.  Subcontractor shall ensure that any representatives or agents to whom Subcontractor provides PHI received from, or created or received by Subcontractor on behalf of, Business Associate agree to the same restrictions and conditions that apply to Subcontractor with respect to such PHI.

   (d)   <u>Availability of PHI</u>.   At Business Associate's request, Subcontractor shall provide access to any PHI not otherwise available to Business Associate, within five (5) calendar days from the date Subcontractor receives any such request so that the Covered Entity can respond to a request from an Individual to have access to, provide a copy of, and account for Disclosures of PHI pursuant to HIPAA, including, but not limited to, 45 C.F.R. §§ 164.524 and 164.528.  If Subcontractor receives any requests directly from an Individual for access to PHI, Subcontractor shall first notify Business Associate before responding to any such requests.

   (e)   <u>Amendment of PHI</u>.   At Business Associate's request, Subcontractor shall provide access to any PHI not otherwise available to Business Associate that is in Subcontractor's possession, within five (5) calendar days from the date Subcontractor receives any such request so that the Covered Entity can respond to a request from an Individual to amend PHI in accordance with 45 C.F.R. § 164.526.  If Subcontractor receives any requests directly from an Individual to amend PHI, Subcontractor shall first notify Business Associate before responding to any such requests.  Additionally, upon notice from Business

DT1 858589v2 12/14/09

Associate, Subcontractor will make any necessary amendments to PHI in Subcontractor's possession.

(f) **Documentation of Disclosures**.   At the request of Business Associate, Subcontractor shall provide an accounting of disclosures of PHI, other than disclosures excepted under 45 C.F.R. § 164.528(a)(1), to Business Associate in a time and manner designated by Business Associate.   Subcontractor shall document any Disclosure of PHI and information related to such Disclosure as required for the Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528(d).  At a minimum, Subcontractor shall document the following information: (A) the date of the Disclosure; (B) the name of the entity or person who received the PHI and, if known, the address of such entity or person; (C) a brief description of the PHI Disclosed; and (D) a brief statement of the purpose of such Disclosure that reasonably informs the Individual of the basis for the Disclosure or, in lieu of such statement, a copy of a written request, if any, for a disclosure under 45 C.F.R. §§ 164.502(a)(2)(ii) or 164.512.

(g) **Internal Practices**.  For purposes of the Secretary determining the Covered Entity's compliance with the Privacy Standards and Security Standards, Subcontractor shall make available to the Covered Entity and/or the Secretary, in a time and manner designated by Business Associate or the Secretary, Subcontractor's practices, books, and records relating to the Use and Disclosure of PHI received from Business Associate, created or received by Subcontractor on behalf of or at the request of Business Associate, or made available to Business Associate.

(h) **Minimum Necessary Use and Disclosure**.   In conducting functions and/or activities under this Subcontractor Agreement that involve the Use and/or Disclosure of PHI, Subcontractor shall make reasonable efforts to limit the Use and/or Disclosure of PHI to the minimum necessary in accordance with 45 C.F.R. § 164.514(d) to accomplish the intended purpose of the Use or Disclosure.

2.    *Permitted Uses and Disclosures of PHI*.  Subcontractor may only Use or Disclose PHI to secure payments from patients and such other functions, activities, or services for, or on behalf of, Business Associate as specified in this Subcontractor Agreement and/or the BAA or as required by law.   Notwithstanding the foregoing, Subcontractor shall not, and shall ensure that its directors, officers, representatives, agents and employees do not, disclose PHI if such Use or Disclosure would violate HIPAA.

B.    Security Standards. Subcontractor agrees that it will comply, and cause all of its employees, agents and representatives to comply, with the applicable requirements of the Security Standards, including, but not limited to the following:

*1.* ⸱ *Security Safeguards.*   Subcontractor shall implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic PHI that it creates, receives, maintains or transmits on behalf of Business Associate as required by the Security Standards;

*2.* *Disclosure to Third Parties.*   Subcontractor shall ensure that any agent, including a subcontractor, to whom it provides the electronic PHI agrees to implement reasonable and appropriate safeguards to protect such information; and

*3.* *Reporting of Violations.*   Subcontractor shall report to Business Associate any Security Incident of which it becomes aware within twenty-four (24) hours, and shall provide written notice no later than forty-eight (48) hours of such Security Incident.

## III.   TERM AND TERMINATION ⸱

**A.   Term.**   The term of this Subcontractor Agreement shall be effective as of the Effective Date, and shall terminate when Subcontractor no longer owns the Accounts or provides the Services; provided, however, that notwithstanding the termination of this Subcontractor Agreement, Subcontractor shall be required to comply with **Section III.C.** below.

**B.   Failure to Comply with HIPAA Obligations.**

*1.* *Mitigation Obligation.*   If, following the Effective Date, Subcontractor violates any of its obligations under **Section II**, Subcontractor shall, at its sole cost and expense, immediately take all steps necessary to mitigate the harmful effects of such violation, if any.

*2.* *Termination.*   If, following the Effective Date, Subcontractor notifies Business Associate or Business Associate otherwise has reason to believe, that Subcontractor has violated a material term of any of the requirements set forth in this Subcontractor Agreement, Business Associate shall have the right, in its sole discretion, to immediately terminate this Subcontractor Agreement.   Further, Business Associate may terminate this Subcontractor Agreement effective immediately, if (i) Subcontractor is named as a defendant in a criminal or administrative proceeding for a violation of HIPAA, or (ii) a finding or stipulation that Subcontractor has violated any standard or requirement of HIPAA (or other security or privacy law) is made in any administrative or civil proceeding.

**C.   Effect of Termination.**   Except as set forth in this **Section III.C.**, upon termination of this Subcontractor Agreement for any reason, at the request of Business Associate, Subcontractor shall return or destroy all PHI received from Business Associate, or created or received by Subcontractor on behalf of Business Associate.   This provision shall also apply to PHI that is in the possession of employees, representatives or agents of Subcontractor. Subcontractor and its employees, representatives and agents shall not retain any copies of the

DT1 858589v2 12/14/09

PHI.   In the event that Subcontractor determines that returning or destroying the PHI is infeasible, Subcontractor shall provide to Business Associate written notification of the conditions that make return or destruction infeasible.  If Business Associate agrees that return or destruction of PHI is infeasible, Subcontractor shall extend the protections of this Subcontractor Agreement to such PHI and limit further Uses and Disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Subcontractor maintains such PHI. Notwithstanding the foregoing, if the parties determine that return or destruction of PHI is infeasible, Subcontractor shall continue to make PHI available to Business Associate and the Covered Entity, so that Business Associate and the Covered Entity can comply with **Sections II.A.1(d)-(g)** of this Subcontractor Agreement.

## IV.    MISCELLANEOUS

    **A.    State Law Requirements.**  To the extent the applicable laws and regulations of any state that apply to this Subcontractor Agreement are More Stringent than those set forth in the Privacy Standards, any Use or Disclosure of PHI by Subcontractor shall be made in accordance with such laws and regulations.

    **B.    Training of Subcontractor's Employees.**  Subcontractor represents and warrants to Business Associate that Subcontractor's employees, agents, representatives, and subcontractors who will have access to PHI after the Effective Date will have: (1) been provided with general HIPAA-related training and education; and (2) specific knowledge of Subcontractor's HIPAA-related responsibilities and contractual requirements to Business Associate (including applicable state laws and regulations), in each case prior to being allowed to have access to PHI.

    **C.    Interpretation.**  This Subcontractor Agreement shall be interpreted as broadly as necessary to implement and comply with HIPAA, the HIPAA Regulations and applicable state laws.  The parties agree that any ambiguity in this Subcontractor Agreement shall be resolved in favor of a meaning that complies and is consistent with HIPAA and the HIPAA Regulations.

    **D.    Changes or Modifications to HIPAA and/or HIPAA Regulations.**  If, following the Effective Date, HIPAA and/or the Privacy Standards or the Security Standards are modified, and/or additional regulations are issued pursuant to HIPAA, the parties agree to work together in good faith to amend this Subcontractor Agreement so that the parties hereto remain in compliance with such regulations.

    **E.    Indemnity for Third Party Claims.**  In the event of a breach of this Subcontractor Agreement, Subcontractor shall indemnify, defend and hold Business Associate and the Covered Entity and their affiliates, respective members, directors, officers, shareholders, employees, representatives, agents, attorneys, successors, and assigns, harmless from and against any and all third-party claims, damages, liabilities, judgments, fines, assessments and/or other losses and expenses (including reasonable attorneys' fees) arising out of or relating to any failure by Subcontractor to comply with the terms of this Subcontractor Agreement (including any HIPAA-related obligations under applicable state laws and regulations).

DT1 858589v2 12/14/09

**F.     Injunctive Relief.**  Subcontractor agrees that the remedies at law for a breach by it of the terms of this Subcontractor Agreement may be inadequate and that monetary damages resulting from such breach may not be readily measured.  Accordingly, in the event of a breach or threatened breach by Subcontractor of the terms of this Subcontractor Agreement, Business Associate shall be entitled to immediate injunctive relief.  Nothing herein shall prohibit Business Associate from pursuing any other remedies that may be available to it for such breach.

**G.     Counterparts; Attachments.**  This Subcontractor Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.  The counterparts of this Subcontractor Agreement may be executed and delivered by facsimile or .pdf signature by either party to the other party.  A facsimile or emailed .pdf file signature page shall be deemed an original.

**H.     Survival.**  The obligations of Subcontractor under **Sections III.C.** and **IV.E.** of this Subcontractor Agreement shall survive the termination of this Subcontractor Agreement.

**I.     Entire Agreement.**  This Subcontractor Agreement constitutes the entire agreement between the parties and supersedes all prior negotiations, discussions, representations, or proposals, whether oral or written, unless expressly incorporated herein, related to the subject matter of this Subcontractor Agreement.  Unless otherwise expressly provided herein, this Subcontractor Agreement may not be modified unless in writing signed by the duly authorized representatives of the parties.  If any provision or part thereof is found to be invalid, the remaining provisions shall remain in full force and effect.

**J.     Third Party Beneficiaries.**  Except as otherwise provided for in the Privacy Standards or this Subcontractor Agreement, the Covered Entity shall be the only third party beneficiary to this Subcontractor Agreement.  Subcontractor's obligations are to Business Associate and the Covered Entity with respect to the handling of PHI.

**K.     Successors and Assigns.**  This Subcontractor Agreement will inure to the benefit of and be binding upon the successors and assigns of both parties.  However, this Subcontractor Agreement is not assignable by any party without the prior written consent of the other party.

**L.     Assistance in Litigation or Administrative Proceedings.**  Subcontractor shall make itself, and any employees, agents or representatives assisting Subcontractor in the performance of its obligations under this Subcontractor Agreement, available to Business Associate and/or the Covered Entity upon reasonable notice, at Business Associate's and/or the Covered Entity's expense, to testify as witnesses, for document production, or otherwise, in the event of litigation or administrative proceedings being commenced against Business Associate and/or the Covered Entity, their respective members, trustees, officers, agents or employees based upon an alleged violation of HIPAA, the HIPAA Regulations or other laws relating to security and privacy, except where Subcontractor or its employee, agent or representative is a named adverse party.  In such event, such adverse party shall be responsible for all of its expenses.

DTI 858589v2 12/14/09

**M.    Location of Services.**   Subcontractor shall perform all Services in the United States.

**N.    Independent Contractor.**   The relationship between the parties will be solely that of independent contractors contracting with each other solely for the purposes of effecting the provisions of this Subcontractor Agreement.

**O.    Expenses.**   Any and all expenses incurred by Subcontractor in compliance with the terms of this Subcontractor Agreement shall be borne by Subcontractor.

**IN WITNESS WHEREOF,** duly authorized representatives of the parties have executed this Subcontractor Business Associate Agreement as of the Effective Date.

BUSINESS ASSOCIATE:

GREENFISH FUND II, L.P.

By its General Partner,
Purplefish LLC

By:_____
Name: Eric Raymond
Title:   Managing Partner

SUBCONTRACTOR:

INTERNATIONAL PORTFOLIO, INC.

By:_____
Name: Richard Shusterman
Title:   President

C-7

**M.**    **Location of Services.**  Subcontractor shall perform all Services in the United States.

**N.**    **Independent Contractor.**  The relationship between the parties will be solely that of independent contractors contracting with each other solely for the purposes of effecting the provisions of this Subcontractor Agreement.

**O.**    **Expenses.**  Any and all expenses incurred by Subcontractor in compliance with the terms of this Subcontractor Agreement shall be borne by Subcontractor.

**IN WITNESS WHEREOF,** duly authorized representatives of the parties have executed this Subcontractor Business Associate Agreement as of the Effective Date.

**BUSINESS ASSOCIATE:**

**GREENFISH FUND II, L.P.**

By its General Partner,
Purplefish LLC

By:_____
Name: Eric Raymond
Title:  Managing Partner

**SUBCONTRACTOR:**

**INTERNATIONAL PORTFOLIO, INC.**

By:_____
Name: Richard Shusterman
Title:  President

C-7